IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 19-CR-00224-PAB

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

DAKOTA MICHAEL HELLER,

    Defendant.
_____

REPORTER'S TRANSCRIPT
Trial to Jury, Vol. 1
_____

    Proceedings before the HONORABLE PHILIP A. BRIMMER, Chief Judge, United States District Court for the District of Colorado, commencing at 8:05 a.m., on the 28th day of October, 2019, in Courtroom A701, United States Courthouse, Denver, Colorado.

APPEARANCES

    Patricia Davies and Andrea Surratt, U.S. Attorney's Office, 1801 California Street, Suite 1600, Denver, CO 80202, appearing for the plaintiff.

    Kelly Christl, Natalie Stricklin and Jacob Rasch-Chabot, Office of the Federal Public Defender, 633 17th Street, Suite 1000, Denver, CO 80202, appearing for the defendant.

Proceeding Recorded by Mechanical Stenography, Transcription Produced via Computer by Janet M. Coppock, 901 19th Street, Room A257, Denver, Colorado, 80294, (303) 335-2106

```
 1                          PROCEEDINGS

 2            THE COURT:  The matter before the Court is United

 3    States of America versus Dakota Michael Heller.  This is

 4    Criminal Case 19-CR-224.

 5            I'll take entries of appearance, please.

 6            MS. DAVIES:  Good morning, Your Honor.  Patricia

 7    Davies for the United States along with Andrea Surratt and

 8    Special Agent Philip Jones with the FBI.

 9            THE COURT:  Good morning to each of you.

10            On behalf of Mr. Heller?

11            MS. CHRISTL:  Good morning, Your Honor.  Kelly Christl

12    and Natalie Stricklin on behalf of Mr. Heller.

13            THE COURT:  And Mr. Heller is here.  He is on bond.

14    Good morning to you.

15            We are here for the first day of trial in this matter,

16    so let's go over just a few things before we potentially wait

17    for a long time to get enough jurors.  So remember, seat No. 7

18    is our alternate seat.  You should not during the course of

19    voir dire or any other time identify who that person is, okay?

20    That person should not know that he or she is the alternate.

21            Let's talk about the issue of sequestration.  We

22    brought that up on Friday.  Since that time the government

23    filed Docket No. 103 bringing up the statute 18, United States

24    Code, Section 3771, specifically (a)(3) of that.  Any

25    additional evidence or showing on behalf of Mr. Heller that
```

1   there would be clear and convincing evidence that the victim's

2   testimony would be materially altered if we proceeded in the

3   way that the government indicates that it intends to proceed,

4   namely that Christopher would be brought in to testify at some

5   point in time and then he would request to remain in the

6   courtroom after that fact?

7        MS. CHRISTL:  Your Honor, we do object.  I know the

8   government disagrees with this, but I think that there are

9   several points of impeachment with regard to all of the

10  statements that Christopher gave in this case, and therefore we

11  believe that there is clear and convincing --

12       THE COURT:  Well, he will be cross-examined

13  presumably.  So if he is called and if he is cross-examined and

14  then remains in the courtroom afterwards -- now, presumably if

15  Mr. Heller testifies, he would listen to Mr. Heller testify,

16  but if he has already been asked questions on cross, what

17  would -- what's the clear and convincing evidence that somehow

18  his testimony would be materially altered were he to testify

19  after that?

20       MS. CHRISTL:  Your Honor, I think if he were called in

21  a rebuttal, as a rebuttal witness by the government, because he

22  has given so many inconsistent statements or omitted things

23  previously when he has talked to the FBI special agent and the

24  government, that I think that it's likely for that to happen

25  going forward.  And for that reason we believe he should not be

1   allowed to remain in the room.

2          THE COURT:  Okay.  That objection will be overruled.

3   To the extent that Christopher has given a lot of different

4   inconsistent statements, that's already happened.  He can be

5   asked about those and, you know, not suggesting what Mr. Heller

6   has to do, but he would certainly be allowed or at least it

7   would be an option to cross-examine Christopher on all of those

8   things.  And there has been no clear and convincing showing

9   that somehow listening to Mr. Heller's testimony were he to

10  decide to testify, that Christopher's testimony on rebuttal

11  were he to be called would be materially altered as a result.

12         So I will allow the government to go ahead and have

13  Christopher remain in the courtroom after he testifies as the

14  government indicated it intended to do.

15         MS. SURRATT:  Our paralegal, Mike Price, who is

16  sitting in the back of the courtroom will be in the courtroom

17  for most of this trial.  We do not expect to call him as a

18  witness unless after Special Agent Jones has to leave we need

19  Mr. Price to authenticate evidence off of the cellphone,

20  meaning Mr. Price would say I reviewed the Cellebrite report

21  and I found government exhibit such and such on the Cellebrite

22  report.  But it would be purely for authentication, and as the

23  Court knows, the Cellebrite dump itself is already stipulated

24  to, so we ask that Mr. Price be also exempted from the

25  sequestration order.

1          THE COURT:  And what's the purpose of Mr. Price

2    staying in the courtroom to begin with?

3          MS. SURRATT:  He is our paralegal and will be running

4    Trial Director or at least sharing the duties of Trial

5    Director.

6          THE COURT:  Any objection?

7          MS. CHRISTL:  No, Your Honor.  I think that's pretty

8    unlikely to happen.  And we might be able to resolve anything

9    like that by stipulation where he wouldn't have to be called to

10   testify.

11         THE COURT:  Then Mr. Price will be able to remain in

12   the courtroom.

13         Then let's talk about some other issues.  So we had

14   talked on Friday about letting the jury know during the voir

15   dire process that unlike the expectation that some of the

16   jurors may have that consent of a minor is irrelevant, that in

17   this case it's relevant, and we are going to notify the jury of

18   that.  Thoughts about how and when that should be done, first

19   of all, on behalf of the United States?

20         MS. DAVIES:  Your Honor, there is a jury instruction I

21   drafted and I sent over to the FPD.  And they have made some

22   additions and we do not object to it.  And I have it in one

23   these folders.

24         THE COURT:  Okay.  Yeah, assuming -- and this is

25   acceptable to the defendant?

1           *MS. CHRISTL:*  Yes, Your Honor.

2           *THE COURT:*  Yeah, I will read this instruction which I

3    think is good early on, not necessarily with the other

4    instructions, but very close to when I read some of the other

5    instructions like presumption of innocence, duty to testify,

6    that type of thing.  That's great.

7           Okay.  Any questions that anyone thought of about voir

8    dire mechanics, anything like that?  No?  So we talked about

9    having openings 30 minutes.  That's a long time, but, you know,

10   I will let you do it if you need to.  Hopefully we'll get

11   underway without too much delay.  Any request for me to give

12   the government a heads-up when a certain amount of time is

13   left?

14          *MS. DAVIES:*  Not with respect to opening, your Honor.

15   I am not going to approach 30 minutes.

16          *THE COURT:*  Any request by the defense?

17          *MS. CHRISTL:*  No, Your Honor, same.  I am not going to

18   be anywhere close to that.

19          *THE COURT:*  Of course, were you to hit 30 minutes, I

20   would say something, but it doesn't sound like that's a

21   problem.

22          So during the course of the trial, I want you to stay

23   within arm's length of the podium and the table up there.  The

24   way that the furniture is set up, you are kind of corralled.

25   You can come around the other side, but I don't want you

1    wandering around the courtroom.  For purposes of opening and

2    closing, if you want to go midway here out away from the

3    podium, you can.  It's hard to drag the podium around with you,

4    but if you want to -- because you have got your openings

5    memorized or you can hold your notes, you can certainly come in

6    front here if you want to do that.

7          I will read a list of the witnesses in alphabetical

8    order.  Any changes in the witness list?  In other words, have

9    we dropped anyone?

10         *MS. DAVIES:*  We have not dropped anyone yet, Your

11   Honor, but we are mindful of the weather if needed.

12         *THE COURT:*  Let me just go over a few of the names.

13   Is it Susan Burchett or is it Burchett?

14         *MS. CHRISTL:*  Burchett, Your Honor.

15         *THE COURT:*  Burchett, okay.  Is it Gabe Kinszley?

16         *MS. DAVIES:*  That is correct, Your Honor.

17         *THE COURT:*  Josh Korac?

18         *MS. CHRISTL:*  Yes, Your Honor.

19         *THE COURT:*  Is it Quesada?

20         *MS. DAVIES:*  Quesada is my understanding, Your Honor.

21         *THE COURT:*  All right.  And then I will introduce

22   members of the court staff who are in the courtroom, and then

23   I'll have each side introduce themselves as well.  So, you

24   know, be prepared for that.

25         All right.  Anything else that we should take up

1    before we wait until we've got enough jurors?

2         *MS. DAVIES:*  Your Honor, this is obviously a minor

3    point, but in this courtroom what is the Court's preference?

4    It feels rude to have our backs to the jury.  Where do you

5    normally have counsel sit for this table?

6         *THE COURT:*  It's up to you.  You can do it however you

7    want.  I am always stunned when people have, lawyers or anyone,

8    with their backs to the jury.

9         *MS. DAVIES:*  Thank you.

10        Anything else?  Anything on behalf of -- go ahead.

11        *MS. SURRATT:*  Your Honor, we raised on Friday the

12   issue of a dispute over which portions of what we have been

13   calling the confrontation audio should be played.

14        *THE COURT:*  Right.

15        *MS. SURRATT:*  We have between the parties narrowed

16   down what the precise objections are.  And to the extent we

17   have time right now, we would like to bring those objections to

18   the Court's attention.

19        *THE COURT:*  What are we looking like?  Do we have any

20   idea, Ms. Grimm?

21        *COURT DEPUTY CLERK:*  We have 49 jurors downstairs.

22        *THE COURT:*  Yeah, we won't do that now.

23        Anything on behalf of Mr. Heller?

24        *MS. CHRISTL:*  No, Your Honor.

25        *THE COURT:*  Then we will be in recess until such time

1    as we have got enough jurors to proceed.  That magic number is

2    50.

3         (Recess at 8:17 a.m.)

4         (Reconvened at 8:58 a.m.)

5         *THE COURT:*  Welcome everybody to the United States

6    District Court for the District of Colorado.  We are here today

7    for jury selection in a case, obviously.  First of all, let me

8    thank you for appearing in response to a summons.  It was tough

9    sledding out there today, but yet we got an earlier start than

10   we thought.  I really appreciate the effort.

11        Jury service, as I am sure you understand, is one of

12   the most important civic obligations that a United States

13   citizen has.  It guarantees that the parties to the case have a

14   case decided by people from the community as opposed to

15   professional judges or someone like that.  It's part of the

16   common law system, of course, that came over from England.

17        Just to give you a sense of how much trust is placed

18   in people like yourselves, people called from the community for

19   jury service, some of you may have heard about the case that

20   was going on out in San Francisco, *Apple v. Samsung*.  It

21   involved patents for the iPhone, really complicated issues in

22   that case having to do with, you know, programming, all sorts

23   of things like that, a case worth hundreds of millions of

24   dollars, and yet people just like yourselves were called to

25   decide that particular case.

1            To give you a sense -- another way to look at it,

2      ladies and gentlemen, every single person in this courtroom,

3      myself included, is just one traffic accident away from being

4      either a plaintiff in a case or a defendant in a case.  And

5      certainly if it was your day to begin your trial, you would

6      want the people who show up for jury duty to take the process

7      seriously, to answer the questions truthfully so that you would

8      have a fair trial.

9            My name is Philip Brimmer.  I am the judge who is

10     presiding over this particular case.  And the name of the case

11     that we are convened for is United States of America v. Dakota

12     Michael Heller, Case 19-CR-224.  This is a criminal case.  So

13     in this particular case, ladies and gentlemen -- some of you

14     may have served on a jury.  We will ask about that at some

15     point today -- you may have served on a civil case before.  In

16     a civil case the burden of proof is preponderance of the

17     evidence.  In a criminal case the burden of proof is different.

18     The burden of proof is beyond a reasonable doubt, so that's a

19     difference.

20           The Indictment in this particular case charges

21     Mr. Heller with knowingly engaging in sexual contact with

22     another person without that person's permission.  Keep in mind,

23     ladies and gentlemen, that this is only a charge.  Mr. Heller

24     is presumed innocent unless proven guilty.

25           Let me also talk a little bit about the nature of this

1    particular case.  The alleged victim in the case at the time of

2    the alleged sexual contact was 16, so the person was a minor.

3    However, let me read you the following instruction that I

4    anticipate giving regarding the victim's age in relationship to

5    the particular statute charged against Mr. Heller in this case.

6         The alleged victim's age is not an element of the

7    charged offense.  That the alleged victim was a minor, namely

8    under the age of 18, does not mean that he was legally unable

9    to consent to any sexual contact with an adult.  The age of

10   consent under federal law is 16, all right?

11        Also, ladies and gentlemen, another thing about this

12   particular case, and that is the alleged victim in the case

13   will be referred to by a pseudonym, in other words, not the

14   person's real name.  The pseudonym that the person will be

15   referred to is Christopher, all right?  Due to the nature of

16   this case, namely one involving a charge of sexual contact, the

17   use of a pseudonym is common and is permissible, so that's what

18   people will be referring to the alleged victim as, Christopher.

19        Let me now, ladies and gentlemen, read a couple of

20   other jury instructions to you at this time just to inform you

21   for purposes of jury selection of some of the principles that

22   will be in operation in the trial.  The government has the

23   burden of proving a defendant guilty beyond a reasonable doubt.

24   The law does not require a defendant to prove his innocence or

25   produce any evidence at all.  The government has the burden of

1    proving the defendant guilty beyond a reasonable doubt, and if

2    it fails to do so, you must find the defendant not guilty.

3          Proof beyond a reasonable doubt is proof that leaves

4    you firmly convinced of the defendant's guilt.  There are few

5    things in this world that we know with absolute certainty and

6    in criminal cases the law does not require proof that overcomes

7    every possible doubt.  It is only required that the

8    government's proof exclude any reasonable doubt concerning the

9    defendant's guilt.  A reasonable doubt is a doubt based on

10   reason and common sense after careful and impartial

11   consideration of all the evidence in the case.

12         If based upon your consideration of the evidence you

13   are firmly convinced that the defendant is guilty of the crime

14   charged, you must find him guilty.  If, on the other hand, you

15   think there is a real possibility that he is not guilty, you

16   must give him the benefit of the doubt and find him not guilty.

17         Here is another instruction and I will read it at this

18   time.  You must understand that the Constitution of the United

19   States grants to a defendant the right to remain silent.  That

20   means the right not to testify.  That is a constitutional right

21   in this country.  It is very carefully guarded.  And you must

22   not presume or infer guilt from the fact that a defendant does

23   not take the witness stand and testify or call any witnesses.

24         All right.  Ladies and gentlemen, what we're going to

25   do this morning is we're going to pick a jury that consists of

1    12 regular jurors and one alternate.  Let me begin by

2    introducing the members of my staff who will be helping out

3    during the course of the trial.

4            Ms. Sabrina Grimm is seated right over there.  If you

5    are on the jury, she will be the person that you have most of

6    your contact with from my staff.  My court reporter is sitting

7    right in front of me, Ms. Janet Coppock.  She is taking down

8    everything that we say.  So during the course of jury selection

9    this morning, it's important that you respond to any question

10   verbally.  So, for instance, if you nodded your head up or

11   down, that wouldn't work because she wouldn't have anything to

12   take down.  So we may remind you at some point, is that a yes,

13   is that a no, that type of thing.  But she is taking everything

14   down.  And we are going to be using the microphones that you

15   see on those stands as well, so we will be passing those

16   around.

17           Mr. Tony Binder is seated over by Ms. Grimm.

18   Mr. Binder is my law clerk.  He will be coming in and out of

19   the courtroom as he may need to.

20           At this time let me have the parties to the case

21   introduce themselves, and I'll start first of all with the

22   United States.  Ms. Davies?

23           *MS. DAVIES:*  Good morning.  I am Patricia Davies.  I

24   am an Assistant United States Attorney.  This is my colleague,

25   Andrea Surratt, who is also a United States Attorney, and

1    Special Agent Philip Jones of the FBI.

2         *THE COURT:*  Thank you.

3         Ms. Christl?

4         *MS. CHRISTL:*  Thank you, Your Honor.  My name is Kelly

5    Christl.  I, along with my colleague Natalie Stricklin,

6    represent Dakota Heller.  Thank you.

7         *THE COURT:*  Ladies and gentlemen, this trial is set

8    for three days.  However, keep in mind that there is no limit

9    on the amount of time that the jury can deliberate, all right?

10        The hours, because of jury selection, I am not sure

11   exactly how today will play out.  We'll see.  But beginning

12   tomorrow we will convene at 8:30.  There will be a mid-morning

13   break at 10:15 for about 15 minutes.  Then at noon we will

14   break for lunch.  We will come back at 1:30.  In the afternoon

15   we will have a 15-minute break, usually at 3:15, and then at

16   5:00 o'clock we will recess for the day.

17        Today we will see how things go, but we will probably

18   plan on taking that mid-morning break at around 10:15.

19   However, this is not an endurance contest.  So if one of you

20   really needs to take a break, raise your hand.  We'll take a

21   break.  But keep in mind the following.  I don't mean to deter

22   you, but if one person takes a break, we all take a break

23   because those of you in the back, one of you can't like sneak

24   out the back and use the restroom quickly, something like that,

25   because we all have to hear what's going on in the courtroom,

1    okay?

2          If we do take a break and you see some of the

3    attorneys or the parties in the hallway, they will try to avoid

4    you.  You should try to avoid them, not that they are not

5    friendly people, they are friendly people, but we just don't

6    want there to be an appearance that one of them is lobbying you

7    or, you know, chatting you up or something of that nature.  So

8    they are under orders to try to steer clear of you.  You can

9    help, make sure that you identify yourselves as jurors by

10   keeping those yellow juror buttons visible as best you can, all

11   right?

12         All right.  Ladies and gentlemen, once upon a time

13   before the invention of cellphones that had internet access, we

14   didn't have to worry about this too much, but now we do, and

15   that is obviously if you have a phone with internet connection,

16   you can look up all sorts of information.  That can be a

17   problem in a case in trial because the jury has to base its

18   verdict on just the evidence presented during the trial.  So I

19   am going to order you until such time as you are released from

20   jury duty in this case not to look up any information about

21   this case, about the attorneys, about some term that you may

22   hear.  You may hear some legal term, but that term will have to

23   be defined for you during the course of the trial.

24         Don't ask anyone else to look up information.  Don't

25   use a dictionary.  Don't look up anything at all, okay?  It's

1   really important that you follow that particular admonition.

2   Let me give you an example of why.  Several years ago there was

3   a trial in this courthouse.  It was a charged criminal case.

4   It was charged under the Lacey Act.  The Lacey Act prohibits

5   the importation of animal parts into the United States unless

6   that particular animal was lawfully shot.

7          Well, this case involved a leopard that was -- for

8   which the hunter had a license for South Africa, but the

9   allegation was that the leopard was actually shot across the

10  border in Namibia.  That border was a dry river bed, so the

11  case turned on exactly where the border was, where this river

12  bed was.  And the judge told the jury, just like I'm telling

13  you, don't look up any information about the case.

14         Well, one of the jurors thought it might be a good

15  idea for her to download a lot of satellite photos of this

16  particular river bed and brought them into the jury room.  Of

17  course, the other jurors notified the judge what she had done

18  and then the judge had to declare a mistrial in the case.  The

19  question then became whether the juror would have to pay the

20  cost of the retrial, keeping in mind that witnesses had to be

21  flown in from Africa for the trial, so it's really important

22  that you follow that particular admonition.

23         The process of selecting a jury, ladies and gentlemen,

24  is to determine whether each of the persons can be fair and

25  impartial to both sides and also base the verdict on the law

1    that I give to them as opposed to some personal opinion they

2    may have as to the law.  So to accomplish that, I am going to

3    ask you a series of questions.  Also, I am going to give the

4    lawyers on each side an opportunity to ask questions of you as

5    well.

6          If -- certainly none of us intend to ask you a

7    question that would have the effect of embarrassing you, but if

8    one of the questions posed to you would embarrass you, you

9    don't want to be answer and be heard by everyone, let me know

10   and we can bring you up to the bench.  I have a microphone up

11   here, and your answer would be heard by me and it would be

12   heard by the attorneys, but it wouldn't be heard by the entire

13   courtroom.  So if that happens, let me know.

14         Ladies and gentlemen, in answering the questions, you

15   need to answer them truthfully and completely.  And in order to

16   do that, just like any witness in a case, you need to take an

17   oath.  So if each of the prospective jurors would please stand,

18   raise your right hand.  Ms. Grimm will administer that oath to

19   you.  And if you agree, say "I do."  If goes for everyone in

20   the back too.  Thank you.

21         (Prospective jurors were sworn:)

22         *PROSPECTIVE JURORS:*  I do.

23         (Jury selection was sealed.)

24         *THE COURT:*  Okay.  So the rest of you, I really

25   appreciate your coming in, especially those of you in the back.

 1    You listened really patiently the entire time.  And as you can

 2    see, we had some people being excused and randomly being called

 3    up.  So thanks for listening.  Thanks for coming in today.  I

 4    know the weather was rough.  Those of you in the nice folding

 5    chairs, we came close, but it turns out we don't need your

 6    service.  So once again, thank you very much on behalf of the

 7    Court.

 8         All right.  Each of you is excused.  Thank you very

 9    much.

10         The attorneys can be seated.  Thank you.

11         So before you get too skinny since we are almost at

12    1:00 o'clock, you may be hungry, let me give you just a few

13    quick pieces of information about your jury service.  First of

14    all, from here on out when you come or go from the courtroom,

15    you will be going out the door right here because the jury room

16    is just across the hall.  Ms. Grimm will be giving you a key

17    card that will allow you to get in through the controlled door

18    which is down the hallway.  You'll see that.

19         You can leave your valuables back in the jury room

20    because very few people are able to come up and down that

21    hallway.  I would recommend that you turn your cellphones off

22    and leave them back there.  You can bring them in the

23    courtroom, but you obviously can't answer your phone in here

24    and you don't want them going off in here either, so it's

25    usually safer to leave them back there.

1          In the courtroom you can bring in water if you would

2    like, but don't bring in any other type of thing to drink or

3    eat, okay?  I don't allow anyone during the course of the trial

4    to chew gum, so don't chew gum either.  Also keep that

5    admonition that I mentioned about not looking any information

6    up firmly in mind, okay?

7          Also, I know because of the weather if you go outside

8    the courthouse for lunch, and you are perfectly free to do

9    that, to the best of your ability try to keep your juror

10   buttons visible if you go to a restaurant or something of that

11   nature.  That will help because there are witnesses, they don't

12   know who you are, and so it would help if you would do that.

13   And if you can try to keep them visible to the best of your

14   ability if you are out in the hallways, that would be great as

15   well.

16         One of you is the alternate.  It could be anyone.  It

17   randomly -- I just pick a random seat who will be the

18   alternate.  When you come back, ladies and gentlemen, from

19   lunch, I am going to read you a preliminary jury instruction.

20   At that time you are going to hear the opening statements.

21   Mr. Heller doesn't have to give an opening statement at all and

22   he can wait until whether he chooses to present evidence as

23   well, we will see, but we will hear opening statements, and

24   then after that the government will begin presenting its

25   evidence.

1          From here on out whenever you leave the courtroom or

2     come back into the courtroom, we will all stand for you.

3     That's out of respect for the jury.  Once you get to your

4     seat -- I would like you to keep your same seats that you are

5     sitting in right now -- just go ahead and sit down.  We will

6     all be standing, but we are just waiting for you.  And then

7     once everyone is seated in the jury, then I will instruct

8     everyone else in the courtroom to go ahead and have a seat at

9     that time, all right?

10         Let's look at our clock.  So it's almost 1:00 o'clock.

11    Why don't we plan on reconvening at 2:30, okay?  We will take

12    an hour and a half for lunch.  We still will be breaking at the

13    same time I mentioned before, ladies and gentlemen, at 5:00,

14    but we'll probably take a mid-afternoon break at a little

15    different time because the afternoon will be fairly short.

16         If any of you need a letter for your employer, for

17    instance, indicating that you are on jury duty, we can be -- we

18    will be happy to provide that.  Just let Ms. Grimm know, okay?

19    Ladies and gentlemen, at this time you are excused for the

20    lunch recess.

21         (Jury excused.)

22         *THE COURT:*  We didn't do too bad.

23         Anything on behalf of the United States before we

24    break for lunch?

25         *MS. SURRATT:*  No, Your Honor, just at some point today

1   we would like to take up the issue of the transcripts.

2          THE COURT:  Do you think you will get to the

3   transcripts today?

4          MS. SURRATT:  No, but we will definitely need to fix

5   the recordings and the transcripts tonight to the extent

6   something needs to be fixed.

7          THE COURT:  Sure.  We have our jury instruction

8   conference tonight too, but let's plan on taking that up, then,

9   sometime after 5:00.

10          MS. SURRATT:  Your Honor, Ms. Davies reminds me that

11   we had hoped to open on some of the issues that are in dispute,

12   but I assume that's not of concern for the Court.

13          THE COURT:  Well, try to work them out with the

14   attorneys on the other side just so we can try to skirt those;

15   but if there is a dispute, best to avoid it.

16          MS. SURRATT:  Your Honor, if it would be at all

17   helpful to the Court, I have marked copies of the transcripts

18   where the issues in dispute are.

19          THE COURT:  That would be helpful.  If you don't mind

20   providing those to Mr. Binder.

21          MS. SURRATT:  I will, Your Honor.

22          So the Court knows what is in blue and yellow are the

23   things that the defense marked as objectionable.  Yellow is the

24   stuff we are not going to fuss about.  We're going to agree

25   with the defense and we'll keep it out.  The blue is what the

1   government believes should come in over the defendant's

2   objection.

3          We will talk more about this later, but just so the

4   Court knows, the entirety of the audio recording is an hour

5   long.  What we intend to play in court is already only 19

6   minutes, so we have already pared down what we think is

7   objectionable or not relevant down to 19 minutes.  So now what

8   we are fighting about is what's left in that 19 minutes the

9   government intended to play.

10         THE COURT:  Okay.  Thank you.

11         Anything on behalf of Mr. Heller?

12         MS. STRICKLIN:  No, Your Honor.  Thank you.

13         THE COURT:  Then we will be in recess until 2:30.

14   Thank you.

15      (Recess at 1:00 p.m.)

16      (Reconvened at 2:35 p.m.)

17         THE COURT:  We are back on the record in the Heller

18   matter.  The jury is not present.  Over the lunch hour the

19   defendant filed a motion to reconsider my ruling on a motion *in*

20   *limine*.  This is Docket No. 104.  The Court will deny that

21   motion to reconsider at this time.

22         For one thing, in terms of the group conversation,

23   there were lots of people that were involved in that particular

24   group conversation that were not within any type of a

25   privilege, and otherwise there just simply was not any

1   reasonable basis for Mr. Heller to believe that what was

2   discussed at that particular group meeting what would be held

3   in confidence or is in any way part of a confidential

4   communication, so I deny that aspect of it.

5        Also in terms of Ms. Quesada, Ms. Quesada had

6   submitted a declaration, which is Docket No. 84-2, and in it

7   she said that she never acted as a minister for Mr. Heller,

8   never acted as any sort of virtual adviser of Mr. Heller on

9   behalf of the church and was only a friend to him.  Because of

10  that, you need some type of role in the capacity of a spiritual

11  adviser.  And for that reason the fact that Mr. Heller may have

12  thought that he was expressing things in confidence, I don't

13  find that that would make a difference, so I deny that aspect

14  of the motion too.

15        Are we ready, then, to bring the jury in for openings?

16        *MS. DAVIES:*  Yes for the government.

17        *MS. CHRISTL:*  Yes, Your Honor.

18        *THE COURT:*  Let's bring the jury back in.

19        (Jury present:)

20        *THE COURT:*  All right, ladies and gentlemen.  As I

21  indicated to you, I am now going to read a preliminary jury

22  instruction to you, and then after that you are going to hear

23  the opening statements.  So let me read that instruction to you

24  at this time.

25        Members of the jury, at the end of the trial I will

1    give you detailed guidance on the law and on how you will go

2    about reaching your decision, but now I simply want to

3    generally explain how the trial will proceed.

4         This criminal case has been brought by the United

5    States Government.  I will sometimes refer to the government as

6    the prosecution.  The government is represented by Assistant

7    United States Attorneys Patricia Davies and Andrea Surratt.

8    The defendant, Dakota Michael Heller, is represented by his

9    lawyers, Kelly Christl and Natalie Stricklin.

10        The Indictment charges the defendant with knowingly

11   engaging in sexual contact with another person without that

12   person's permission.  The Indictment is simply the description

13   of the charge made by the government against the defendant.  It

14   is not evidence of guilt or anything else.  The defendant

15   pleaded not guilty and is resumed innocent.  He may not be

16   found guilty by you unless all 12 of you unanimously find that

17   the government has proved his guilt beyond a reasonable doubt.

18        The first step in the trial will be the opening

19   statements.  The government in its opening statement will tell

20   you about the evidence which it intends to put before you.

21   Just as the Indictment is not evidence, neither is the opening

22   statement.  Its purpose is only to help you understand what the

23   evidence will be.  It is a road map to show you what is ahead.

24   After the government's opening statement, the defendant may

25   make an opening statement.

1          Evidence will be presented from what you will have to

2     determine the facts.  The evidence will consist of the

3     testimony of the witnesses, documents and other things received

4     into the record as exhibits, and any facts about which the

5     lawyers agree or to which they stipulate.

6          The government will offer its evidence.  After the

7     government's evidence, the defendant may present evidence, but

8     he is not required to do so.  I remind you that the defendant

9     is presumed innocent and it is the government that must prove

10    the defendant's guilt beyond a reasonable doubt.  If the

11    defendant submits evidence, the government may introduce

12    rebuttal evidence.

13         At times during the trial a lawyer may make an

14    objection to a question asked by another lawyer or to an answer

15    by a witness.  This simply means that the lawyer is requesting

16    that I make a decision on a particular rule of law.  Do not

17    draw any conclusion from such objections or from my rulings on

18    the objections.

19         If I sustain an objection to a question, the witness

20    may not answer it.  Do not attempt to guess what the answer

21    might have been given if I had allowed the answer.  If I

22    overrule the objection, treat the answer as any other.  If I

23    tell you not to consider a particular statement, you may not

24    refer to that statement in your later deliberations.

25    Similarly, if I tell you to consider a particular piece of

1    evidence for a specific purpose, you may consider it only for

2    that purpose.

3            During the course of the trial, I may have to

4    interrupt the proceedings to confer with the attorneys about

5    the rules of law that should apply.  Sometimes we will talk

6    briefly at the bench, but some of these conferences may take

7    more time, so I will excuse you from the courtroom.  I will try

8    to avoid such interruptions wherever possible, but please be

9    patient even if the trial seems to be moving slowly because

10   such conferences actually save time in the end.

11           You are to consider all the evidence received in this

12   trial.  It will be up to you to decide what evidence to believe

13   and how much of any witness' testimony to accept or to reject.

14   After you have heard all the evidence, I will instruct you on

15   the rules of law which you are to use in reaching your verdict.

16   The government and the defense will then each be given time for

17   their final arguments.

18           Let me give you some information about whether or not

19   you choose to take notes.  If you would like to take notes

20   during the trial, you may.  On the other hand, you are not

21   required to take notes.  If you do decide to take notes, be

22   careful not to get so involved in note-taking that you become

23   distracted.  And remember that your notes will not necessarily

24   reflect exactly what was said, so your notes should be used

25   only as memory aids.

1          Therefore, you should not give your notes precedent

2    over your independent recollection of the evidence.  You should

3    also not be unduly influenced by the notes of other jurors.  If

4    you do take notes, leave them in the jury room at night and do

5    not discuss the contents of your notes until you begin

6    deliberations.

7          I do not permit jurors to ask questions of witnesses

8    or of the lawyers.  If you are unable to hear a witness or a

9    lawyer, please raise your hand immediately and I will see that

10   that is corrected.

11         During the course of the trial, you should not talk

12   with any witness or with the defendant or with any of the

13   lawyers at all.  In addition, during the course of the trial,

14   you should not talk about the trial with anyone else.  Also,

15   you should not discuss this case amongst yourselves until I

16   have instructed you on the law and you have gone to the jury

17   room to make your decision at the end of the trial.  It is

18   important that you wait until all the evidence is received and

19   you have heard my instructions on the controlling rules of law

20   before you deliberate among yourselves.

21         Let me add that during the course of the trial, you

22   will receive all the evidence you properly may consider to

23   decide the case.  Because of this, you should not attempt to

24   gather any information on your own that you think might be

25   helpful.  Do not engage in any outside reading or research on

1  the case, including through the use of the internet,

2  cellphones, smart phones or paper resources.  Do not attempt to

3  visit anyplace mentioned in the case and do not in any other

4  way try to learn about the case outside the courtroom.

5       Now that the trial has begun, you must not listen to

6  or read about it in the media.  The reason for this is that

7  your decision in this case must be made solely on the evidence

8  presented at the trial.  So for instance, if you were to look

9  in the paper or hear something on the radio, something came on

10  TV that you thought might be about this case, try to turn the

11  channel, avert your eyes, whatever.  Try to avoid that.

12       The court reporter is making stenographic notes of

13  everything that is said.  This is basically to assist in any

14  appeals.  However, a typewritten copy of the testimony will not

15  be available for your use during deliberations.  On the other

16  hand, any exhibits will be available to you during your

17  deliberations.

18       With that introduction, the United States may present

19  its opening statement.

20       Ms. Davies?

21       *MS. DAVIES:*  Thank you, Your Honor.

22                    **OPENING STATEMENT**

23       *MS. DAVIES:*  Good afternoon, members of the jury.

24       On April 3rd, 2017, during an international flight,

25  this defendant, then 35-year-old Dakota Heller, reached beneath

1   a blanket he had spread over the lap of the 16-year-old boy

2   next to him who was mostly asleep after taking Ambien,

3   unfastened the boy's shorts, reached into the boy's underwear

4   and rubbed the boy's penis until the defendant made the boy

5   ejaculate.

6          You will see and hear from that then 16-year-old boy

7   who during this trial you will hear referred to as Christopher

8   to protect his privacy.  Christopher will tell you about what

9   the defendant did to him on that April 3rd, 2017 flight, and he

10  will tell you that when the defendant put his hand on

11  Christopher's thigh, Christopher did not give permission.  When

12  the defendant slid his hand up to Christopher's crotch,

13  Christopher did not give permission.

14         When the defendant unfastened the button of

15  Christopher's shorts, Christopher did not give permission.

16  When the defendant opened the zipper on Christopher's shorts,

17  again Christopher did not give permission.  When the defendant

18  stuck his hand into the top of Christopher's underwear

19  waistband, Christopher did not give permission.  And when the

20  defendant rubbed Christopher's penis until he made Christopher

21  ejaculate, Christopher did not give permission.

22         Members of the jury, in the course of this trial, you

23  will learn that Christopher is a member of Cornerstone Church

24  in Boulder, Colorado; that Christopher met the defendant

25  through the church; and the defendant was a volunteer leader

1   over a small group that Christopher participated in when he was

2   just 14 years old.

3        You will learn that Christopher was on that

4   international flight from Dubai to Seattle in April of 2017

5   because he was returning from a church mission trip in Uganda;

6   that returning to the United States on the travel leg from

7   Dubai to Seattle, Christopher sat in his assigned seat in the

8   middle of three seats with another church member sitting on his

9   left; that the defendant switched from his assigned seat in

10   order to sit next to Christopher with the defendant sitting

11   immediately on Christopher's right.

12        Christopher knew the flight was 15 hours long and he

13   wanted something to help him sleep.  The evidence will show

14   that the defendant gave Christopher a sleep aid called Ambien.

15   Christopher took the Ambien and it made him very sleepy and

16   groggy.

17        Christopher will tell you that about two hours into

18   the flight when the cabin was darkened and he was mostly

19   asleep, that was when the defendant reached below the blanket

20   he had spread over Christopher's lap and sexually abused him.

21   Christopher will tell you that he was so groggy from the Ambien

22   that at first he didn't realize fully what had happened and he

23   went back to sleep.  Only later when Christopher got up to use

24   the restroom and saw that his shorts were unfastened did he

25   fully realize what the defendant had done to him.  Christopher

1   will also tell you that no one else had ever touched him

2   sexually on his penis before.

3        The evidence will show that the international flight

4   landed at an airport near Seattle, Washington, and that at that

5   airport Christopher saw the defendant standing alone and he

6   confronted him.  Christopher was angry and he asked the

7   defendant, "What did you do to me?"

8        Christopher will describe how the defendant responded.

9   He said he was sorry.  He said he had made a mistake.  He tried

10  to hush Christopher because other church members were nearby

11  and he didn't want anyone to hear.  And the defendant also

12  asked Christopher not to tell anyone what he had done because

13  Christopher telling would ruin the defendant's life.

14       The evidence will also show that Christopher and the

15  other church members then took another flight to return them to

16  Colorado where they all lived.  After the return defendant

17  contacted Christopher repeatedly until Christopher decided he

18  had to respond because they still both attended the same church

19  and Christopher would have to deal with him eventually.

20       At the defendant's request, Christopher met the

21  defendant at a local Chipotle restaurant where defendant cried

22  and put his hands in his face, repeated that he was sorry and

23  that he had messed up.  He told Christopher he thought

24  Christopher might be gay because Christopher didn't have a

25  girlfriend.  And the defendant said he would get help and then

1   repeated his request that Christopher not tell anyone or it

2   would ruin the defendant's life.

3        Christopher will describe how he was angry and sad and

4   wished that it had never happened, but because the defendant

5   said he would get help and because Christopher did not want to

6   be the person responsible for ruining the defendant's life,

7   that he did not tell anyone at that time about the defendant's

8   abusive sexual contact on the flight.

9        Members of the jury, the evidence will show that very

10  shortly after these events, the defendant did seek help.

11  Witnesses will testify the defendant asked for financial

12  support, and through a Go Fund Me page church members raised

13  money to get the defendant help.

14       The defendant kept contacting Christopher on social

15  media and some text messaging.  And Christopher will explain

16  that because the defendant got angry when Christopher did not

17  respond and because Christopher was going to see him at the

18  church they both attended anyway, Christopher communicated some

19  with the defendant through social media and text messages.

20       The evidence will show that in the year after the

21  defendant's April 3rd, 2017 abusive sexual contact with

22  Christopher, the defendant and Christopher saw each other

23  outside of church a few times, and Christopher will tell you

24  that at no time did he want or give permission for sexual

25  contact from the defendant.

1          More than a year after the defendant had sexually

2    abused Christopher, Christopher began working for the defendant

3    in his home improvement business.  And Christopher will explain

4    that during this time from April 2017 and afterwards

5    Christopher had not told anyone about defendant's sexual abuse

6    of him while he was half asleep on the international flight.

7    He will testify he tried not to think about it.  He tried to

8    move on with his life, but it weighed on him.

9          The evidence will show that in October of 2018,

10   Christopher went on another church-related trip, this time to

11   Australia.  There he disclosed first to a small group and then

12   to a pastor in Australia what had occurred, that the defendant

13   had committed abusive sexual contact on that flight.  And you

14   will hear that that Australian pastor told Christopher to

15   report the abuse.

16         Christopher will tell you that when he returned to

17   Colorado from Australia in late December of 2018, he had made

18   up his mind, and in early January of 2019, he reported

19   defendant's abusive sexual contact to Gabriel Kinzley, who you

20   will learn is Christopher's uncle, is a pastor in the church,

21   and is the person who had organized the mission trip to Uganda

22   in late March to April of 2017.

23         Christopher will also explain he sent a text message

24   to the defendant telling him that he was going to disclose the

25   abusive sexual contact.  And you will see the defendant's

1    response saying to Christopher he had made a huge mistake.  He

2    was still incredibly sorry.  He would deal with the

3    consequences of his action and he wished he could make it all

4    go away.

5         You will see and hear from Gabriel Kinzley.  He will

6    testify that he is Christopher's uncle and a pastor in the

7    church's youth ministry, that he organized and attended the

8    mission trip to Uganda; that on January 13 of 2019, Christopher

9    reported that the defendant had sexually abused Christopher on

10   the Dubai to Seattle flight home from the mission trip.

11        You will learn that Mr. Kinzley notified the church

12   leadership.  He reported the sexual abuse to law enforcement,

13   later speaking with Special Agent Philip Jones.  You will also

14   learn that at the time that the disclosure occurred and

15   Mr. Kinzley learned of this, the defendant lived in a house

16   that was owned by Mr. Kinzley, rented by the defendant along

17   with other adult church members.

18        Mr. Kinzley will tell you that he organized a meeting

19   to confront the defendant, that he, another church pastor, a

20   close friend of the defendant's, defendant's mother and

21   defendant's roommates all confronted defendant about his sexual

22   abuse of Christopher.  The evidence will show that that meeting

23   occurred on January 16th and it was recorded.

24        You will hear parts of that recording, hear the

25   defendant's own words, what he said when the group told him

1    they knew that he had committed sexual abuse against

2    Christopher, including that he could not stop himself at the

3    time and that he repeatedly apologized for what he had done to

4    Christopher.

5         You will also hear testimony from other church members

6    and friends of the defendant who will testify about what they

7    observed before the mission trip to Uganda in March, April of

8    2017, during the mission trip and after the mission trip.  All

9    witnesses will say they never saw Christopher do anything

10   suggesting he was interested in or gave permission for sexual

11   contact from the defendant.  And you will see and hear about

12   other statements made by the defendant regarding his actions in

13   this case, statements that he made in text messages or in his

14   conversations where he acknowledged he knew he had done wrong

15   and similar statements.

16        You will also hear from FBI Special Agent Jones and he

17   will describe his investigation in this case, including how he

18   obtained a search warrant for the defendant's cellphone and

19   what he found on that phone.  Special Agent Jones will also

20   testify regarding how he arrested the defendant here in

21   Colorado.

22        Well, members of the jury, that is an overview of what

23   the government expects its evidence to show.  At the end of

24   this case, AUSA Surratt and I will have another chance to speak

25   with you.  And we will ask you to return the verdict that is

1  consistent with the evidence in this case and that is guilty of

2  engaging in abusive sexual contact as charged.

3      Thank you.

4      *THE COURT:*  Thank you, Ms. Davies.

5      Opening on behalf of Mr. Heller?

6      *MS. CHRISTL:*  Yes, Your Honor.  Thank you.

7                      **OPENING STATEMENT**

8      *MS. CHRISTL:*  Good afternoon.

9      On April 3rd, 2017, on that flight from Dubai to

10  Seattle, Mr. Heller misread a situation.  He did not commit a

11  crime.  You're going to be asked to evaluate this case based on

12  what Mr. Heller knew or believed regarding whether or not he

13  had permission to engage in this sexual contact.

14      There is some important background information that

15  you should know.  At this point in 2017, Mr. Heller had been a

16  part of the Cornerstone Church in Boulder for about eight

17  years.  That's where his -- that was his spiritual home, that's

18  where his social life was, and that is where he got his

19  religious and moral teachings on life.

20      Mr. Heller had previously attended a mission trip in

21  Uganda where they were building a well and a school for

22  children in this village in Uganda.  He wanted to continue the

23  good work that they had done on that first mission trip, but he

24  wasn't sure if he could fund or finance going back in April of

25  2017.  So he signed up for this mission trip late after the

1    rest of the church members had already purchased their tickets.

2         This church mission trip in Uganda was a bonding

3    experience for all of the members at Cornerstone that went on

4    it.  They were in close quarters.  They traveled a lot

5    throughout the country in a van.  And they were doing good work

6    there, and that -- seeing the results and the fruits of their

7    labor bonded them.

8         Christopher and Mr. Heller had been friends and had

9    known each other for years before this incident, but something

10   changed during that trip to Uganda.  Mr. Heller picked up on

11   signals that he believed Christopher was sending him.  Those

12   signals included what Christopher described as a playful game

13   of footsy while they were at the home that they were staying at

14   in Uganda toward the end of the trip a few days before they

15   left and returned back to the United States.

16        Those signals were validated once they got on the

17   flight -- once they boarded the flight back from Dubai to

18   Seattle.  Christopher asked Mr. Heller -- let me back up.

19   Mr. Heller switched seats so that he could be close to the

20   group since he purchased his ticket late, and as Christopher

21   will tell you, he and Mr. Heller were friends, so they wanted

22   to sit next to each other.  You'll also hear that Christopher

23   asked Mr. Heller to borrow his blanket or to share his blanket,

24   one of those small airline blankets.

25        During that sexual contact, Mr. Heller -- one thing

1    that's important for you to know is that this is not in

2    dispute.  This contact did occur.  Mr. Heller acknowledges it.

3    He admits it.  He now realizes he may have misread the

4    situation, but Christopher gave no indication during the sexual

5    contact that what Mr. Heller was doing was not welcomed based

6    on the sitting next to each other, the sharing of the blanket

7    and some of the things that transpired in Uganda.  Mr. Heller

8    believed what he was doing was okay.  And Christopher did

9    nothing to indicate while it was happening that it was not

10   okay.

11        The government talked to you about statements that

12   you're going to hear in this case that Mr. Heller made after

13   this incident.  There are some important things that I ask you

14   to take, that you look at the context of the statements that

15   were made.  Particularly in this case, the government just said

16   the church members confronted Mr. Heller and asked him about

17   sexually abusing Christopher and he admitted it.  He said he

18   was sorry.  That's not what they confronted him with.  They

19   said, "We know what you did."

20        They don't ever get into the actual substance of what

21   occurred or what Mr. Heller felt sorry or remorseful for.  He

22   felt sorry and remorseful because he did learn during the -- at

23   the Seattle airport when Christopher approached him that what

24   he had done wasn't okay with Christopher.  And, of course, if

25   you have sexual contact with someone that at the time you

1    believed was welcomed and then you find out later that it

2    wasn't, of course you're going to question what the

3    ramifications are to that.  Of course you're going to feel

4    remorseful and feel like you made a big mistake.

5          And those are the statements that Mr. Heller made.  He

6    acknowledges he misread the situation.  He made a

7    miscalculation and he made a mistake.  But at the time he

8    believed what he was doing was welcomed contact.

9          Another thing I ask you to keep in mind when you hear

10   these statements is I think there is a big misconception, and

11   we talked about it a lot during jury selection, that having sex

12   with a minor or any sort of sexual contact with a minor is a

13   crime.  But as Judge Brimmer told you, 16 is the age of consent

14   under the law that you are evaluating this case on.  But it's

15   reasonable that people involved in this case automatically

16   thought because Christopher was a minor that this was illegal

17   conduct, including Mr. Heller himself.

18         The one thing that I'd ask you to understand, ask you

19   to listen for in this case, is for Mr. Heller there was

20   something even deeper about why he felt remorse and regret, and

21   that is because as you will hear many witnesses say,

22   Mr. Heller, quote, struggles with same sex attraction.  What

23   that means is that Mr. Heller has attraction, physical

24   attraction to men; but because of his religious, moral beliefs,

25   what he believes the Bible says and what his church tells him

1    is moral is that those struggles are sinful, that those

2    struggles are immoral.  So Mr. Heller also feels remorseful

3    about taking part in that contact, sexual contact, because it

4    was with someone of his same gender.

5         Christopher and Mr. Heller were friends before this

6    incident happened and they remained friends after this incident

7    happened.  You will hear testimony that six months after this

8    incident, Christopher invited Mr. Heller, just the two of them,

9    to go to a concert at Red Rocks.  You will hear shortly after

10   that concert at Red Rocks, Christopher began working for

11   Mr. Heller in his own home improvement business.

12        And you will see evidence that after Christopher --

13   there was a period of time that Christopher did not work for

14   Mr. Heller because he went to this other church program in

15   Australia.  And while he was in Australia, he contacted

16   Mr. Heller asking, can I come back and work for you when I get

17   back?

18        Mr. Heller and Christopher saw each other with the

19   exception of early on and during the time he was in Australia

20   three times a week.  They would sometimes have a meal together.

21   They went to the Red Rocks concert together.  And they worked

22   together closely.  And I think it's also important for you to

23   remember that during -- to listen for this during the trial.

24   During all of that contact they had, nothing sexual ever

25   happened between the two of them again, and that's because

1    Mr. Heller respected the boundary that Christopher set.

2           He recognized that he made a mistake in thinking that

3    Christopher wanted the sexual contact, and he never ever did

4    anything again.  Once Christopher said no, that's not what I

5    want, that was it.  The line was drawn and it never happened

6    again.  And that's because he misread the situation and he did

7    not commit a crime.

8           Another thing that you will see the government talked

9    about in their opening is you'll see the text messages between

10   Christopher and Mr. Heller when Christopher tells Mr. Heller

11   that he is going to tell someone about this evidence.

12   Christopher decided that he wanted to marry his girlfriend Joy

13   and felt like he needed to tell her about, quote, his past,

14   tell her about my past and what happened in Uganda.  That is

15   what the text message read and that is the text message that

16   you will see.  That does not sound like a sex crime.  I'm going

17   to tell her about my past, including Uganda.

18          There are miscalculations, misreadings of the

19   situation all of the time in relationships with co-workers,

20   with friends, with family.  It's particularly prevalent in

21   romantic situations.  And oftentimes in romantic or sexual or

22   dating situations, there isn't explicit I consented to this, I

23   consented to that given.  It's all about signals that you're

24   giving, signals that you're receiving.  A lot of it is unsaid.

25   It's just what you feel.  And that's what happened in this

1    case.

2            Mr. Heller now knows he misread the situation and

3    misread those signals.  He did not commit a crime.  Again,

4    you're going to be asked to evaluate this case on what

5    Mr. Heller knew or believed at the time regarding Christopher's

6    permission.  There is nothing that says that in order to engage

7    in sexual contact, that you have to explicitly verbally

8    consent.  We all know -- we are all adults -- that's just not

9    how it works.  And Christopher being 16 years old at the time

10   was legally able to give consent to the sexual contact.

11           At the end of this case, we are going to ask you to

12   evaluate this incident, listen carefully to the evidence, and

13   we are going to ask you to find Mr. Heller not guilty.

14           THE COURT:  Thank you, Ms. Christl.

15           Ladies and gentlemen, we are now ready to begin the

16   evidence in the case.  The United States goes first, and at

17   this time the United States may call its first witness.

18           MS. DAVIES:  The United States calls Christopher.

19       (**Christopher** was sworn.)

20           THE WITNESS:  Yes.

21           COURT DEPUTY CLERK:  Please state your name and spell

22   your name for the record.

23           THE COURT:  You can use your pseudonym.

24           THE WITNESS:  Christopher, C-H-R-I-S-T-F-E-R.

25           THE COURT:  Since it's not his real name, the spelling

Christopher - Direct

1    is really not that important.

2          Go ahead.

3                        **DIRECT EXAMINATION**

4    *BY MS. DAVIES:*

5    *Q.*  Good afternoon.

6          Prior to this trial, did you meet with me and ask that

7    your actual name not be used?

8    *A.*  Yes.

9    *Q.*  And was that to protect your privacy?

10   *A.*  Yes.

11   *Q.*  And did you pick the name Christopher that you just spelled

12   for the jury?

13   *A.*  Yes.

14   *Q.*  Christopher, where do you live?

15   *A.*  I live in Arvada, Colorado.

16   *Q.*  And do you live with family members there?

17   *A.*  Yes.

18   *Q.*  Who do you live with?

19   *A.*  I live with my mom and my dad and my three siblings.

20   *Q.*  How old are you today?

21   *A.*  I am 19 years old.

22   *Q.*  And how old were you on April 3rd, 2017?

23   *A.*  I was 16.

24   *Q.*  Today how are you employed?

25   *A.*  Today I work at Cornerstone Church, I give guitar lessons,

Christopher - Direct

1    and I work for someone who has their own start-up business.

2    Q.   What do you do in your spare time?

3    A.   In my spare time, I play guitar or hang out with friends,

4    yeah, stuff like that.

5    Q.   Do you have a girlfriend?

6    A.   I do.

7    Q.   What is your girlfriend's first name?

8    A.   Joy.

9    Q.   Approximately how long have you and Joy been dating?

10   A.   About a year and a half.

11   Q.   Are you sexually attracted to men?

12   A.   No.

13   Q.   Have you ever been sexually attracted to men?

14   A.   No.

15   Q.   Did there come a time when you began attending Cornerstone

16   Church in Boulder, Colorado?

17   A.   Yes.

18   Q.   Do you know about how old you were when you started going

19   there?

20   A.   I believe I was about 12.

21   Q.   Once you started attending Cornerstone, were there

22   particular activities that you participated in?

23   A.   Yeah.  When I started, I started by playing in the middle

24   school band.

25   Q.   What did you do in the church band?

Christopher - Direct

1    A.   I played electric guitar.

2    Q.   Was that for services or something else?

3    A.   It was for the youth services at the time.

4    Q.   And did there come a time when you joined a high school

5    group?

6    A.   Yes.

7    Q.   And about how old were you when you joined the high school

8    group?

9    A.   I believe I was 14.

10   Q.   Did there come a time when you met someone named Dakota

11   Heller?

12   A.   Yes.

13   Q.   How did you come to meet Mr. Heller?

14   A.   I met him at church.

15   Q.   Was there any particular activities at church that brought

16   you together with Mr. Heller?

17   A.   Not really.  We would just see each other occasionally.

18   And then starting -- when I started going to high school group,

19   he was one of my leaders and counselors.

20   Q.   How old were you when Mr. Heller was one of your leaders

21   and counselors?

22   A.   I was 14.

23   Q.   And how often would you see Mr. Heller once he was your

24   small group leader at about age 14?

25   A.   I would see him about once per week.

Christopher - Direct

1    *Q.*  And where would you see him?

2    *A.*  I would see him at the house where the high school group

3    was located.

4    *Q.*  As your volunteer small group leader, what did Mr. Heller

5    do?

6    *A.*  He would walk me and a few other guys, along with other

7    leaders in the church, and we would just meet and talk about

8    life and stuff like that.

9    *Q.*  Was there a longer program that would take place on

10   Tuesdays that this was part of?

11   *A.*  Yeah.

12   *Q.*  And could you describe what all -- what happened on Tuesday

13   nights?

14   *A.*  Usually we would get there and there would be music at the

15   beginning.  And then there would be a talk from somebody and

16   then more music afterwards.  And then we would break off into

17   small groups where we would, yeah, talk with our leaders.

18   *Q.*  And this last portion of the small group, is that when you

19   would be working more particularly with Mr. Heller?

20   *A.*  Yes.

21   *Q.*  Did you have other small group leaders besides Mr. Heller?

22   *A.*  Yes.

23   *Q.*  Was there anyone who worked with Mr. Heller when he was

24   your small group leader?

25   *A.*  Yes.  The ones that I can remember would be Dave Wolf and

Christopher - Direct

1  Jason Levy.

2  *Q.*  Do you know about how old Mr. Heller was when you first got

3  to know him?

4  *A.*  I don't know for sure.

5  *Q.*  Do you know about how old he was?

6  *A.*  I knew he was in his thirties.

7  *Q.*  Do you see Mr. Heller here in the courtroom?

8  *A.*  Yes.

9  *Q.*  Could you please identify him by describing where he is

10 sitting and an article of clothing he is wearing?

11 *A.*  Sitting right there with a checkered shirt.

12      *MS. DAVIES:*  Your Honor, may the record reflect that

13 the witness has identified the defendant?

14      *THE COURT:*  It shall.

15 *BY MS. DAVIES:*

16 *Q.*  Did there come a time when Mr. Heller stepped down as his

17 role as a volunteer small group leader working with you?

18 *A.*  Yes.

19 *Q.*  Do you recall about how long he was your small group leader

20 before he stepped down?

21 *A.*  It would have been around six months, I think.

22 *Q.*  And after Mr. Heller stepped down from his role as a small

23 group youth leader, did you still see him?

24 *A.*  I did see him around church occasionally.

25 *Q.*  And so could you approximate how many times a month you

Christopher - Direct

1  might see Mr. Heller after he was no longer your small group

2  leader?

3  A.  After that, that would have been maybe around two times per

4  month.

5  Q.  Other than seeing Mr. Heller occasionally at church

6  services after he stepped down as your small group leader, what

7  other contact did you have with him from the time he stepped

8  down until about March of 2017?

9  A.  None.

10  Q.  Just around the church?

11  A.  Yes.

12  Q.  During this time did you want a sexual relationship with

13  Mr. Heller?

14  A.  No.

15  Q.  During this time did you ever give him permission for any

16  type of sexual contact with you?

17  A.  No.

18  Q.  Did there come a time when you went on a mission trip to

19  Uganda with Cornerstone Church members that began in late March

20  of 2017 through April of 2017?

21  A.  Yes.

22  Q.  How did you come to be on that mission trip?

23  A.  I heard about it from my uncle and I decided that I wanted

24  to sign up for it.

25  Q.  And Christopher, who is your uncle?

Christopher - Direct

1    *A.*  My uncle is Gabe, Gabriel Kinzley.

2    *Q.*  And how was it that you learned about it through your

3    uncle?  Who is Mr. Kinzley in relation to Cornerstone Church?

4    *A.*  Gabe is the senior youth pastor at Cornerstone.

5    *Q.*  Were you the only 16-year-old who was allowed to go?

6    *A.*  Yes.

7    *Q.*  About how long did the mission trip last?

8    *A.*  It lasted for 10 days and we were in Uganda for six.

9    *Q.*  And approximately how many Cornerstone members went on this

10   trip?

11   *A.*  There was about 12.

12   *Q.*  Do you recall the flights you took to get to and from

13   Uganda, not by the flight numbers, but by the cities you went

14   through?

15   *A.*  Yes.

16   *Q.*  Do you recall whether it was the same route going there as

17   it was coming back?

18   *A.*  It was.

19   *Q.*  Did you sit next to church members on every leg of the trip

20   going from Colorado to Uganda?

21   *A.*  Yes.

22   *Q.*  And do you remember who sat next to you on the way to

23   Uganda?

24   *A.*  No.

25   *Q.*  Where was your destination in Uganda for the mission work?

1   *A.*  We landed in Entebbe and we did work in a town called

2   Kamuli.

3   *Q.*  Can you please describe your day-to-day activities during

4   the mission trip?

5   *A.*  Yeah.  We would wake up and then the team would have

6   breakfast in another building that was nearby David's house,

7   who was our -- our -- David was the guy that we were staying

8   with in Uganda.

9   *Q.*  And David, was he a member of a church or religious

10  organization in Uganda?

11  *A.*  Yes.

12  *Q.*  Did you call him Pastor David?

13  *A.*  Yes.

14  *Q.*  So after you woke up and you had breakfast somewhere on

15  Pastor David's place, what happened next?

16  *A.*  After we had breakfast, we would go and usually do some

17  type of activity under the mango tree that was nearby, and that

18  would have been for kind of a bible school for the Ugandan

19  kids.

20  *Q.*  What type of activities?  Before you got to the bible

21  school, what might you do under the mango tree?

22  *A.*  We would usually just play songs together and stuff like

23  that.

24  *Q.*  And then can you tell us about the vacation bible school?

25  *A.*  For that we would just kind of hang out with the kids and

Christopher - Direct

1  play games.  And then after that we would go and help them in

2  their school.

3  Q.  And then after you did some classroom stuff, what would

4  happen next, your typical day at the mission trip?

5  A.  After that it varied day to day.  We would either just rest

6  or we could continue playing games with the kids or we would go

7  and visit wells.

8       MS. DAVIES:  May the witness please be shown

9  Government's Exhibit 22.

10 BY MS. DAVIES:

11 Q.  Christopher, do you recognize what is depicted on what's

12 marked for identification as Government Exhibit 22?

13 A.  Yes.

14 Q.  Does that truly and accurately reflect how your mission

15 group looked for the mission trip you testified about in late

16 March 2017 through early April 2017?

17 A.  Yes.

18      MS. DAVIES:  Your Honor, I move to admit Government

19 Exhibit 22.

20      THE COURT:  Any objection to the admission of

21 Exhibit 22?

22      MS. CHRISTL:  No objection, Your Honor.

23      THE COURT:  Exhibit 22 will be admitted.

24      MS. DAVIES:  Your Honor, request to publish?

25      THE COURT:  You may.

52

Christopher - Direct

1              Ladies and gentlemen, when you hear the term request

2    to publish, it's just a way of saying that the attorney who has

3    just admitted the exhibit wishes for you to see it as well.  So

4    ladies and gentlemen, if you look, you will see -- Mr. Lang,

5    you will see that monitor in front of you there.  Others of

6    you, if you look in the armrest between your chairs, there is a

7    computer monitor in them.  So you can pull those monitors out.

8    Just flip that board back and then the monitor will swivel to

9    the side.

10             Ladies and gentlemen, during the course of the trial,

11   there may be occasions where now you know about that, you

12   will -- may wonder how come you're not being able to see an

13   exhibit because the witness seems to see the exhibit.  Keep in

14   mind that until an exhibit has been admitted and the attorneys

15   ask to publish it to you, you won't be able to see it, okay?

16             Go ahead.

17   BY MS. DAVIES:

18   Q.   Christopher, do you have Exhibit 22 before you?

19   A.   Yes.

20   Q.   And Christopher, I am told this is kind of high tech.  You

21   can place your finger on the monitor, and if you are able,

22   please circle yourself as it appears on Government Exhibit 22.

23             Is that you in the baseball cap?

24   A.   Yes.

25   Q.   And would you please also circle now Mr. Heller.

Christopher - Direct

1   So he is in the back row kind of behind your left

2   shoulder; is that right?

3   *A.*   Yes.

4   *Q.*   And I understand we can now clear this.

5   Christopher, would you please -- so sorry.   Keeping

6   your attention on Exhibit 22 for a second, is this the group as

7   it's landing in Entebbe?

8   *A.*   Yes.

9   *Q.*   Is everybody who is pictured in Exhibit 22 from Cornerstone

10  Church?

11  *A.*   Yes.   There are a few Ugandans there as well, though.

12  *Q.*   And everybody else who does not appear to be Ugandan is, in

13  fact, from Cornerstone Church?

14  *A.*   Yes.

15  *Q.*   Would you please now look at Government's Exhibit 23.

16  Do you recognize what is depicted in that exhibit for

17  identification?

18  *A.*   Yes.

19  *Q.*   Does that truly and accurately reflect something you just

20  told the jury about from your mission trip in late March 2017

21  through April 2017?

22  *A.*   Yes.

23  *MS. DAVIES:*   Your Honor, move to admit Government

24  Exhibit 23.

25  *THE COURT:*   Any objection to the admission of

Christopher - Direct

1   Exhibit 23?

2              *MS. CHRISTL:*  Relevance.

3              *THE COURT:*  Overruled.  23 will be admitted.

4              *MS. DAVIES:*  Your Honor, request to publish?

5              *THE COURT:*  You may.

6   *BY MS. DAVIES:*

7   *Q.*  Christopher, looking at Government's Exhibit 23, can you

8   describe to the jury what we are seeing?

9   *A.*  This is when we would play songs for the Ugandan kids right

10  next to the mango tree.

11  *Q.*  Is there a mango tree somewhere right out of the view of

12  this camera?

13  *A.*  Yes.  It's just to the right.

14  *Q.*  Again using an indicator, can you point yourself out to the

15  jury, please.

16         And you've actually circled two heads.  Are you the

17  closer person in that photo?

18  *A.*  Sorry, yes.

19  *Q.*  And who is the other person pictured there?

20  *A.*  The other one is my uncle, Gabe.

21  *Q.*  And again is this something that was done on a daily basis

22  during the mission trip?

23  *A.*  Yes.

24  *Q.*  And please look at what's marked for identification as

25  Government Exhibit 24.

Christopher - Direct

1      Do you recognize what is depicted in that exhibit for

2  identification?

3  A.  Yes.

4  Q.  Does it truly and accurately reflect what it depicts for

5  the mission trip you testified about in late March through

6  early April 2017?

7  A.  Yes.

8      MS. DAVIES:  Your Honor, I move to admit Government

9  Exhibit 24.

10      THE COURT:  Any objection to the admission of

11  Exhibit 24?

12      MS. CHRISTL:  Same objection, Your Honor, relevance.

13      THE COURT:  That will be overruled.  Exhibit 24 will

14  be admitted.

15      MS. DAVIES:  Request to publish, Your Honor.

16      THE COURT:  You may.

17  BY MS. DAVIES:

18  Q.  Christopher, can you describe briefly to the jury what is

19  happening in Government's Exhibit 24?

20  A.  This is when we would all kind of help the school teachers

21  and work with them teaching the kids geography and English and

22  stuff like that.

23  Q.  Is this in a classroom in the compound at Pastor David's

24  place?

25  A.  Yes.

Christopher - Direct

1    *Q.*  Please look at what's marked for identification as

2    Government's Exhibit 26.

3            Do you recognize what is depicted in that photo?

4    *A.*  Yes.

5    *Q.*  Does it truly and accurately reflect what it depicts from

6    the mission trip you testified about in late March through

7    early April 2017?

8    *A.*  Yes.

9            *MS. DAVIES:*  Move to admit Government Exhibit 26.

10           *THE COURT:*  Any objection to 26?

11           *MS. CHRISTL:*  Same objection, Your Honor.

12           *THE COURT:*  That will be overruled.  26 will be

13   admitted.

14           *MS. DAVIES:*  Request to publish, Your Honor?

15           *THE COURT:*  You may.

16   *BY MS. DAVIES:*

17   *Q.*  Christopher, can you describe for the jury what is

18   happening as shown in Government's Exhibit 26?

19   *A.*  This is when we were building desks for the school.

20   *Q.*  And once again, using your finger can you indicate if you

21   are pictured in this photo?

22   *A.*  Yeah.

23   *Q.*  Now, please look at what's marked for identification as

24   Government Exhibit 28.

25           Do you recognize what is shown there?

Christopher - Direct

1    *A.*  Yes.

2    *Q.*  Does that truly and accurately reflect what it depicts from

3    the mission trip you testified about in late March through

4    early April of 2017?

5    *A.*  Yes.

6         *MS. DAVIES:*  Your Honor, move to admit Government

7    Exhibit 28.

8         *THE COURT:*  Any objection to the admission of

9    Exhibit 28?

10        *MS. CHRISTL:*  Your Honor, same objection.

11        *THE COURT:*  That objection will be overruled.

12   Exhibit 28 will be admitted.

13        *MS. DAVIES:*  Your Honor, request to publish.

14        *THE COURT:*  You may.

15   *BY MS. DAVIES:*

16   *Q.*  Christopher, can you describe for the jury what's happening

17   as shown in Government Exhibit 28?

18   *A.*  This is when we would open up a well for the first time and

19   we would go to where it was located and hang out with people

20   there.

21   *Q.*  Was it part of your mission trip to actually dig wells?

22   *A.*  No.

23   *Q.*  Was it part of your mission trip nonetheless to make wells

24   available for all the villages?

25   *A.*  Yes.

Christopher - Direct

1   Q.  Do you know how that happened?

2   A.  The wells were sponsored by Cornerstone Church, I think.

3   And we would go and kind of put the last few pieces on there

4   and would oversee water running out of them for the first time.

5   Q.  And Christopher, do you see yourself in this photo?

6   A.  I think so.

7   Q.  Drawing a small circle as you can to make it precise, can

8   you point out where you think you are?

9       Sir, do you see Mr. Heller in this photo as well?

10  A.  Yes.

11  Q.  Can you draw a circle around Mr. Heller?

12      The people on the left side of the photo, do you know

13  where they were from?

14  A.  They were the Ugandans.

15  Q.  Local villagers?

16  A.  Yes.

17  Q.  People on the right-hand side, who were they?

18  A.  They were all part of our team.

19  Q.  Church members from Cornerstone?

20  A.  Yeah.

21  Q.  Christopher, where did you stay when you were in Uganda?

22  A.  I stayed at -- I stayed in a building that was behind

23  Pastor David's house.

24  Q.  And what were the sleeping arrangements?

25  A.  In my room, I slept with two other guys my age.

Christopher - Direct

1   Q.  Were they 16?

2   A.  No.  They were both 18, I believe.

3   Q.  Were they the closest in age to you?

4   A.  Yes.

5   Q.  And neither of them were Mr. Heller, correct?

6   A.  Correct.

7   Q.  How would you describe how the church members on the

8   mission trip got along with each other?

9   A.  We all got along very well and were friendly to each other.

10  Q.  What, if anything, physical affection did you see shown

11  between church members during the mission trip?

12  A.  If anything, we would just hug each other periodically.

13  Q.  Did you initiate physical affection with Mr. Heller?

14  A.  No.

15  Q.  What, if any, alone time did you spend with Mr. Heller

16  during this mission trip?

17  A.  None that I can remember.

18  Q.  What, if any, romantic or sexual relationship did you want

19  with Mr. Heller at this time?

20  A.  Zero.

21  Q.  What, if any, permission did you give Mr. Heller to start

22  sexual contact with you during this time?

23  A.  Nothing.

24  Q.  Do you remember holding his hand in Uganda?

25  A.  No.

Christopher - Direct

1   Q.  Do you remember holding his hand on the flight home?

2   A.  No.

3   Q.  What, if any, event do you recall where you and the

4   defendant rubbed feet together in any fashion?

5   A.  I don't recall that.

6   Q.  Are you certain about that?

7   A.  Yes.

8   Q.  What makes you so sure that you did not rub feet with the

9   defendant while on a mission trip in Uganda?

10  A.  Because if that happened, I think I would have remembered

11  it.

12  Q.  And why is that?

13  A.  In Uganda no one really wears closed-toe shoes and so

14  everyone's feet are dirty.  And there is not many showers.  And

15  that is not something that I am particularly pleased with.

16  Q.  While you were on this Ugandan mission trip, did you take

17  any day trips to nearby areas?

18  A.  Yes.

19  Q.  Where did you go?

20  A.  We went to a few wells and we went to the Nile River.  And

21  I think we took a trip to Pastor David's church.

22  Q.  And on these individual local trips, how did you get there?

23  A.  We would ride in various minivans that Pastor David had.

24  Q.  Would you please look for identification at Government

25  Exhibit 25?

Christopher - Direct

1              Do you recognize what is pictured in Government

2    Exhibit 25 for identification?

3    *A.*  Yes.

4    *Q.*  Does it truly and accurately reflect something that

5    occurred during your mission trip in late March to early April

6    2017?

7    *A.*  Yes.

8              *MS. DAVIES:*  Your Honor, I move to admit Government

9    Exhibit 25.

10             *THE COURT:*  Any objection to the admission of

11   Exhibit 25?

12             *MS. CHRISTL:*  No objection.

13             *THE COURT:*  Exhibit 25 will be admitted.

14             *MS. DAVIES:*  Your Honor, request to publish?

15             *THE COURT:*  You may.

16   *BY MS. DAVIES:*

17   *Q.*  Christopher, can you tell the jury what's happening as

18   pictured in Government Exhibit 25?

19   *A.*  This is when we took a trip to the Nile River and we in

20   this picture are in a boat traveling around in.

21   *Q.*  And who is pictured in Government Exhibit 25?

22   *A.*  These are all people from our team and then Pastor David

23   and his friend in the very front.

24   *Q.*  Did anything unusual happen during any of the day trips

25   that you have just testified about during this mission trip in

Christopher - Direct

1   late March to early April 2017?

2   A.   Yes.

3   Q.   And what unusual event happened?

4   A.   During one of the day trips in the minivan as I was sitting

5   next to Mr. Heller, he exposed his genitals to me.

6   Q.   Can you please describe in greater detail how that came

7   about?

8   A.   I don't remember where we were going.  I think we were

9   going to one of the well ceremonies.  And I got in the back of

10   the van next to -- to Dakota's left because that was the only

11   available seat.  And about halfway through the ride, I looked

12   over and Mr. Heller's legs -- or shorts had ridden up and his

13   genitals were exposed.

14   Q.   Do you recall what Mr. Heller was wearing at the beginning

15   of this van ride?

16   A.   Yeah.  He was wearing basketball shorts.

17   Q.   Can you estimate by virtue of like to your knee, how close

18   to the knee did the shorts extend when they were hanging in the

19   appropriate position?

20   A.   They stopped at the knee.

21   Q.   And when you got into the van, do you recall whether or not

22   Mr. Heller was covered?

23   A.   He was.

24   Q.   And can you describe for the jury sort of how he was

25   sitting?

Christopher - Direct

1   *A.*  In the van ride, he had his knees kind of propped up

2   against the bench seat in front of us, so his legs were kind of

3   up.

4   *Q.*  And was this a smooth road, a bumpy road?  What do you

5   recall?

6   *A.*  It was a pretty bumpy ride.

7   *Q.*  Do you recall how much time passed between when you saw the

8   shorts were hanging down and then suddenly his genitals were

9   exposed?

10  *A.*  Probably 20 minutes.

11  *Q.*  What was Mr. Heller doing when this was going on?

12  *A.*  He appeared to be sleeping.

13  *Q.*  Did there come a time when you didn't think he was

14  sleeping?

15  *A.*  Yes.

16  *Q.*  And what did you conclude?

17  *A.*  I concluded that or I thought that he -- his intention was

18  to expose himself to me.

19  *Q.*  What makes you think that, Christopher?

20  *A.*  I think that due to the fact that he molested me on the

21  ride home and due to the fact that he has expressed his

22  attraction towards men and towards minors.

23        *MS. CHRISTL:*  Objection, foundation.  Actually, at

24  this point can we have a side bar?

25        *THE COURT:*  Yes.  Approach, please.

1          (At the bench:)

2          *MS. CHRISTL:*  I am hard of hearing, so sometimes it's

3     hard for me.

4          This was purposely excluded during the 404(b) motion.

5     And there is no -- it's -- this was excluded in the Judge's --

6     in the Court's 404(b) order regarding an attraction to minors.

7          *THE COURT:*  And is there some basis to believe that

8     Christopher may have personal knowledge of some other

9     attraction Mr. Heller has towards minors?

10          *MS. CHRISTL:*  Your Honor, we have not been tendered

11     anything in discovery that indicates that.

12          *THE COURT:*  Response?

13          *MS. DAVIES:*  Well, as Ms. Christl knows, there is a

14     conversation at Chipotle where he says he is going to get help.

15     Christopher drew certain inferences about what kind of help he

16     was going to get based on the conversation and thought it was a

17     help do address his attraction to minors.  We did not expect

18     that answer, but it is his belief and it's --

19          *THE COURT:*  It doesn't matter whether it's his belief.

20     It has to be based on personal knowledge.  So make sure that

21     you ask questions that are very carefully directed to avoid

22     anything like that.

23          *MS. DAVIES:*  I will do that.

24          *THE COURT:*  And if you think you need to talk to

25     Christopher at this time --

Christopher - Direct

1          MS. DAVIES:  I certainly can if the Court wants.

2          THE COURT:  Well, you know your witness better than I

3    do, so I don't know what's going to come out, but if you think

4    that that's a good idea, we can wait for just a second.  You

5    can confer with him and then come back here and then we will

6    break so it's not quite as obvious.

7          MS. DAVIES:  Okay.  I can do that or I can ask a very

8    specific question.  I just didn't want to get a leading

9    objection to try to direct him away from this.

10          THE COURT:  Well, I doubt that it would be, but if

11    it's overruled, then it's a consequence, okay.

12          Anything else, Ms. Christl?

13          MS. CHRISTL:  Is that objection going to be sustained

14    or is it going to be -- the answer going to be stricken?

15          THE COURT:  Well, the objection unfortunately was

16    late, so whether I sustain it or not, it doesn't really matter.

17          MS. CHRISTL:  Your Honor, would you strike that last

18    part?  It's certainly 403.  And this was previously discussed

19    in the Court's order and generally the practices that the

20    government admonishes.

21          THE COURT:  The problem is if I do that, it's just

22    going to emphasize because the answer was appropriate except

23    for the last two words, so I would only strike the last two

24    words and I'd have to remind the jury of what those were.

25          MS. DAVIES:  Your Honor, if I may, this was not the

Christopher - Direct

1   subject of the 404(b) notice.  I mean, those were very, very

2   specific things.

3          THE COURT:  Well, it depends on what the basis of

4   knowledge was, but if it came out independently through some

5   conversation, I'll strike it.

6          MS. CHRISTL:  I also think it's a discovery violation.

7   We have never been tendered anything that Christopher ever said

8   or that our client ever said to Christopher that he had an

9   attraction to minors.

10          THE COURT:  I don't think that he indicated the source

11   of his information about the minors came from anything that was

12   said to him.  But back to our point, do you want me to strike

13   the last two words?  I'd have to tell the jury what to remember

14   about it.

15          MS. CHRISTL:  Your Honor, could you ask -- could you

16   strike the last answer and ask the government to reask it?

17          THE COURT:  No, I'm not going to do that.  It's just

18   the last two words that were objectionable, so ...

19          MS. CHRISTL:  Your Honor, I would ask that you

20   strike -- yes, I would ask that you strike those two words.  I

21   think the bell has been rung.

22          THE COURT:  All right.  Anything else?

23          MS. CHRISTL:  No, Your Honor.

24      (In open court:)

25          THE COURT:  Ladies and gentlemen, Christopher's

67

Christopher - Direct

1    last -- the very end of his answer where he said "and minors,"

2    I am going to strike that.  So you should disregard those last

3    two words of his answer, all right?

4         Go ahead, Ms. Davies.

5    BY MS. DAVIES:

6    Q.  Christopher, do you recall on that van ride from the time

7    Mr. Heller's shorts were down and covering a portion of his

8    legs until the time when you noticed that a pant leg was up and

9    his genitals were exposed, did that happen rapidly?  Was it

10   over a long period of time?  Do you recall?

11   A.  I remember looking away one minute and then -- or I

12   remember looking at his shorts and they were up one minute, and

13   then I turned away.  And then when I eventually looked back,

14   his genitals were exposed.

15   Q.  And I apologize for the graphic nature of the question, but

16   can you describe precisely to the jury what it was you saw once

17   his shorts were no longer in the same position?

18   A.  When they were no longer in the same position, I saw his

19   penis.

20   Q.  And was it the right leg or the left leg, if you recall,

21   that had changed such position and his penis was exposed?

22   A.  I recall the right leg.

23   Q.  How, if at all, did the sight of Mr. Heller's exposed penis

24   during the van ride affect whether you wanted a sexual

25   relationship?

Christopher - Direct

1   *A.*   It did not.

2   *Q.*   How did the mission trip wrap up?

3   *A.*   It wrapped up by we all said goodbye to the Ugandans and

4   Pastor David and his family, and then we took a six-hour van

5   ride from Kamuli to the Entebbe airport.

6   *Q.*   And once you were at the Entebbe airport, what was the next

7   step in your return trip home?

8   *A.*   After that we flew to Dubai.

9   *Q.*   Do you know approximately how long that flight was from

10  Entebbe to Dubai?

11  *A.*   That was around six hours.

12  *Q.*   So at the time you arrived in Dubai, about how long had you

13  been traveling?

14  *A.*   We had been traveling for like 12 or 13 hours at that

15  point.

16  *Q.*   Were you tired?

17  *A.*   Yes.

18         *THE COURT:*  Ms. Davies, it's a quarter of now.  Would

19  this be a convenient time to take the mid-afternoon break, not

20  quite mid, but afternoon break?

21         *MS. DAVIES:*  Yes, Your Honor.  Thank you.

22         *THE COURT:*  Ladies and gentlemen, we will go ahead and

23  take the afternoon break, so why don't you plan on reconvening

24  at 4:00, all right?

25         The jury is excused.  Keep the admonitions in mind,

Christopher - Direct

1    ladies and gentlemen.  Thank you.

2               (Jury excused.)

3         (Recess at 3:46 p.m.)

4               THE COURT:  Christopher, you can step down if you

5    would like.

6               Anything else before -- and you may be seated, thank

7    you.  Anything before we take the recess?

8               MS. DAVIES:  No, Your Honor.  Thank you.

9               THE COURT:  Anything on behalf of Mr. Heller?

10              MS. CHRISTL:  No, Your Honor.

11              THE COURT:  We will be in recess until 4:00, then.

12   Thank you.

13        (Recess at 3:47 p.m.)

14        (Reconvened at 4:05 p.m.)

15              THE COURT:  Are we ready to bring the jury back in?

16              MS. DAVIES:  Yes, Your Honor.

17              MS. CHRISTL:  Yes, Your Honor.

18              THE COURT:  All right.  Let's bring in the jury.

19              Christopher, if you don't mind, can you please resume

20   the witness stand?

21              (Jury present.)

22              THE COURT:  Go ahead.

23              MS. DAVIES:  Thank you.

24   BY MS. DAVIES:

25   Q.  Christopher, when we took the afternoon break, you were

Christopher - Direct

1   describing the journey back to the United States.

2           Do you recall where you were in your testimony?

3   A.   I don't remember.

4   Q.   I think we had gotten you to the Dubai airport and you had

5   been traveling approximately 12 to 13 hours; is that correct?

6   A.   Yes.

7   Q.   And you had told the jury you were tired at that point; is

8   that correct?

9   A.   Yes.

10  Q.   Christopher, what airline, if you recall, did you fly on to

11  leave Dubai?

12  A.   We flew with Emirates.

13  Q.   Do you remember how long the leg from Dubai to Seattle was

14  supposed to be?

15  A.   That was supposed to be 15 hours.

16  Q.   Did you sit in your assigned seat for that flight?

17  A.   Yes.

18  Q.   Do you recall who sat on your left?

19  A.   Nate Goodman.

20  Q.   Can you describe for the jury kind of were there three

21  seats together or four seats together, how that set up was.

22  A.   Yeah.  There was a middle aisle of four seats and then

23  aisles of three seats on either side.

24  Q.   Were you on the left-hand three set of seats or the

25  right-hand three set of seats on the plane?

71

Christopher - Direct

1   A.   The left, left-hand.

2   Q.   And you recall that you were in your assigned seat and

3   Mr. Goodman was immediately on your left?

4   A.   Yes.

5   Q.   Do you recall who sat on your right on the flight from

6   Dubai to Seattle?

7   A.   That was Mr. Heller.

8   Q.   What, if anything, do you recall about whether Mr. Heller

9   was sitting in his assigned seat on that leg of the flight?

10  A.   That was not his assigned seat.  He had switched seats.

11  Q.   How did you know that?

12  A.   I believe he told me that.

13  Q.   Did you try to sleep on the 15-hour flight from Dubai to

14  Seattle?

15  A.   Yes.

16  Q.   And what, if anything, did you do to help you sleep on that

17  flight?

18  A.   On that flight I took Ambien.

19  Q.   What is Ambien?

20  A.   Ambien is a -- it's like a pill that you take to help you

21  fall asleep.  It makes you drowsy.

22  Q.   Had you ever taken Ambien before that trip?

23  A.   I never had.

24  Q.   Did you bring Ambien along with you on that trip?

25  A.   No.

72

Christopher - Direct

1   Q.   Who gave you the Ambien for the Dubai to Seattle flight?

2   A.   I believe it was either Mr. Heller or Mr. Goodman.

3   Q.   And why do you say that, Christopher?

4   A.   Because I remember getting the Ambien after I had sat down

5   on the plane.

6   Q.   So your recollection is either the person on the right or

7   the person on the left?

8   A.   Yes.

9   Q.   Do you recall Mr. Heller offering Ambien to church members

10  on the mission trip for other flights?

11  A.   Yes.

12  Q.   And when I say that, I mean the March 2017 to April 2017

13  mission trip.

14  A.   Yes.

15  Q.   And are you sure you got it from either Mr. Heller or

16  Mr. Goodman?

17  A.   Yes.

18  Q.   Did you take the Ambien?

19  A.   I did.

20  Q.   What effect, if any, did the Ambien have on you during that

21  flight?

22  A.   It made me really drowsy and sleepy and it made my eyes

23  heavy.

24  Q.   Did something unusual happen to you during the flight from

25  Dubai to Seattle?

73

Christopher - Direct

1   A.   Yes.

2   Q.   And knowing that this may be difficult for you to describe,

3   could you please explain to the jury what happened step by

4   step.

5   A.   Yes.   After I took the Ambien, I was beginning to fall

6   asleep.   And I was about half asleep when -- actually, I

7   believe before that Mr. Heller, he put one of the plane

8   blankets over both of our legs.   And then as I was beginning to

9   sleep, I felt Mr. Heller's hand on my right leg.

10  Q.   And after you felt Mr. Heller's hand on your leg, what

11  happened next?

12  A.   After that I -- my eyes were closed and I was trying to

13  sleep.   And I felt his hand go from the bottom of my leg to the

14  top of my leg and eventually slide -- he unbuttoned and

15  unzipped my shorts, and then he slid his hand underneath my

16  shorts and underwear.

17  Q.   And can you describe for the jury how that happened?   Did

18  he go through a leg, through the waistband?

19  A.   He went through the waistband.

20  Q.   Can you describe what you were wearing that day,

21  Christopher?

22  A.   That day I was just wearing like black shorts, sort of like

23  Chino shorts.

24  Q.   And there was both a button and a zipper to close the

25  front?

Christopher - Direct

1   A.  Yes.

2   Q.  And he undid both as you recall?

3   A.  Yes.

4   Q.  After he had slid his hand through the waistband of your

5   underwear, what happened next?

6   A.  After that he began to masturbate me.

7   Q.  By that do you mean he rubbed your penis?

8   A.  Yes.

9   Q.  Did he rub your penis until he made you ejaculate?

10  A.  Yes.

11  Q.  Was there anything about the cabin that concealed what

12  Mr. Heller was doing, and by that I mean the lighting or

13  anything else?

14  A.  The lighting on the plane was dark, meant for helping

15  people sleep.

16  Q.  And do you recall whether the blanket covered your groin

17  area entirely?

18  A.  It did.

19  Q.  Approximately how long into the flight did this happen that

20  Mr. Heller rubbed your penis?

21  A.  I believe that was maybe an hour into the flight.

22  Q.  And what was your state of wakefulness while Mr. Heller was

23  doing this to your private parts?

24  A.  I wasn't fully asleep, but I was awake enough to kind of

25  know what was going on.

Christopher - Direct

1   Q.  Did you say anything to him?

2   A.  No.

3   Q.  Why not?

4   A.  I didn't really -- at the time I didn't really -- it didn't

5   really register what was going on as I was on Ambien, and I was

6   kind of on the edge of sleep at that point.

7   Q.  How old were you when this occurred, Christopher?

8   A.  I was 16 when that occurred.

9   Q.  Was this the first time another person had touched your

10  genitals in a sexual manner?

11  A.  Yes.

12  Q.  And what did you do after Mr. Heller rubbed your penis

13  until he made you ejaculate?

14  A.  I believe after that I fell asleep.  And then eventually I

15  woke up and went to the bathroom, and that's when I saw my

16  shorts undone and that's when I realized what had happened.

17  Q.  And what was it about having your shorts undone that told

18  you something was wrong?

19  A.  Because I knew that I hadn't -- I hadn't undone them

20  myself, and I still kind of had the memory of what Dakota did

21  in my mind.

22  Q.  Did it click at that point?

23  A.  Yeah.

24  Q.  Before Mr. Heller rubbed your penis until he made you

25  ejaculate on April 3rd, 2017, did he ask you permission for the

 1  sexual contact?

 2  A.   No.

 3  Q.   Did you give him permission for the sexual contact?

 4  A.   No.

 5  Q.   Where did this flight land after Mr. Heller sexually abused

 6  you?

 7  A.   That flight landed in Seattle.

 8  Q.   Once you were at the Seattle airport, what, if any,

 9  emotions were you feeling toward Mr. Heller?

10  A.   At that time I was feeling anger and disgust and -- yeah,

11  mostly that.

12  Q.   Did you confront Mr. Heller at the Seattle airport?

13  A.   Yes.

14  Q.   And can you describe for the jury how that happened?

15  A.   After we went through customs, we -- our team was waiting

16  to get our boarding passes for the next flight.  And I --

17  Mr. Heller was charging his phone off in the corner, and so I

18  walked up to him and started talking to him.

19  Q.   Were you angry?

20  A.   Yes.

21  Q.   What did you say to him?

22  A.   I asked him, I said, "What were you thinking?  What just

23  happened?  Like what are you doing?  Like why the hell did you

24  do that?"

25  Q.   Did he respond?

Christopher - Direct

1    *A.*   He did.

2    *Q.*   What did he say?

3    *A.*   He said, "I don't know."  And he told me to kind of quiet

4    my voice for -- he was afraid of the rest of our team hearing

5    me being loud because I was angry.

6    *Q.*   Do you recall anything else that he said then?

7    *A.*   He said that he made a big mistake and, yeah, told me not

8    to tell anyone.

9    *Q.*   What, if anything, did he say about what effect it would

10   have on him if you disclosed?

11   *A.*   He said that he would be in a lot of trouble if I told

12   anyone.

13   *Q.*   Did you board your next flight and return home to Colorado?

14   *A.*   Yes.

15   *Q.*   Once you were back in Colorado, is this now early April of

16   2017?

17   *A.*   Yes.

18   *Q.*   Once you were back in Colorado, did Mr. Heller contact you?

19   *A.*   Yes.

20   *Q.*   How did he contact you?

21   *A.*   He contacted me by texting me and he Snapchatted me.

22   *Q.*   Can you explain to the jury what Snapchat is?

23   *A.*   Snapchat is an app where you can communicate with people

24   and the messages disappear after a short period of time.

25   *Q.*   And was Snapchat an app that you had in April of 2017?

Christopher - Direct

1    A.   Yes.

2    Q.   Did Mr. Heller contact you just once after you first got

3    back?

4    A.   No, no.  It was multiple times.

5    Q.   And what did Mr. Heller communicate when he contacted you

6    in April of 2017?

7    A.   He said, "Why are you ignoring me," and wanted to talk

8    about what had happened and apologize again.

9    Q.   And how did you respond?

10   A.   I just continued to ignore him, ignore his messages.

11   Q.   Did there come a time when you agreed to meet with him

12   someplace?

13   A.   Yes.

14   Q.   And why did you agree to meet with him?

15   A.   He asked me to meet with him at Chipotle and he wanted to

16   apologize and talk through everything.  And I -- and so yeah, I

17   agreed.

18   Q.   Why did you agree?

19   A.   I agreed because I wanted to try and be gracious of him and

20   I wanted to think the best of his character.

21   Q.   Other than Chipotle, were you going to see each other?

22   A.   What's that?

23   Q.   Were there other occasions you would have seen Mr. Heller

24   in any case?

25   A.   Not after the Uganda trip.

Christopher - Direct

1   *Q.*  Were you still attending Cornerstone Church?

2   *A.*  Yes.

3   *Q.*  To your knowledge, was he still attending Cornerstone

4   Church?

5   *A.*  Yes.

6   *Q.*  Do you know approximately when you met at Chipotle?

7   *A.*  I think that was about a week after I got back from Uganda.

8   *Q.*  Approximately April 10th, give or take, of 2017?

9   *A.*  Yes.

10  *Q.*  Once you were at Chipotle, did you sit down with

11  Mr. Heller?

12  *A.*  Yeah.  We each got food and then we sat down at a table.

13  *Q.*  Do you recall what happened?

14  *A.*  Yes.

15  *Q.*  Can you describe it for the jury, please?

16  *A.*  We sat down and Mr. Heller apologized and was crying.  He

17  said that he made a huge mistake and he said he didn't want to

18  kind of put me in a situation, but there was nothing he could

19  take back at that point.  And then he also said, he told me to

20  not tell anybody, but he had said that if I did, that I would

21  alert him first.  And then during that meeting he said he

22  was -- he kind of asked me if I thought if I was leading him on

23  or not in Uganda.

24  *Q.*  What, if anything, did he say about any corrective action

25  he would take if you would not disclose?

Christopher - Direct

1    A.  Can you repeat the question?

2    Q.  Do you recall anything else that Mr. Heller said on the

3    issue of whether or not you were going to disclose?

4    A.  Well, he said that he thought that I had been leading him

5    on in Uganda and he wasn't sure.  He thought that I was sending

6    him mixed signals, and he wasn't sure if I was gay or not

7    because I did not have a girlfriend at the time and the other

8    two boys my age on the trip did.  And so he knew because they

9    had girlfriends that they weren't gay, so they weren't, I

10   guess, up for grabs, I guess.

11   Q.  What, if anything, did Mr. Heller say about specific

12   examples of things you had done to send signals?

13   A.  He didn't say anything to my recollection.

14   Q.  What if anything else did he say that suggested that he

15   thought you had given him permission?

16   A.  Nothing that I can remember.

17   Q.  Did you ultimately decide, at least at that time, not to

18   disclose what Mr. Heller had done to you?

19   A.  At that time, yeah.

20   Q.  Was there anything he said to you that helped you make that

21   decision that at least in the moment you should not disclose

22   what he had done?

23   A.  Yeah.  He said that I should be aware that if I told anyone

24   in the church, that they would be required by law to tell law

25   enforcement.

Christopher - Direct

1   *Q.*  Did he say he would get help if you would just not

2   disclose?

3   *A.*  He did.

4   *Q.*  How did you feel about the sexual contact Heller had done

5   to you on April 3rd, 2017?

6   *A.*  I felt horrible and disgusted.

7   *Q.*  At that time shortly after meeting at Chipotle around

8   April 10 of 2017, did you make the decision to disclose?

9   *A.*  I did not.

10  *Q.*  And why not?

11  *A.*  Because I thought that Mr. Heller was going to get help for

12  his attraction to minors.

13          *MS. CHRISTL:*  Objection, Your Honor.

14          *THE COURT:*  I will sustain it.  If you could ignore,

15  ladies and gentlemen, the statement about attraction to minors.

16          Go ahead.

17          *MS. CHRISTL:*  Your Honor, could we have a side bar and

18  maybe discuss what we discussed earlier at the bench about an

19  admonition?

20          *THE COURT:*  Yes.  You may approach.

21     (At the bench:)

22          *MS. CHRISTL:*  At this point I am asking the witness be

23  admonished outside the presence of the jury to not say an

24  attraction to minors again.

25          *THE COURT:*  I am not going to admonish a witness, but

Christopher - Direct

1  I will allow Ms. Davies to mention to Christopher that, if she

2  chooses -- it's probably a good idea -- not to mention that

3  particular statement.

4        *MS. DAVIES:*  It is his belief.  And I did not talk to

5  him during the break to avoid any other problems, but...

6        *THE COURT:*  Do you want to do that now, Ms. Davies?

7        *MS. DAVIES:*  I certainly can.

8        *THE COURT:*  We will wait for you to come back.

9        *MS. DAVIES:*  Okay.  So what would you like me to do,

10  just talk to him right here?

11        *THE COURT:*  Yeah.

12        *MS. DAVIES:*  Okay.  Done.

13        *THE COURT:*  All right.  Thank you.

14     (In open court:)

15        Ms. Davies, go ahead.

16  *BY MS. DAVIES:*

17  *Q.*  Christopher, after meeting Mr. Heller at Chipotle, from

18  April of 2017 going forward did you see Mr. Heller on a regular

19  basis?

20  *A.*  Not at first, but then I eventually started seeing him at

21  church again.

22  *Q.*  So was there some period of time when you did not see him

23  at church?

24  *A.*  I think so.

25  *Q.*  And when you say church, what church are we talking about?

Christopher - Direct

1    *A.*   Corner -- Cornerstone Church.

2    *Q.*   Outside of church -- so at church, approximately how many

3    times would you see him per month once you resumed seeing him

4    there?

5    *A.*   Maybe around three times per month.

6    *Q.*   And now setting that aside, Christopher, outside of church

7    about how many times did you see Mr. Heller between, say,

8    approximately April 2017 and April 2018?

9    *A.*   I saw him probably every month.

10   *Q.*   And where would you see him?

11   *A.*   I would see him at church, and then I would also

12   occasionally see him at kind of like friend group gatherings as

13   we kind of had similar friend groups within the church.

14   *Q.*   And now setting those aside, if we are just talking about

15   occasions when you saw Mr. Heller on a one-on-one basis,

16   between that same time period, approximately April 2017 and

17   April 2018, how many times would you say you saw Mr. Heller

18   alone, just the two of you?

19   *A.*   Not many.

20   *Q.*   Can you describe for the jury an occasion when you saw

21   Mr. Heller, just the two of you, doing something together?

22   *A.*   Yeah.  I believe there was a time that we went to a

23   concert, and then there is another time where we went to the

24   mall together.

25   *Q.*   Focusing on the mall trip, can you describe to the jury how

Christopher - Direct

1  that came about?

2  A.  I believe I -- at that point Dakota was contacting me over

3  Snapchat a lot and I just kind of went along with it because I

4  thought that was the easiest thing to do.  And I think at that

5  time I needed some shirts and I think I told Mr. Heller that,

6  and he asked if he could come along.

7  Q.  And then you mentioned a concert.  Can you describe for the

8  jury approximately when that was?

9  A.  I think that was October of 2017, around there.

10 Q.  So about six months after the events we talked about on the

11 plane?

12 A.  Yes.

13 Q.  And can you describe for the jury where that concert was

14 and when it was?  I am sorry, you told us when; where it was.

15 A.  That would have been at Red Rocks.

16 Q.  How was it that Mr. Heller came to go to a concert with you

17 at Red Rocks?

18 A.  I believe I told him about it and none of my other friends

19 wanted to go.  And then he said that he would go with me.

20 Q.  Aside from those two occasions in the year between

21 April 2017 and April 2018, do you recall any other occasions

22 just one on one that you would be doing some things together?

23 A.  No.

24 Q.  Was there a lunch perhaps at some point?

25 A.  Oh, yeah, there was one time when we got lunch at Tokyo

Christopher - Direct

1  Joe's, I believe.

2  Q.  During any of those three outings in a year, what, if any,

3  permission did you give Mr. Heller for sexual contact?

4  A.  None.

5  Q.  What, if any, messages or social media do you recall

6  exchanging with him in the time period we have just been

7  talking about, April of 2017 and going forward?

8  A.  That would have been mainly Snapchat messages and text

9  messages.

10  Q.  Who initiated the Snapchat messages for the most part?

11  A.  Mr. Heller.

12  Q.  And what kind of information, if you recall, would he

13  communicate to you during these Snapchat messages?

14  A.  Kind of just random stuff about his day.

15  Q.  Did you also communicate with other friends using Snapchat

16  during this time?

17  A.  Yes.

18  Q.  And did you respond to your other friends?

19  A.  Yes.

20  Q.  Did you respond to Mr. Heller?

21  A.  Yes.

22  Q.  Why did you respond to Mr. Heller?

23  A.  I did because I had other friends on Snapchat and I would

24  respond to them.  And I thought responding to him would be

25  easier than him getting mad at me for ignoring him.

Christopher - Direct

1   Q.   And did that happen?  Did he get mad at you?

2   A.   He had, yeah.

3   Q.   And after he got mad at you, how did you change your

4   behavior to avoid that?

5   A.   I usually kind of just went along with his communications.

6   Q.   Did there come a time when you started working out, doing

7   exercise in order to get stronger?

8   A.   Yes.

9   Q.   Do you recall when you started working out, if that was

10   before or after the Uganda mission trip?

11   A.   That was after the mission trip.

12   Q.   Do you recall approximately how long after the Uganda trip?

13   A.   It was probably within the six months following the mission

14   trip.

15   Q.   Do you recall after you started working out whether or not

16   that was something that you exchanged messages with Mr. Heller

17   about?

18   A.   It was.

19   Q.   And why was that?

20   A.   Just because we had kind of a common interest in working

21   out.

22   Q.   Do you recall whether or not you sent Mr. Heller any photos

23   of you that related to your working out?

24   A.   I did once.

25   Q.   What did you send him?

Christopher - Direct

1   A.   I believe I just sent him a shirtless picture of myself.

2   Q.   Why did you do that?

3   A.   Just because we had kind of the common interest and I

4   was -- I kind of had done that with other friends as well.

5   Q.   And what is the purpose for people who are working out in

6   exchanging photos like that?

7   A.   Just to kind of note like on physical fitness progress, I

8   guess, because when you work out, you usually get stronger and

9   bigger.

10  Q.   Did the picture show your muscles were getting bigger?

11  A.   Yes.

12  Q.   Was the one time when you sent a photo of a shirtless

13  picture to Mr. Heller in any way intended to give him

14  permission or validate what he had done back on April 3rd of

15  2017?

16  A.   No, not at all.

17  Q.   What, if any, photos did Mr. Heller send to you that caused

18  you concern?

19  A.   Heller did send multiple shirtless photos and one of them

20  he was in his underwear.

21  Q.   And all of the communications we're talking about regarding

22  working out, can you just clarify where they were in relation

23  to the Uganda mission trip?

24  A.   What do you mean?

25  Q.   In time, when did the messages regarding working out, any

Christopher - Direct

1   photos were exchanged, when did those occur relative to the

2   Ugandan mission trip?

3   A.   That was probably in like June or July, like the summer

4   after the mission trip.

5   Q.   So two, three, four months afterwards?

6   A.   Yes.

7   Q.   Do you recall sending any photos to Mr. Heller that

8   depicted a picture of your face making any sort of gesture that

9   might have a sexual connotation?

10   A.   No.

11   Q.   Do you recall ever doing that?

12   A.   No.

13   Q.   Did there come a time when you began working as an employee

14   for Mr. Heller?

15   A.   Yes.

16   Q.   Approximately when was that, Christopher?

17   A.   That would have been I think May or June of 2018.

18   Q.   So more than a year after the sexual abuse ended?

19   A.   Yes.

20   Q.   How did that come about?

21   A.   I wasn't really happy at my current job, and so I knew that

22   I had some friends that had worked for Mr. Heller before.  And

23   so I reached out and asked if I could do so as well.

24   Q.   And focusing on the time after you started working for

25   Mr. Heller, how often did you see him?

Christopher - Direct

1    A.  I saw him about three times per week.

2    Q.  And that was for work, correct?

3    A.  Yes.

4    Q.  And in addition to seeing him through your work

5    relationship, did you see him otherwise?

6    A.  Yeah.  I saw him occasionally at church and still at like

7    social gatherings with friends.

8    Q.  While you worked on projects together, did he tell you

9    about his friends and his social life?

10   A.  Yeah, sometimes.

11   Q.  From what Mr. Heller told you in the May, June 2018 and

12   beyond time frame, who were his closest friends?

13   A.  I believe David Wolf and Kari Quesada.

14          MS. CHRISTL:  Objection, Your Honor, foundation as to

15   when this conversation took place.  Also, none of this was

16   tendered in discovery and they are statements that my client

17   made.

18          THE COURT:  Overruled.

19   BY MS. DAVIES:

20   Q.  What, if any, sexual contact with Mr. Heller did you want

21   during this time?

22   A.  Zero.

23   Q.  What, if anything, did you do to validate the fact that he

24   had previously sexually abused you while you were working for

25   him?

1     *A.*   Nothing.

2     *Q.*   Christopher, from April 3rd, 2017 until the fall of 2018,

3     who, if anyone, had you told about the sexual abuse on the

4     plane?

5     *A.*   Nobody.

6     *Q.*   Had you been thinking about it?

7     *A.*   Yes.

8     *Q.*   How, if at all, was it weighing on your mind?

9     *A.*   I knew -- I knew that I was going to have to tell somebody

10   at some point, whether it was somebody in the church or

11   whenever I got married or something like that.

12   *Q.*   Did there come a time when you chose to talk to someone

13   about Mr. Heller's sexual contact with you on April 3rd, 2017?

14   *A.*   Yes.

15   *Q.*   Who did you disclose this event to?

16   *A.*   I disclosed it to kind of a group of friends in Australia

17   while I was on a gap year.

18   *Q.*   Can you describe for the jury how it was you came to be in

19   Australia and who you were with?

20   *A.*   I went to sort of a christian school thing in Australia for

21   three months after my graduation.

22   *Q.*   And where in Australia was this?

23   *A.*   This was in Gold Coast, Australia, kind of like five hours

24   or so north of Sydney.

25   *Q.*   Who was this group to who you disclosed?

Christopher - Direct

1   A.   This was kind of another small group similar to what we had

2   at Cornerstone Church.

3   Q.   After you disclosed, can you describe briefly for the jury

4   what it was you told this small group?

5   A.   I just told the small group what had happened on the

6   airplane in -- yeah, on my first trip to Uganda.

7   Q.   After you disclosed to the small group, did you tell

8   anybody else?

9   A.   Yes.

10  Q.   And who did you next tell about the sexual act?

11  A.   After that I told my friend, Jaden, who lived in Australia,

12  and then he advised me to tell one of his pastors from his

13  church about it.

14  Q.   And did you do that, Christopher?

15  A.   Yes.

16  Q.   And what did you conclude after speaking to the pastor in

17  Australia?

18  A.   After that I concluded that I needed to tell Cornerstone

19  about that, about the incident.

20  Q.   Did there come a time when you decided to tell somebody at

21  Cornerstone about the incident?

22  A.   Yes.

23  Q.   And who did you decide to tell?

24  A.   I told Gabe Kinzley, my uncle.

25  Q.   And why was it you chose to tell Mr. Kinzley about this?

Christopher - Direct

1  *A.*  I told him because he was the head of the Uganda trip in

2  2016 -- or 2017, and he is the senior youth pastor at

3  Cornerstone.

4  *Q.*  When approximately did you tell Mr. Kinzley what had

5  happened to you?

6  *A.*  That would have been in the beginning of January about a

7  week or two after I got back from Australia.

8  *Q.*  Besides Mr. Kinzley, did you tell anybody else about the

9  same time?

10  *A.*  Yes.

11  *Q.*  Who else did you tell?

12  *A.*  I told my girlfriend Joy like about three hours earlier.

13  *Q.*  And did you tell Mr. Kinzley what had happened in the same

14  fashion that you told the jury here today?

15  *A.*  Yes.

16  *Q.*  You had previously told Mr. Heller that you would tell him

17  when you decided to disclose.  Did you do so in this case?

18  *A.*  No.

19  *Q.*  Would you please look at what's marked for identification

20  as Government Exhibit 6.  And Christopher, if you would please

21  flip through the pages that make up Government Exhibit 6 for

22  identification.

23       Do you recognize what it is that is marked for

24  identification as Government Exhibit 6?

25  *A.*  Yes.

Christopher - Direct

1   *Q.*  And without disclosing the contents, what is it?

2   *A.*  It's a text message conversation I had with Mr. Heller

3   after coming back from Australia.

4   *Q.*  And do the pages that make up Government's Exhibit 6 for

5   identification appear to be a true and correct copy of your

6   text messages with Mr. Heller after you came back from

7   Australia?

8   *A.*  Yes.

9         *MS. DAVIES:*  Your Honor, I move the admission of

10  Government Exhibit 6.

11        *THE COURT:*  Any objection to the admission of

12  Exhibit 6?

13        *MS. CHRISTL:*  No, Your Honor.

14        *THE COURT:*  Exhibit 6 will be admitted.

15        *MS. DAVIES:*  Your Honor, request to publish?

16        *THE COURT:*  You may.  If you could just indicate which

17  pages you are displaying to the jury when they are being

18  displayed.

19  *BY MS. DAVIES:*

20  *Q.*  Starting with Page 1, and Christopher, you'll see in the

21  lower left-hand corner someone has put in Nos. 106.  Do you see

22  that?

23  *A.*  Yes.

24  *Q.*  So looking at the same page that is displayed on the

25  monitor, can you describe for the jury what this is?

1    *A.*  This is a picture of Mr. Heller's contact information in my

2    phone.

3    *Q.*  Is this on your phone?

4    *A.*  Yes.

5    *Q.*  Is that the number that you communicated with him, to the

6    best of your knowledge?

7    *A.*  Yes.

8    *Q.*  Is that his picture that we see at the top of that screen?

9    *A.*  Yes.

10   *Q.*  If you would now turn to Page 2.  And I see some

11   conversation strings or bubbles that are in different colors,

12   so I want to focus first on the blue.

13          Do you know who the blue is?

14   *A.*  That's me.

15   *Q.*  Starting about the middle of the page on another note, do

16   you see where that starts?

17   *A.*  Yes.

18   *Q.*  Can you explain to the jury what it is you were trying to

19   communicate to Mr. Heller in the rest of that page?

20   *A.*  Just explain?

21   *Q.*  Yes, please.

22   *A.*  I was just telling him kind of what happened in Australia

23   and, yeah, that I was going to tell somebody about the

24   incident.

25   *Q.*  And what incident are you talking about, Christopher?

Christopher - Direct

1   *A.*   The sexual abuse on the airplane.

2   *Q.*   And now if we turn to the next page, so Page 3 of 6 in the

3   lower left-hand.

4         And Christopher, at the time that you sent the text

5   that we are seeing here, had you already disclosed to

6   anybody --

7   *A.*   Yes.

8   *Q.*   -- about the incident?

9   *A.*   Yes.

10  *Q.*   And the gray bubble, do you know who that is?  That's in

11  the top portion of the page on Page 3 of 6, Government

12  Exhibit 6.

13  *A.*   Yes.  That's Mr. Heller.

14  *Q.*   And what did you understand he was telling you?  And I

15  guess the jury can read the words for themselves.

16  *A.*   Yeah.

17  *Q.*   Now if we turn to Page 4 of 6.

18         Is this the first time you had spoken to Mr. Heller

19  about the incident after Chipotle?

20  *A.*   Yes.

21  *Q.*   Had he attempted to speak to you on another occasion?

22  *A.*   He did.

23  *Q.*   And what did you say on that occasion?

24  *A.*   I told him I didn't want to talk about it.

25  *Q.*   And to your knowledge, is all the information that appears

Christopher - Direct

1   in gray on Page 4 of Government Exhibit 6, that is Mr. Heller

2   speaking to you?

3   *A.*   Yes.

4   *Q.*   He indicates he is sorry; is that right?

5   *A.*   Yes.

6   *Q.*   That he made a huge mistake?

7   *A.*   Yeah.

8   *Q.*   And that he will deal with the consequences; is that right?

9   *A.*   Yes.

10  *Q.*   And then do you know the date specifically that this text

11  message was sent, Christopher?

12  *A.*   I don't know specifically.

13  *Q.*   Do you know approximately when it was sent?

14  *A.*   It would have been like a day or two after I told Gabe.

15  *Q.*   We can take that exhibit down.

16         What, if any, further communications did you have with

17  Mr. Heller after this text message, Exhibit 6, in January of

18  2018?

19  *A.*   None.

20  *Q.*   Any further communications on other social media?

21  *A.*   No.

22  *Q.*   Did you work for him after this?

23  *A.*   No.

24  *Q.*   Did you see him at church?

25  *A.*   No.

Christopher - Direct

1    *Q.* Did you see him other places?

2    *A.* No.

3    *Q.* Christopher, prior to testifying today, have you been

4    interviewed previously by the FBI?

5    *A.* Yes.

6    *Q.* And have you been interviewed by me and other people from

7    the U.S. Attorney's Office?

8    *A.* Yes.

9    *Q.* How, if at all, have the questions gotten more specific as

10   this trial -- here we are today -- has gotten closer?

11          *MS. CHRISTL:* Objection, relevance.

12          *THE COURT:* What's the relevance?

13          *MS. DAVIES:* To give the witness an opportunity to

14   explain the process by which he prepared himself to testify.

15          *THE COURT:* Overruled.

16   *A.* As I have kind of talked about it more and been interviewed

17   more, I've -- my memory has kind of been jogged more on what

18   happened.

19   *BY MS. DAVIES:*

20   *Q.* And have more specific questions made you remember more

21   details?

22   *A.* Yes.

23   *Q.* And have you provided those details to the jury here today?

24   *A.* Yes.

25          *MS. DAVIES:* Your Honor, if I may just have a moment,

Christopher - Cross

1     please.

2             *THE COURT:*  You may.

3             *MS. DAVIES:*  No further questions at this time.

4             *THE COURT:*  Thank you.

5             Cross-examination?

6                        **CROSS-EXAMINATION**

7     *BY MS. CHRISTL:*

8     *Q.*  Good afternoon, Christopher.

9     *A.*  Good afternoon.

10    *Q.*  You are 19 years old now; is that correct?

11    *A.*  Yes.

12    *Q.*  Okay.  And in April of 2017, you were 16.

13    *A.*  Yes.

14    *Q.*  Your birthday was in -- is in May, correct?

15    *A.*  Yes.

16    *Q.*  So you were pretty close to 17?

17    *A.*  Uh-huh.

18    *Q.*  I wanted to talk to you a little bit about the word you

19    used today "molestation," correct?

20    *A.*  Yes.

21    *Q.*  Can we pull up Government Exhibit 6, and Page 2.

22            Today you said -- this is the first time that you have

23    used that word, "molestation," correct?

24    *A.*  Yes.

25    *Q.*  You interviewed, as Ms. Davies said, with the government in

Christopher - Cross

1   preparation for your trial correct?

2   *A.*  Yes.

3   *Q.*  Testimony?  You talked to Special Agent Jones who is seated

4   at this table also on multiple occasions, correct?

5   *A.*  Yes.

6   *Q.*  You have had at least I believe four in-person meetings

7   with Special Agent Jones.

8   *A.*  Yes.

9   *Q.*  One in January of 2017 --

10  *A.*  Uh-huh.

11  *Q.*  -- correct?  I am sorry, 2019.  One in May of 2019,

12  correct?

13  *A.*  Yes.

14  *Q.*  And then you had two in October to get ready for trial.

15  *A.*  Yes.

16  *Q.*  And you've also talked to Special Agent Jones on the

17  telephone multiple times, correct?

18  *A.*  Yes.

19  *Q.*  You, in fact, had his mobile phone number, correct?

20  *A.*  Uh-huh.

21  *Q.*  And you had exchanged text messages with him at times.

22  *A.*  Yes.

23  *Q.*  During none of those conversations you ever used the word

24  "molestation," correct?

25  *A.*  I have no clue.

100

Christopher - Cross

1   Q.  You don't remember using that word.

2   A.  I don't remember if I did or if I didn't.

3   Q.  Okay.  I am circling on Page 2 of Government Exhibit 6 the

4   language that you used regarding what happened in this case

5   back in January of 2019, correct?

6   A.  Yes.

7   Q.  How did you refer to what happened on the airplane in this

8   text message to Mr. Heller?

9   A.  In the text message as what happened in Uganda.

10  Q.  You said, "And so tonight I was going to tell her about my

11  past, including what happened in Uganda," correct?

12  A.  Yes.

13  Q.  And those were words that you chose.

14  A.  Uh-huh.

15  Q.  You didn't say, "I'm going to tell her that you molested

16  me," correct?

17  A.  Correct.

18  Q.  You did not tell her -- tell Mr. Heller, "I am going to

19  tell her that you sexually assaulted me," correct?

20  A.  Correct.

21  Q.  You did not use the words to Mr. Heller, "I am going to

22  tell Joy that you sexually abused me," correct?

23          MS. DAVIES:  Objection.  The document speaks for

24  itself.

25          THE COURT:  Overruled.

Christopher - Cross

1    *BY MS. CHRISTL:*

2    *Q.* And I -- we are both using the term Mr. Heller.  You saw

3    him three times a week and had a relationship with him,

4    correct?

5    *A.* Uh-huh.

6    *Q.* You referred to him as Dakota?

7    *A.* Yes.

8    *Q.* We are using formalities today because we are in court.

9    That's why you are referring to him as Mr. Heller, correct?

10   *A.* Yes.

11   *Q.* So let's go back and talk about the day that you talked

12   about going to the well ceremony in Uganda, right?

13   *A.* What does that mean?

14   *Q.* Well, you talked about how Mr. Heller exposed himself to

15   you on your way to a well ceremony, correct?

16   *A.* Right.

17   *Q.* You also testified when asked by Ms. Davies that you had

18   disclosed a lot of what happened to your uncle, Gabe Kinzley,

19   correct?

20   *A.* Yes.

21   *Q.* And when you told Gabe about Mr. Heller exposing himself to

22   you or you seeing his penis, that that happened on a bed,

23   correct?

24   *A.* On a bed?  I never said that.

25   *Q.* You did not say that to your uncle, Gabe.

Christopher - Cross

1   A.  No.

2   Q.  Not when you had the conversation with him in January of

3   2019?

4   A.  No.

5   Q.  Now, you went to a couple of well ceremonies in --

6   A.  Yes, in Uganda.

7   Q.  -- in Uganda, correct?

8   A.  Yes.

9   Q.  And those well ceremonies were special events.

10  A.  Uh-huh.

11  Q.  Yes?

12  A.  Yes.

13  Q.  You were bringing water to areas that did not have clean

14  drinking water.

15  A.  Yes.

16  Q.  And you had worked hard on these, building these wells?

17  A.  I didn't build them.

18  Q.  Or the group?

19  A.  The group never built the wells.

20  Q.  Okay.  The group -- okay.  Who was building the wells?

21  A.  The Ugandans.

22  Q.  What was the purpose of the well ceremony?

23  A.  Because that was the first time that we would open them up

24  to the public, and Cornerstone Church was the ones sponsoring

25  the building of the wells.

Christopher - Cross

1   *Q.* So you were instructed by your uncle, Gabe, that these were

2   more formal occasions, correct?

3   *A.* Yes.

4   *Q.* And that you were supposed to dress up.

5   *A.* Yes.

6   *Q.* Okay.  I am going to show you -- could you please pull up

7   Government Exhibit No. 28.

8        This is Mr. Heller that I have circled at one such

9   well ceremony, correct?

10   *A.* Yes.

11   *Q.* And Mr. Heller appears to be wearing a button-down shirt

12   and khaki pants.

13   *A.* Yes.

14   *Q.* And that was customary during these well ceremonies that

15   the members of Cornerstone Church dressed up.

16   *A.* I mean, it wasn't really customary, but some of us did.

17   *Q.* And most of you wore pants for these ceremonies, right?

18   *A.* I -- no, I wore shorts.

19   *Q.* You wore shorts.  But everyone else was wearing pants for

20   these ceremonies?

21   *A.* No.  There was other people wearing shorts too.

22   *Q.* But people weren't wearing basketball shorts for these

23   ceremonies.

24   *A.* They might have been, but those just weren't wearing

25   anything fancy either, so it didn't matter a whole lot.

Christopher - Cross

1    *Q.*  But this -- could you pull up Government Exhibit 27,

2    please?  This is another well photo from the well ceremony,

3    correct?

4    *A.*  Yes.

5    *Q.*  And that's your uncle, Gabe?

6    *A.*  Yes.

7    *Q.*  And your uncle, Gabe, is wearing a button-down shirt and

8    pants, correct?

9    *A.*  Yes.

10   *Q.*  That was the dress consistent with these well ceremonies in

11   Uganda.

12   *A.*  Well, not necessarily.

13   *Q.*  Well, the photos that the government introduced of the well

14   ceremonies show people from Cornerstone dressed up.

15   *A.*  Yeah, but you could also see in the previous photo there

16   were people from Cornerstone wearing graphic T-shirts and

17   shorts and cargo pants, you know.  So it wasn't everybody

18   wearing button-down shirts.  And I don't even know if it was

19   specifically to a well ceremony that Dakota exposed himself to

20   me, but I do remember that he was wearing basketball shorts.

21   *Q.*  But you did testify -- you took an oath today, correct?

22   *A.*  Yes.

23   *Q.*  And you testified under oath when you were on direct

24   examination, correct?

25   *A.*  Uh-huh.

Christopher - Cross

1   Q.  And you testified under oath that this occurred on the way

2   to a well ceremony.

3   A.  I didn't say that for sure.  I said that it was maybe on

4   the way to a well ceremony or something like that.

5   Q.  That's how you answered the question when asked?

6   A.  That's what I remember.

7           MS. CHRISTL:  Okay.  Could you pull up Exhibit 28

8   again, please?

9   BY MS. CHRISTL:

10  Q.  Could you show me in this photograph where a member from

11  Cornerstone is wearing shorts?

12  A.  I can't see, but you can't really see anyone's legs in this

13  picture anyways.

14  Q.  Didn't you just testify that in this photograph you could

15  see people from Cornerstone wearing shorts and graphic

16  T-shirts?

17  A.  Well, there is two wearing graphic T-shirts and there is

18  two wearing cargo pants.

19  Q.  So you were mistaken when you said that there was someone

20  wearing shorts in this photograph.

21  A.  Yeah, I guess so.

22  Q.  Okay.  You also testified that when this supposedly

23  happened, that Mr. Heller was asleep.

24  A.  He appeared to be asleep.

25  Q.  And he appeared to be sleeping because he had his eyes

1    closed?

2    *A.*  Yes.

3    *Q.*  He wasn't talking?

4    *A.*  Correct.

5         *MS. CHRISTL:*  Your Honor, I am about to get into a

6    section that probably has a lot of like -- I will be playing

7    audio recordings.

8         *THE COURT:*  Right.  That's fine.  We are about three

9    minutes before 5:00, so we will go ahead -- the implication

10   being that this would be a good time to break for the day?

11        *MS. CHRISTL:*  Yes.

12        *THE COURT:*  Yes, I think it would be.

13        Ladies and gentlemen, we will go ahead and recess for

14   the day.  So keep in mind the following things:  First of all,

15   when you go home or if you are talking to other people, do not

16   tell them any more than the following.  Just tell them you are

17   a juror in United States District Court.  You are on a criminal

18   case and the trial is expected to last three days, but you are

19   not sure how long the deliberations will last, okay?

20        Don't tell them anything more about it because

21   otherwise you might be off to the races.  They might start

22   talking to you about things, who knows what, but you might then

23   get told things that I have indicated to you you shouldn't be

24   exposed to, okay?  So just limit it.

25        Once the trial is over with and you are released from

1    jury duty in this case, you can talk to people as much or as

2    little as you want, but not until then, okay?  And obviously

3    you can't deliberate at all, talk to yourselves or to one

4    another until you are released to commence your deliberations

5    too.  Also don't look up any information about the case.

6         Let's plan on reconvening tomorrow at 8:30.  So you

7    may have come in earlier today to try to get here to start.

8    The traffic may be a lot worse if you are coming in at 8:30, so

9    try to -- it's going to be icy tomorrow and everything I am

10   sure, so try to leave early.  Try to get here early because we

11   obviously can't start until each of you is here and ready to

12   go.  You did a great job this morning, so try to allow a little

13   extra time tomorrow morning.

14        As you may know, this is not the first of the snow.

15   There is more snow coming tomorrow afternoon apparently.  We

16   will keep a weather eye on that as well, all right, because I

17   don't want you to have to go home in a snowstorm or something,

18   but we will keep an eye on that, all right?

19        I hope you have a good evening.  Drive carefully if

20   you are driving back home tonight.  The jury is excused.  We

21   will reconvene tomorrow at 8:30.  Thank you.

22             (Jury excused.)

23        Christopher, you can go ahead and go back outside if

24   you want.  And can you be back here ready to go at

25   8:30 tomorrow?

1          *THE WITNESS:*  Sure.

2          *THE COURT:*  Great.  Thank you.

3          All right.  We will be in recess until 5:15 and then

4    at that time we will do two things.  We will talk about those

5    objections on the -- to the one -- to the exhibits and we will

6    also talk about the jury instructions.  Mr. Heller does not

7    have to stick around for those things if he chooses not to.  On

8    the other hand, he is perfectly free to stay, totally up to

9    him.  Same goes with Special Agent Jones.

10         *MS. CHRISTL:*  Your Honor, before I guess everyone in

11   the courtroom leaves, I do have one request.  Since there is a

12   sequestration order in this case, it's my understanding that

13   there is several people in the audience who are related to, in

14   some cases a sibling of or married to a witness in this case.

15   I don't know that the Court can admonish them, but I would ask

16   that the Court ask the government to admonish their witnesses

17   that they are not to talk to anyone who is a witnesses in this

18   case about what transpired in the courtroom today.

19         *THE COURT:*  Right.  It would time not be appropriate

20   to talk to witnesses about testimony that has happened because

21   there is a sequestration order in effect.

22         We will be in recess until 5:15.  Thank you.

23      (Recess at 5:02 p.m.)

24      (Reconvened at 5:17 p.m.)

25         *THE COURT:*  We are reconvened in the Heller case.  The

1    jury is not present.  Mr. Heller is not present.  He doesn't

2    need to be here for this.  Special Agent Jones, however, is

3    present.  The attorneys are present.

4           We are going to talk about two matters.  One is the

5    issue that came up regarding the transcript of the recording of

6    the group conversation or confrontation.  So why don't we go

7    ahead and take that issue up first.

8           I was tendered by Ms. Surratt GX62.  And actually, it

9    keeps going on.  It's a number of different pages sequentially

10   numbered, but they are color-coded.  Portions of the transcript

11   are marked in blue.  Apparently those are portions of the

12   transcript that the defendant objects to and which the

13   government thinks are admissible.  Other portions of that

14   document are marked in yellow, highlighted in yellow.  Those

15   are portions that the defendant objects to but which the

16   government will concede will not come in.

17          Do you want to go ahead or do you want to have the

18   defendant go first?

19          Great.  Ms. Stricklin, go ahead.

20          MS. STRICKLIN:  Your Honor, just as a starting point,

21   we will withdraw our objection to 61-D.

22          THE COURT:  What page is that on?

23          MS. STRICKLIN:  Seven.  So it starts on seven,

24   continues to eight.  From the bottom of seven all the way to

25   eight is information that was highlighted in blue, meaning it

1   was information we were objecting to and the government was not

2   conceding.  We will withdraw our objection.  That leaves 61-D

3   as, I guess, unobjected to as it is on the paper.

4           THE COURT:  Okay.  Any others that you are now

5   changing or conceding or whatever?

6           MS. STRICKLIN:  No.

7           THE COURT:  Then why don't we go -- Page 4 may be the

8   first page that contains a disputed section.  This is a section

9   of the transcript that's GX61-B, which I guess stands for

10  government exhibit.  And then at Line 24 through 26 there is an

11  objected to portion and then Lines 32 through 36.

12          First of all, as to the objected portion on Lines 24

13  through 26, go ahead.  What's the basis for that objection?

14          MS. STRICKLIN:  Your Honor, our objection generally,

15  and specifically with this exhibit and the remainder of the

16  exhibits, our objections fall -- the remaining objections fall

17  into the category of statements that Mr. Heller makes that deal

18  with turning himself in, going to jail, the legal process and

19  things of that nature.

20          Specifically with Page 4, Lines 24 through 26, our

21  issue with that is where Mr. Heller says, "I wanted to turn

22  myself in from the very beginning whether it's jail," and then

23  he continues on about committing suicide, which the government

24  has conceded they will remove.  So our specific objection is

25  made under Federal Rules of Evidence 401 and 403.

1          As it relates to 403, I will note for the Court that

2     typically we make this objection when something is overly

3     prejudicial.  I think that exists to some degree with many of

4     these statements.  But secondly, I also think that there is a

5     confusion of the issues objection based primarily upon this

6     issue that has been throughout, which is this idea of consent,

7     state statutory rape laws versus the federal law that he is

8     being prosecuted under.

9          And I think that a lot of these statements, including

10    this statement in Lines 24 through 26 regarding the legal

11    process, going to jail, registering as a sex offender, are

12    objectionable under not just that they are overly prejudicial,

13    but also that it creates a confusion of the issues for the

14    jury.

15         *THE COURT:*  And you mean by confusion of the issues,

16    is the argument that Mr. Heller was thinking of what most

17    people might think of as a state law consequence, but given the

18    federal charge, the age of the victim would be such that the

19    consequence might be different or --

20         *MS. STRICKLIN:*  Yes, Your Honor.  That's the crux of

21    the argument.  In terms of evidence related to that, I think

22    there are kind of two issues.  The first is I think Mr. Kinzley

23    when he testifies will testify that he first reported this to

24    Child Protective Services.  Then he reported this to a couple

25    different state agencies and then finally was told that he

1   needed to report it to the FBI, as the jurisdiction was federal

2   because it happened on an airplane.

3          Secondly, there are at least in an interview of

4   Mr. Heller where Special Agent Jones -- and I think also in an

5   interview of Christopher, Special Agent Jones comments that the

6   conduct was illegal based upon the fact that Christopher was a

7   minor.

8          THE COURT:  So are you mentioning that because you

9   anticipate that Special Agent Jones will say that or that

10  you -- or that you believe that that may have influenced

11  Mr. Heller to talk in this conversation the way he does?

12         MS. STRICKLIN:  So this conversation happened prior to

13  any of those statements being made by Special Agent Jones, but

14  I think I mention that just because it confirms that this

15  confusion is realistic and exists and even existed by the lead

16  agent at some period of time.

17         THE COURT:  Okay.  If the argument is essentially the

18  same for some other portions or all the rest of the portions,

19  then we can take them all -- well, maybe I guess -- let's see.

20  What else do we have?  Oh, we have the one on Page 9.  We can

21  take them one at a time or one page at a time or all together,

22  whatever you think is best.

23         MS. STRICKLIN:  Your Honor, I think we can take them

24  one at a time beginning where we are on Page 44, Lines 24

25  through 26.  It's the mention of him turning himself in from

1  the very beginning and going to jail that we are maintaining

2  our objection to.

3          Moving on to Lines 32 through 36 --

4          THE COURT:  If that's a separate argument, maybe we

5  will hear from the government.  We will just go one by one.

6          MS. STRICKLIN:  Well -- okay, Your Honor.  Thank you.

7          THE COURT:  Ms. Surratt?

8          MS. SURRATT:  Your Honor, in terms of 401 and 403,

9  this is consciousness of guilt.  In a simpler situation like,

10 for instance, a drug dealer got caught with a suitcase and then

11 says, "Oh, god, I am going to jail," we would all agree that

12 that's consciousness of guilt and that means he knew what was

13 in the suitcase.  He knew the dope was in the suitcase.  So the

14 fact that somebody is admitting that they know they are going

15 to jail is certainly consciousness of guilt, so it's probative

16 as to their state of mind.

17         THE COURT:  But I guess it's consciousness of guilt as

18 to what?  For instance, if you thought and if Mr. Heller

19 thought that it was, you know, essentially strict liability, if

20 he had sexual contact with a minor, you know, that was that,

21 then you might say, yup, going to jail.  On the other hand, I

22 think that the argument by Mr. Heller is that if you -- that

23 would be misleading in this context because consent is a

24 defense.

25         MS. SURRATT:  Right.  That's the second part of the

1    argument.  So I think sort of in a vacuum saying that you know

2    you are going to jail is certainly probative as to

3    consciousness of guilt.  I think the crux of this issue is just

4    as the Court articulated.  It's whether it's so confusing

5    because at the time Mr. Heller and maybe others had in their

6    head that this was a statutory offense.  And so on that point I

7    will say a few things.

8          First, in this hour-long audio recording, Mr. Heller

9    never says anything like that.  He never says, you know, I get

10   it.  You know, I touched a 16-year-old.  I understand this is a

11   statutory offense.  In fact, if anything, on the very last

12   page, Page 13, and they are objecting to this too, Lines 10

13   through 13, he says, "It's been two years.  You don't think

14   I've looked all this up."

15         So he is saying he has looked into this.  He knows he

16   is going to have to register as a sex offender, which is, in

17   fact, a consequence of conviction after this offense.  He

18   apparently has done his research and is implying that he knows

19   what awaits him.

20         In any event, what Ms. Stricklin just articulated

21   counsel can argue and, in fact, already has put before the jury

22   in the opening statement.  So simply because they are asserting

23   now without any basis in this transcript that Mr. Heller was

24   confused does not mean that something that is so probative of

25   his consciousness of guilt should stay out.

1          *THE COURT:*  And both sides have identified that the

2    issue in the case is whether or not the defendant believed he

3    had consent.

4          *MS. SURRATT:*  True, Your Honor.

5          *THE COURT:*  So why does this -- because the defense

6    concedes in opening that the issue is not whether or not the

7    sexual contact occurred.  So why is anything here relevant to

8    the issue of consent or whether he believed he had consent?

9          *MS. SURRATT:*  Because it goes to the issue of whether

10   he knew he was doing something wrong or illegal.

11         *THE COURT:*  But why doesn't that just directly lead us

12   back to the confusion issue?  Why -- I mean, is there any

13   reason to believe that he stumbled across this federal statute

14   and, you know, believed that, you know, because Christopher was

15   16 at the time, that there might be a consent defense?

16         *MS. SURRATT:*  Again, Your Honor, there is nothing in

17   this recording or really anywhere where he says that he

18   believed he had consent.  And so he is ex post saying that

19   there was some confusion.

20         *THE COURT:*  But wouldn't that be probative or perhaps

21   wouldn't that be a more natural inference?  If there is nothing

22   about consent, isn't that consistent with a view that he's not

23   thinking along those lines because he doesn't think that

24   consent is even an issue.  It's not relevant.  He is guilty.

25   He had sexual contact.

1          *MS. SURRATT:*  Well, when he spoke with Christopher, he

2     seemed to think it was relevant since at the Chipotle meeting

3     he confronted Christopher and said, "Am I crazy that you were

4     giving me signals?"  So when he confronts Christopher, he at

5     least alludes to the idea that Christopher was sending him

6     signals such that Mr. Heller believed that he was getting some

7     sort of consent.  What I'm saying is when given an opportunity

8     to explain himself and really an unlimited opportunity to

9     explain himself, he never goes anywhere near that topic.  He

10    never talks about "I thought he played footsy" or "I thought he

11    held my hand."

12         *THE COURT:*  But won't your expert talk about those

13    things, that the reason that Mr. Heller might have talked to

14    Christopher about the leading him on or something would be a

15    way of making sure that he doesn't report it because it's his

16    fault, it's the child's fault?

17         *MS. SURRATT:*  Sure, Your Honor, if the expert is

18    permitted to testify, she will talk about issues like that.

19    But this is the defendant in his own words saying that he knows

20    he has done something illegal.  It's extremely probative on

21    that fact.  In fact, nothing is more probative on that fact.

22         And again, as to the confusion of the legal issue,

23    counsel is welcome to argue that and we expected all along that

24    that would be a theme of this trial.

25         *THE COURT:*  Anything more, Ms. Stricklin, on this

1    point?

2         *MS. STRICKLIN:*  Your Honor, I will just maintain that

3    when we are looking at a balancing test of some things

4    relevance on one hand and whether it's overly prejudicial or

5    likely to lead to confusion of issues on the other, I think

6    that the probative value of these statements is far -- is far

7    less than the issues regarding whether or not they are overly

8    prejudicial and/or would lead to a confusion of the issues.

9         *THE COURT:*  Okay.  So on Lines 24 through 26, my

10   ruling is as follows, that 24 and 25 can come in.  The

11   defendant there is indicating that he wanted to turn himself in

12   from the beginning.  The defendant had indicated that he

13   believed he had -- there is other information suggesting that

14   he believed what he had done was wrong.  And for that reason, I

15   think it can come in.

16        However, the cut-off sentence or cut-off words that

17   are somewhat out of context in 26 "whether it's jail" will be

18   excluded.  I don't think it's appropriate to go into punishment

19   since we are telling the jury that you're not supposed to be

20   thinking about punishment anyway.

21        Let's take up 32 through 36.

22        *MS. STRICKLIN:*  Your Honor, upon re-reading 32 through

23   36, we will withdraw our objection to that.

24        *THE COURT:*  Okay.  And let's see.  Let's take a look

25   at page -- I think it's 9 -- Page 9, Lines 9 through 21.

1          MS. STRICKLIN:  Your Honor, re-reading this, on

2    Line 12 it talks about when you're facing going to jail, which

3    is most likely what's going to happen.  It continues on Line 14

4    where he says, "I am going to have to register most likely as a

5    sex offender.  I'm not going to be around other people's kids

6    anymore, not going to be able to have my own kids," those are

7    the parts of this statement that we are objecting to.

8          You know, those lead to the context of the next

9    statement, which is "That's and I mean all of that is nothing

10   compared to what I did to Christopher."  I don't know if there

11   is a way that that can be cut.  Further down on Line 18,

12   Mr. Heller says, "It will be the quickest easiest trial,

13   easiest whatever it came down to just so that nothing else

14   would be added to his plate."

15         The reason that the objection is through Lines 9

16   through 21 I think is just an inability to cut the pieces which

17   I have highlighted for the Court on what we are objecting to.

18   If there is a way to piecemeal that out, I would be open to

19   that, but I think I objected -- indicated an objection to

20   Lines 9 through 21 just because it seems to be like a

21   continuous statement with objectionable things embedded in

22   various places.

23         THE COURT:  Thank you.

24         Ms. Surratt?

25         MS. SURRATT:  Given the ruling on the previous

1   exhibit, we would agree that Line 11 from "I do feel very

2   empty" to Line 15, "not be able to have my own kids," could

3   stay out.

4          *THE COURT:*  Okay.

5          *MS. SURRATT:*  So then Lines 9 through 11 through

6   "phone vibrates" would come in.  And 15 starting at "That's and

7   I mean all that is nothing compared to what I did to

8   Christopher," through the end of the blue highlight would come

9   in.

10         *THE COURT:*  What about that, Ms. Stricklin, if we just

11   excised what Ms. Surratt just mentioned?

12         *MS. STRICKLIN:*  Your Honor, that is I think a good

13   solution until we get to Line 18, which is the discussion about

14   the quickest easiest trial, just that little piece in there.

15         *THE COURT:*  Okay.  And what prejudice are you worried

16   about from that statement?

17         *MS. STRICKLIN:*  Well, primarily because we're in trial

18   right now, and I certainly don't want the impression to be that

19   this is the quickest easiest trial or that that's Mr. Heller's

20   position as, you know, we are now at this -- at this point.

21         *THE COURT:*  Ms. Surratt?

22         *MS. SURRATT:*  Your Honor, this doesn't talk about

23   consequences like going to jail or having to register as a sex

24   offender.  Rather, it's an acknowledgment of what he did to

25   Christopher and the remorse that he feels about it.  And

1    whether this is now Mr. Heller's position, it was clearly his

2    position when he said this.  These are his words and it's

3    probative of -- again, it's probative of the same stuff we have

4    been talking about.  It's probative of his guilt and his

5    remorse on this topic.

6         MS. STRICKLIN:  I guess I just certainly don't want

7    the jury to hear something like this and think like this is the

8    quickest, easiest trial.  He is suggesting a certain outcome or

9    was at least back when this occurred.

10        THE COURT:  Ms. Surratt, anything else from that?

11        MS. SURRATT:  No, Your Honor.

12        THE COURT:  I am going to exclude it from 18, "It

13   would be the quickest, easiest trial" through the word "life"

14   in Line 19 because I don't -- I think it's unduly prejudicial

15   to Mr. Heller.  I don't want the jury to be thinking that

16   whatever Mr. Heller's conception of a quick easy trial at the

17   time is not the trial that we're doing right now, and as a

18   result, he is somehow to blame for that.  So for that reason, I

19   think that that will be excluded.

20             Let's turn over to Page 10.

21        MS. STRICKLIN:  Your Honor, the argument on this one

22   is different in the sense that I don't think this is a

23   confusion of, you know, issues regarding consent or statutory

24   rape.  However, the primary objection to this is, one, I think

25   that it's overly prejudicial.  And I also think that it creates

1   some confusion due to this attraction to minors issue and

2   whether that term "sickness" I think is very prejudicial in

3   that that could have a number of contexts, including attraction

4   to minors or pedophilia, things like that.  And I think that

5   term completely unexplained in the way it is in context here is

6   a 403 issue.

7         I also feel similarly about the remainder, which is

8   "The two years when this happened there was nothing that could

9   stop me from it, not even my own self.  It wasn't about that."

10   And just having this three-line clip is -- the relevance is

11   limited in regard to I think the overly prejudicial concerns

12   about a jury just interpreting that as it sits.

13         *THE COURT:*  Okay.  Ms. Surratt?

14         *MS. SURRATT:*  Yes, Your Honor.  This goes directly to

15   the heart of the consent issue.  This is Mr. Heller in his own

16   words saying, "Two years ago when this happened, when I

17   molested Christopher on the airplane, there was nothing that

18   could stop me from it."  This goes directly to whether

19   Christopher was sending him signals or whether Christopher gave

20   him consent.  This is Mr. Heller in his own words saying that

21   "Nothing could have stopped me from it."  This is -- of all the

22   recordings we have been discussing, this is the most relevant

23   of them all.

24         *THE COURT:*  Response, Ms. Stricklin?

25         *MS. STRICKLIN:*  Your Honor, I will just note it

1    appears to me that the -- what the government primarily wants

2    out of this exhibit is what starts at Line 2.  I will continue

3    to object.  However, I think the Court can address this in two

4    separate pieces.

5         THE COURT:  What about that, Ms. Surratt?  Do you mean

6    the first line, the sickness part?  I think that may tie into

7    some of the -- you know, that ties into some of the therapy

8    that he received through the church, things of that nature.

9         MS. SURRATT:  Your Honor, it's our view that the

10   sickness ties directly into what he said right after that,

11   which is, I have the sickness and there was nothing that could

12   have stopped me from what I did on that airplane.  It's him

13   repeating the same thing essentially twice.

14        We think the sickness piece is also relevant and

15   certainly not any -- certainly not any more prejudicial than

16   him saying "Nothing could have stopped me from it."  It is true

17   that if the Court wants to address it in two pieces, "There was

18   nothing that could stop me from it" is the more important part

19   in our mind, but we think the two sentences are tied together

20   in a way that makes the sickness part readable with respect to

21   the second part.

22        THE COURT:  Ms. Stricklin, I will give you the last

23   word.

24        MS. STRICKLIN:  Your Honor, may I have just one

25   moment?

1      THE COURT:  Sure.

2      MS. STRICKLIN:  Your Honor, it's our request that -- I

3 am going to take back what I said before.  It is our request

4 that the Court deal with this as one exhibit as opposed to two

5 separate statements.

6      THE COURT:  Yeah, I will do so.

7      MS. STRICKLIN:  Thank you.

8      THE COURT:  The objection is overruled.

9      I think that -- of course, one -- the first sentence

10 follows the second, so they do appear to be linked, at least in

11 the mind of Mr. Heller.  And I am persuaded by Ms. Surratt's

12 argument that it's directly relevant to issues of consent.

13 That's the issue in the case, and for that reason I will

14 overrule the objection.

15      And then Page 13.

16      MS. STRICKLIN:  Yes, Your Honor.

17      The objection on Page 13, Lines 1 and Line 3 we're not

18 objecting to.  It's what's contained in Lines 5 through 13,

19 primarily the statement where Mr. Heller says, "I wish -- I

20 just want to be in jail right now."  The response, this is his

21 mother with the response being "That's another easy way out,"

22 and then Lines 10 through 13 where he continues on with "That's

23 going to happen, meaning jail.  That's inevitable.  I am going

24 to jail registered as a sex offender."  And then this is the

25 comment that -- the statement that the government earlier

1    referenced with "I've looked this up over the last two years."

2    I think all of that is objectionable for the same reasons

3    regarding punishment, confusion of the issues, the record I

4    made earlier.

5            THE COURT:  Ms. Surratt, go ahead.

6            MS. SURRATT:  Yes, Your Honor.

7            It's largely the same argument as before, although I

8    will add to the extent this has been weighing on Mr. Heller for

9    two years, which it clearly has, and he has been poking around,

10   seeing what the ramifications of his conduct are for two years,

11   it's absolutely not crazy to think that he considered what

12   would happen if the conduct occurred on an airplane.

13           So I know we have been talking about him stumbling

14   into the federal statute.  Our position is this is directly

15   relevant to the issues that we're dealing with at this trial

16   and counsel can make their arguments for why it's not.

17           THE COURT:  Okay.  I am going to exclude it.  I don't

18   think that -- it relates mostly to punishment.  It also --

19   there is just no reason that I have heard to believe that

20   Mr. Heller in the course of his research stumbled across the

21   federal statute, so it seems as if his opinions regarding

22   punishment were probably based upon consent not being a

23   defense.

24           However, I will allow -- in the event that Mr. Heller

25   testifies, I will allow the government to ask him about that

1    subject just in case maybe he did.  I don't know.

2              Are we done with the transcript, then?

3         MS. STRICKLIN:  Yes, we are.

4         THE COURT:  Let's talk about jury instructions.

5         MS. DAVIES:  Your Honor, I am sorry.  Some of the text

6    messages that are indicated on the government's exhibit list

7    raise some of the same issues.  And some of the government's

8    witnesses would testify about Mr. Heller again talking about

9    going to jail.  Should we take them up one by one or do I

10   assume the same rulings apply?

11        THE COURT:  The same rulings are going to apply.  I

12   don't want to get into punishment.

13        MS. DAVIES:  So, Your Honor, if I can just give you an

14   example.

15        THE COURT:  Well, we just don't have time to go

16   through everything right now.  We have got to make progress on

17   jury instructions.  We are not going to do jury instructions

18   tomorrow evening, so tonight is our time.

19        MS. DAVIES:  It's just slightly different.  He asks

20   whether he can turn himself in in a text message.  This is

21   Mr. Heller speaking to Mr. Kinzley.

22        THE COURT:  Response?

23        MS. STRICKLIN:  I mean, I think it's less prejudicial,

24   but for the same reasons I would ask that it be excluded.

25        THE COURT:  Yeah, I remember that one, and as long as

1    it's just that statement, I think that that's permissible

2    because it's a demonstration of consciousness of guilt.  I

3    think that that one is okay.

4         MS. DAVIES:  And then not wanting to push --

5         THE COURT:  How many more of these do you have,

6    Ms. Davies?

7         MS. DAVIES:  There are two.  It's Government

8    Exhibit 20 and 21.  And in this same 20 that we have just been

9    talking about --

10        THE COURT:  These -- we just have to make progress

11   right now on the jury instructions.  We have just got to do it,

12   so we will turn to that right now.

13        I passed out a draft that's marked Draft 10/28/19.

14   And really there is not -- there is not too much play in them.

15   There is substantial agreement on many of them.  The

16   government -- why don't we just take up the first instruction

17   you have a comment on, a question on or an objection to.

18        By the way, during this portion you don't have to

19   stand.  You can remain seated.  Our goal here today is to make

20   as much progress as we can so that when it's time to do our

21   final jury instruction conference, when we are getting close to

22   the close of the evidence, we'll have made a lot of progress.

23   So if there is things that you are thinking about tendering or

24   objections that you might make, it's good to just flag them so

25   that we can make sure that we are efficient when it comes down

1   to our final jury instruction conference.

2          First, then, I will turn to the government.  First

3   instruction that there is a comment, question or problem with?

4          MS. DAVIES:  Your Honor, I think the heart of it is

5   going to be Instruction 12, the elemental instruction.

6          THE COURT:  Right.  Any others?

7          MS. DAVIES:  Your Honor, I am not seeing the venue

8   instruction that we proposed.

9          THE COURT:  And why would you -- why would we instruct

10  the jury about venue?

11         MS. DAVIES:  Your Honor, I actually had never

12  instructed on venue before.

13         THE COURT:  There is a good reason, but go ahead.

14         MS. DAVIES:  Well, in speaking with Ms. Surratt who

15  came from a different district, she always did because her

16  venue in the Southern District of New York was more -- was less

17  obvious.  And so I had some research done and was told that we

18  certainly bear the burden to prove that to the jury by a

19  preponderance.  Normally it's not an issue because the face of

20  our charging document in fact essentially imports jury.  And

21  when they find that beyond a reasonable doubt, we have

22  satisfied that burden.

23         In this case because the venue rests upon Mr. Heller

24  having been arrested in Colorado --

25         THE COURT:  Yeah, but your element instruction doesn't

1    have venue as an element.

2         *MS. DAVIES:*  No.  I have tendered a separate venue

3    instruction.

4         *THE COURT:*  I know, but if it's an element, why

5    wouldn't it be in the element instruction?

6         *MS. DAVIES:*  I don't think it's an element offense.  I

7    think it's something that the jury has to find by a

8    preponderance.

9         *THE COURT:*  Then it's an element of the offense.  Have

10   you ever seen -- I mean, in all your days in the District of

11   Colorado, have you ever submitted an element instruction that

12   had venue?

13        *MS. DAVIES:*  I have not, Your Honor, but --

14        *THE COURT:*  Have you ever found a 10th Circuit case

15   that indicates that venue needs to be proven to the jury as

16   opposed to being the subject of a Rule 29 motion, that could be

17   true.

18        *MS. DAVIES:*  I asked someone to do some research for

19   me as I ran out of time before, and they said their review of

20   10th Circuit law made them believe I did need a venue

21   instruction.

22        *THE COURT:*  Okay.  Well, if that's true, have those

23   same unnamed people show you the cases because I am certainly

24   not aware of it.  I mean, I think it could be the subject of a

25   Rule 29 motion, but I have never heard of it.  And I have never

1    heard of submitting to the jury elements that aren't proved

2    beyond a reasonable doubt.  Never heard of, you know, oh, you

3    have to prove everything beyond a reasonable doubt except for

4    the element of venue, so...  And the other thing is that is

5    that an issue in this case?  I am not sure it is.

6         MS. DAVIES:  The government only wants to make certain

7    it meets its burden of proof.  I will bring that case tomorrow,

8    Your Honor, assuming it says what they tell me it says.

9         THE COURT:  Okay.  Anything else?

10        MS. DAVIES:  Your Honor, we are not aware of any other

11   instruction we object to.  We are just doing a quick comparison

12   with our proposed to make certain nothing was inadvertently

13   omitted.

14        THE COURT:  Sure.  Maybe we will have Ms. Surratt

15   perform that comparison, and then I will hear from the defense.

16   And then we will come back to you, Ms. Davies.

17        So whoever is handling the instructions on behalf of

18   Mr. Heller, same thing.  What's the first instruction you have

19   a question or a comment or objection?

20        MS. CHRISTL:  Your Honor, the first instruction I have

21   a question on is Instruction 9 about the expert witness.  It's

22   my understanding that the Court sort of reversed course on

23   Friday and contemplated allowing the government to call the

24   expert witness after you heard --

25        THE COURT:  No, it was this.  It was that I ruled that

1    the expert, if appropriate, could be called in rebuttal.  But

2    my comment on Friday was that if, for instance, Christopher was

3    cross-examined in a way that would make the testimony of

4    Ms. Blackwell relevant, that the defendant by not calling any

5    witnesses could not prevent Ms. Blackwell from testifying.  In

6    other words, I would be open to the government calling

7    Ms. Blackwell at that time, but her testimony would still have

8    to be relevant.

9         So I am not saying that she automatically comes in.  I

10   am just saying that -- I was just thinking about -- because I

11   am having her testify in the rebuttal case as a way of making

12   the testimony more clear for the jury, but I didn't want to

13   prejudice the government by just in case Mr. Heller raised the

14   issues through cross, but then didn't call any witnesses.

15        *MS. CHRISTL:*  And, Your Honor, just so that we put

16   this on the record, it was our understanding when the Court

17   issued the ruling on the expert that rebuttal meant in their

18   rebuttal case.

19        *THE COURT:*  It probably will.

20        *MS. CHRISTL:*  And at that point when we got that

21   ruling, we did not seek out a rebuttal expert based on the

22   Court's ruling.  So I feel like if --

23        *THE COURT:*  If Mr. Heller -- the only way that

24   Blackwell would testify in the government's case in chief would

25   be if Mr. Heller doesn't call any witnesses, so there wouldn't

1    be a rebuttal case anyway.

2         MS. CHRISTL:  Okay.  And perhaps when the Court makes

3    a decision on the expert, we can have a longer conversation

4    about that, but for now that instruction sticks out.

5         THE COURT:  But is there anything about -- assuming

6    that she does testify and based upon what you know about her

7    testimony, any problems with that instruction?  Let's assume

8    that she testifies as a rebuttal expert, that Mr. Heller calls

9    a witness or something and then she testifies, any problem with

10   the form of that?

11        MS. CHRISTL:  Your Honor, I think the only issue would

12   be the first sentence depending on the scope of her testimony.

13        THE COURT:  Right.  We can modify that according to

14   what she is allowed to testify to.

15        MS. CHRISTL:  Instruction No. 11, I guess that to me

16   generally comes in when there is like 404(b) evidence.

17        THE COURT:  It could come in like in this case where

18   the jury may be thinking of, well, yeah, but boy, he would be

19   guilty under state law.

20        MS. CHRISTL:  Okay.

21        THE COURT:  You know, it's up to you.

22        MS. CHRISTL:  That's fine.  That I think makes more

23   sense.  I was thinking in the context of like other crimes

24   evidence.  And my concern is that they would think that maybe

25   like if they believed that the exposure happened in Uganda,

1    that that was another crime or something like that.  But with

2    that instruction based on the Court's explanation, I think

3    that's fine.

4          And then the only other instruction that I anticipate

5    is the prior inconsistent statement instruction based on

6    Christopher's direct.  I think that that will certainly be --

7          THE COURT:  Oh, you would like one included.

8          MS. CHRISTL:  It is.  Wasn't it 1.13 or is it under

9    credibility of witnesses?  I think there is a specific jury

10   instruction from --

11         THE COURT:  Oh, there is.  I am just saying would you

12   like such a instruction included?

13         MS. CHRISTL:  Yes, Your Honor.

14         THE COURT:  Right.  We will note that.  Depending on

15   how the cross goes, that sounds like it would be appropriate.

16   We will add one in.

17         Anything else?

18         MS. CHRISTL:  Not at this time, Your Honor.

19         THE COURT:  Okay.  Ms. Davies, back to you, then.  Two

20   things.  One is why don't we start off with what we left with.

21   Did you perform that comparison?  Any instructions that you

22   believe should be added in?

23         MS. DAVIES:  I did perform that comparison, and the

24   ones that are omitted I am not concerned about.  I do want to

25   express an objection as to a shrinkage of one of the

1    government's proposed instructions, and that is the knowingly

2    instruction which is Instruction No. 14 on the Court's set.

3            THE COURT:  What is the defendant's tendered one as to

4    that?

5            MS. CHRISTL:  Your Honor, I don't believe we --

6            THE COURT:  Sorry, the government's.  I think the

7    government tendered one.  Which one is that?

8            MS. DAVIES:  The Court's instruction is 14 and the

9    government's instruction is also 14 as it turned out.

10           THE COURT:  Okay.  And why -- what is the portion of

11   it that you think should be added and why?

12           MS. DAVIES:  I actually think, Your Honor, that the

13   government's instruction as tendered is appropriate given the

14   indications in the case thus far in terms of essentially, Your

15   Honor, what I think we have heard in opening and so far is that

16   the defendant will claim that even though there was really no

17   information to support, that nonetheless he clung to the belief

18   that he had received some undefined signals from Christopher

19   and that such signals constituted permission so that he, as the

20   defense said in opening, made a mistake, not committed a

21   criminal act.

22           And I think that this additional language will

23   appropriately direct the jury that there needs to be some basis

24   upon which they can decide knowledge or lack of knowledge and

25   that this instruction will help them.

1        THE COURT:  I don't have that one with me at the

2   present time.  Can you read the portion that you want added

3   back in?

4        MS. DAVIES:  Absolutely.  So the Court ended after

5   "accident."  And the rest of the instruction, which is from the

6   10th Circuit pattern Instruction 1.37 would read as follows:

7   Although knowledge on the part of the defendant cannot be

8   established merely by demonstrating that the defendant was

9   negligent, careless, or foolish, knowledge can be inferred if

10  the defendant deliberately blinded himself to the existence of

11  a fact.  Knowledge can be inferred if the defendant was aware

12  of a --

13       THE COURT:  Okay.  Yeah, I am familiar with that now.

14  Yeah, here is the thing.  I haven't found any case that applies

15  deliberate indifference -- or not deliberate indifference, but

16  deliberate ignorance in a sex assault context.  Of course, the

17  context that's typically at issue when that type of an

18  instruction is given is something more like a financial crime

19  or something that happens over a period of time or something

20  that can be anticipated.

21       So if you can find a case where that deliberate

22  ignorance instruction is applied in a sex assault context or in

23  the context of consent involving some type of assault, I don't

24  know what, but that would be helpful to me.  But I am inclined

25  not to give that because I just don't -- to me that doesn't fit

1  this context.  That's the reason that I went with the short

2  version.

3       MS. DAVIES:  We will look for that case, Your Honor.

4  Thank you.

5       THE COURT:  Sorry, Ms. Davies.  Go ahead.

6       MS. DAVIES:  I believe that's it, then.

7       THE COURT:  Did you have any problem with the

8  elemental instruction?

9       MS. DAVIES:  I do, Your Honor.

10       THE COURT:  Go ahead.

11       MS. DAVIES:  The government had -- the government went

12  through something of an evolution.  There is not a huge amount

13  of case law in this area.  The case that specifically

14  interprets this statute is a case called *United States v. Price*

15  out of the Ninth Circuit and they essentially held that --

16       THE COURT:  Yeah, I am familiar with the *Price* case.

17  I actually think that the concurrence in *Price* is a lot better

18  recent, so that is really kind of informing my views.  I

19  thought that the concurrence did a much better job of going

20  through the legislative history.  It made more sense to me to

21  try to figure out exactly what the statute meant.

22       MS. DAVIES:  So, Your Honor, in formulating the

23  instruction and in particular the alternative instruction that

24  we filed on Friday, we were guided by *Rehaif*, consulted with

25  our appellate division, and we were attempting to essentially

1   strike the appropriate balance between not creating a burden by

2   which essentially the defendant could take the position that he

3   wasn't absolutely certain that he did not have permission, and

4   as such, he did not commit a crime.

5        The point of *Flores-Figueroa* and *Rehaif* is to try to

6   divide the world between innocent and criminal conduct.  So the

7   instruction that the government tendered on Friday tried to

8   strike that balance by saying the defendant had to know

9   something.  He knew he had not obtained Christopher's

10  permission for the sexual contact.  And that appropriately puts

11  the burden on him, that he simply cannot again kind of blind

12  himself to all of the surrounding circumstances, which will be

13  the evidence in this case, and thus conclude that -- unless he

14  absolutely crawled into the victim's mind and absolutely knew

15  that he did not have permission, that, you know, it was a

16  mistake and he is not criminally liable.

17       *THE COURT:*  Okay.  I guess I don't quite know what all

18  that means, but it's true that for the second element in the

19  Court's version, I used more of the words from the defense

20  instruction, but I don't think that that word difference is

21  material.  Do you believe that it is material?

22       *MS. DAVIES:*  I do, Your Honor.

23       *THE COURT:*  Okay.  And tell me why.

24       *MS. DAVIES:*  Because as written in the Court's

25  instruction, the defendant knew he did not have Christopher's

1    permission.  So subjectively again, as long as he claims he is

2    not positive of his lack of permission, that he will still

3    argue that he is not criminally liable.  This puts the onus

4    appropriately on him, that he knew he had not obtained

5    Christopher's permission.  He knew that he needed to have done

6    something affirmative, have received some affirmative evidence

7    that made this noncriminal conduct.

8         THE COURT:  Read that language to me again.  Once

9    again, I don't have your instruction.

10         MS. DAVIES:  For the record, it's Document 99.  And it

11    says:  At the time that the defendant, Dakota Heller, engaged

12    in the sexual contact, he knew he had not obtained

13    Christopher's permission for the sexual contact.

14         THE COURT:  Do you think that by saying "obtained"

15    that it had to be some type of act on Christopher's part or a

16    verbal consent or something?  Do you think that there would be

17    a danger that the consent would be inferred by the jury to

18    require something more formal than the law requires?

19         MS. DAVIES:  I don't, Your Honor.  I think in either

20    case at the end we will both be arguing that the totality of

21    circumstances prove or don't prove.  But I think the problem

22    with the proposed defense instruction that the Court has

23    adopted is that it goes too far.  Again, it says the defendant

24    knew, so it invites this defendant and does not properly

25    separate legal from innocent conduct to simply say, I didn't

1    know for sure whether or not, in fact, he was okay with this.

2    And because the onus is the defendant knew he did not have

3    Christopher's permission, it goes too far.

4           THE COURT:  Okay.  Response?

5           MS. CHRISTL:  Your Honor, may Mr. Rasch-Chabot -- can

6    I consult with him for a moment?

7           THE COURT:  Yes.

8           MS. CHRISTL:  Can Mr. Rasch-Chabot argue this?  He is

9    the one who drafted our instruction.

10          THE COURT:  Sure.  He can go ahead and do that.

11          MR. RASCH-CHABOT:  Thank you, Your Honor.  For the

12   record, Jacob Rasch-Chabot.

13          I did not understand, like Your Honor didn't

14   understand, there to be a material difference between.  I think

15   the only distinction in the language between our instructions

16   is "did not have" versus "had not obtained."  I think that's

17   the only difference.  They want it to be that he had not

18   obtained permission and we wrote did not have permission.

19          I do think that ours is more appropriate, and again I

20   am still not sure that there is a material difference, only

21   that "did not obtain" does sound like he had to -- that the

22   defendant had to take some affirmative act to go out and get

23   something as opposed to just being presented with it.  It's

24   just the -- it sounds like it's the active tense of he obtained

25   it.  He got this thing versus he just had it.  And I think that

1   the law is whether he just had permission I think is enough as

2   opposed to him affirmatively taking some act to go get that

3   permission.

4       THE COURT:  Okay.  Ms. Davies, anything more on that?

5   I am not going to -- here is the deal.  I am not going to make

6   up my mind right now, but I will take both arguments into

7   account.  I may make my decision a little bit closer to the end

8   of the evidence and we will see kind of where the evidence

9   stands on it too, but I am more inclined to stick with what we

10  have, but I will certainly think about the argument that

11  Ms. Davies made.

12      MS. DAVIES:  Your Honor, the only other point I would

13  make is the government did not in any way contest that a

14  consent instruction should be added and, in fact, took the

15  first stab at putting something that would be acceptable to the

16  defense.  I am concerned that the combination of essentially

17  imposing almost a subjective obligation on the defendant that

18  he absolutely had to have known that the victim did not consent

19  coupled with the fact that we have given a separate consent

20  instruction, you know, almost overemphasizes and again does not

21  carry out what the law is, that we are trying to separate

22  innocent from criminal conduct, and this instruction goes too

23  far.

24      THE COURT:  The separate consent instruction that

25  you're talking about is which one?

1          *MS. DAVIES:*  It's the one that the Court read this

2     morning and I believe it's included in this packet again.  It

3     is instruction number --

4          *THE COURT:*  Right.  But why would that somehow

5     interact in some way to influence the element instruction?

6          *MS. DAVIES:*  Only in the sense, Your Honor, that it

7     almost, you know, feels like we are now imposing some burden on

8     the victim to have, you know, absolutely subjectively signaled

9     to the defendant that no way, no how, and that is not the law,

10    Your Honor.

11         *THE COURT:*  Okay.  Any problems, Ms. Davies, with the

12    verdict form?

13         *MS. DAVIES:*  No, Your Honor.

14         *THE COURT:*  And any problem with the verdict form,

15    Ms. Christl?

16         *MS. CHRISTL:*  No, Your Honor.

17         *THE COURT:*  Okay.  So I am not sure exactly when we

18    will meet again to talk about jury instructions, but I will

19    give you a new draft.  I think there aren't too many

20    instructions that we are really worried about, so it shouldn't

21    take too long.  But if you have any additional authority for

22    some of the things that we talked about today, let me know,

23    okay?

24         Anything else that we should take up at this time

25    other than those text messages, Ms. Davies, that you wanted to

1  talk about which I really don't want to wade into at this time?

2      MS. DAVIES:  Your Honor, my only concern with the text

3  messages is they are going to be offered tomorrow.  And some of

4  them, they are not exactly going to fall under the Court's

5  rulings.  They are things the defense has had for months, but I

6  just need directions so to proceed appropriately.

7      THE COURT:  Okay.  Let's do them quick.

8      MS. DAVIES:  Your Honor, the first one is Exhibit 20,

9  and I don't want to guess what the defense objects to.

10      MS. STRICKLIN:  Your Honor, Exhibit 20, we will object

11  to in the first column, the first sentence which reads, "And if

12  he's ok with doing it, I'd prefer that he files the complaint

13  so I don't leave anything out or misconstrue the way he

14  experienced it."  Moving into the middle column it's just this

15  middle text message where he says "I won't fight any part of

16  this process at all," and those are all of our objections to

17  Exhibit 20.

18      THE COURT:  Okay.  Response?

19      MS. DAVIES:  Your Honor, the first portion indicated

20  by the defense, again this in the government's view is

21  probative precisely because he seems to be acknowledging that

22  the victim experienced it in a certain way, and at least at

23  that point in time he wasn't trying to change what that

24  experience was.  And I believe it's admissible.  It goes

25  directly to his intent and his acknowledgment, consciousness of

1   guilt that he had done wrong, and he wasn't going to try to

2   contradict the victim at that time.

3          And then as to the "I won't fight any part of this" in

4   the middle column, I will accede that that is under the Court's

5   prior ruling.

6          THE COURT:  I will exclude that, "I won't fight any of

7   this process at all," but the other part I will allow in.  I

8   don't know why the government would want that in, but whatever.

9   I think that that is consistent with my previous ruling about

10  turning himself in, filing a complaint.  I will allow that.

11         Next?

12         MS. DAVIES:  The next one appears at Government

13  Exhibit 21.

14         MS. STRICKLIN:  Your Honor, the first portion of this

15  exhibit that we will object to is on Page 6.  It is the first

16  message sent by Mr. Heller where he says that he is talking

17  with his oldest sister because she is basically the CEO of a

18  prison in Sacramento and that he'll let -- I think this is to

19  Mr. Kinzley -- let Mr. Kinzley know, you know, when he knows

20  about moving forward.

21         THE COURT:  Response?

22         MS. DAVIES:  Your Honor, we will agree to redact that.

23         THE COURT:  Okay.  Next one?

24         MS. STRICKLIN:  On Page 7 at the very bottom, after

25  ok, there is this message again about -- it actually is fully

1   portrayed on Page 8 that his sister recommended that he leave

2   it in Christopher's parents' hands.  Whatever they want to do

3   he is willing to do.  She doesn't think that jail or

4   registering will be definite unless they press charges.

5           THE COURT:  Response?

6           MS. DAVIES:  Your Honor, we will redact.

7           THE COURT:  I am sorry, Ms. Davies.  I didn't quite

8   hear that.

9           MS. DAVIES:  Your Honor, I read this as probably

10  falling under your prior ruling and we will redact.

11          THE COURT:  Okay.  Thank you.

12          Next page, Ms. Stricklin?

13          MS. STRICKLIN:  Just for context purposes, if the

14  government redacts that, it may make sense to redact the next

15  two that follow.

16          THE COURT:  I am sorry, the next what?

17          MS. STRICKLIN:  The next two texts that follow, like

18  they will have more answers when they call to find out and

19  where Mr. Heller asks who are they calling.  I will leave that

20  to the government, I guess.

21          And then moving forward to Page 10, the text that

22  occurred in the middle of the page on Friday, January 18th,

23  where Mr. Kinzley informs Mr. Heller that Christopher just

24  talked to the field officer and that he definitely said if you

25  want to call him, it would be better for you legally and for

1   the whole situation to speed up.

2          THE COURT:  Response?

3          MS. DAVIES:  Your Honor, I -- this is descriptive of

4   the process and clearly there was an investigation.  They are

5   going to hear from Special Agent Jones, who she did not object

6   to his name on the prior page.  It's just context.  I do not

7   see that this is prejudicial.

8          THE COURT:  Yeah, I am going to exclude that.

9   Obviously, Special Agent Jones is going to talk about getting a

10  call from Mr. Heller and whatever and that's perfectly fine,

11  but here "It will be better for you legally," I think that the

12  jury is going to have all sorts of questions about that, and I

13  don't think that those are anything that's relevant.

14          Once again, that doesn't estop Special Agent Jones

15  from perhaps talking about an advisement that he gave

16  Mr. Heller, I don't know, but as far as this particular text, I

17  am going to order that that be omitted.

18          Next one, Ms. Stricklin?

19          MS. STRICKLIN:  The bottom of Page 10, this text which

20  is fully portrayed on Page 11 where again it's referencing a

21  call from his sister where Mr. Heller is saying "If you receive

22  a call from my sister, it's trying to clear some things up."

23  And then the conversation goes on to describe Mr. Heller

24  getting back his guns and Mr. Kinzley saying, "It doesn't make

25  sense to me why you would have guns right now."  I would just

1   ask that the remainder of these text messages that are

2   portrayed on Page 11 and 12.

3         THE COURT:  Response?

4         MS. DAVIES:  Your Honor, it's mostly a logistics

5   problem.  Again, they've had this a really long time.  It's

6   just hard to fix it on the fly.  We are not fighting to keep

7   the gun stuff in.  It's just the second -- first night of

8   trial, and if the Court orders it excluded, we will do that.

9         MS. STRICKLIN:  It's pretty easy.  They can just

10  remove the last two pages.

11        THE COURT:  I agree with Ms. Stricklin.  I don't think

12  the gun part of it would be at all relevant and it would be

13  prejudicial.  And it does seem like if that rest of the string

14  of text messages has to do with that subject, then simply not

15  offering those two pages should cure the problem.

16        Next one?

17        MS. DAVIES:  Your Honor, I don't believe any other

18  exhibits are implicated.  However -- oh, sorry, I am wrong.

19        MS. SURRATT:  Your Honor, to the extent we are doing

20  the objecting for defense counsel, Government Exhibit 43 raises

21  an issue they may have a problem with.

22        MS. STRICKLIN:  Your Honor, it's right in the middle

23  where Mr. Heller says that "I feel like my old community will

24  only accept prison or something similar for me to heal.  If

25  that's what I deserve then I'll walk that road, but that isn't

1    the reality right now."

2          MS. SURRATT:  Just to be clear, Your Honor, this text

3    was sent after Mr. Heller knew the FBI was involved, that this

4    was going to be a federal charge.  I think Special Agent Jones

5    told him the statute number, gave him the statutory citation.

6    So we are no longer in a place where there is confusion of

7    issues.

8          THE COURT:  Right, but it still has to do with

9    punishment and I don't want to get into punishment at all.  I

10   think that at least that sentence should be excluded.  And

11   perhaps maybe taking that sentence out would solve the problem

12   or, Ms. Stricklin, what are you suggesting?

13         MS. STRICKLIN:  That's my suggestion, Your Honor.

14   That's my objection as to that portion.

15         THE COURT:  So if the government can excise that

16   particular sentence because it is right before -- or you only

17   have overnight to do that.  If this is blacked out or something

18   and you request, I will let the jury know that certain things

19   were redacted that just aren't relevant to this particular

20   trial, all right?

21              Are we done with that?

22         MS. SURRATT:  Your Honor, just flipping through it

23   quickly, I can't think of any other exhibits that have this

24   issue, but I also can't say that this is what I was thinking of

25   when I picked out exhibits.

1          THE COURT:  If you spot an issue overnight, let

2    Ms. Grimm know ASAP so that instead of sitting around waiting

3    until 8:30, if everyone is here, we might be able to talk about

4    it just a little bit before 8:30.

5          MS. SURRATT:  We will, Your Honor.  And we will also

6    ask that defense point out anything that they find

7    objectionable so we can fix this problem.

8          THE COURT:  Anything else?

9          MS. CHRISTL:  Just briefly, the government a couple of

10   times when questioning Christopher referred to this as

11   sexually -- sexual abuse.  I ask that the Court admonish them

12   that that's a conclusion of law that is not --

13         THE COURT:  Why would the jury know that or why -- I

14   mean, do you think it's a legal term?

15         MS. CHRISTL:  I think when he is asked like a question

16   "When he sexually abused you," that is a conclusion of law that

17   the jury is here to decide.

18         THE COURT:  I am not going to prohibit the government

19   from doing that, although I would recommend that they not be

20   heavy-handed about it.  It's a little bit -- may be a little

21   bit difficult to phrase things in terms of alleged, that type

22   of thing, when you are dealing with someone who claims that it

23   was done to him or her because it would almost come across as

24   not believing the person did it.  But obviously if that type of

25   phrasing takes place before someone describes what was done to

1   him or her so that it comes across as leading or something,

2   then I think it would be objectionable.  But in and of itself,

3   I didn't find that the uses of that term in the direct

4   examination of Christopher was inappropriate, so ...

5          Anything else?

6          MS. SURRATT:  Last thing, Your Honor, we will redo the

7   transcript and the audio, obviously.  The witness through who

8   we are going to lay the foundation now won't be able to since

9   he won't be able to re-listen to everything.  So we will draft

10  up a new stip, if that's okay with the counsel for the

11  defendant.

12         MS. STRICKLIN:  That's fine.  We are not going to

13  fight an authentication issue on that.

14         THE COURT:  Sure.  And we can get that substituted in,

15  okay?

16         Anything else?

17         MS. CHRISTL:  No.

18         MS. DAVIES:  Your Honor, based on the Court's ruling

19  just now, there is one witness whose testimony, much of its

20  relevance was things that the defendant had said to her about,

21  you know, his consciousness of guilt and he makes reference to

22  jail.  So I am assuming the same ruling applies.

23         And, Your Honor, in light of that with that evidence

24  excluded, I just want to raise a scheduling issue with the

25  Court, which is as we said from the beginning, Ms. Quesada is

 1   on another mission trip.  And if a couple of the witnesses, a

 2   portion of their testimony is going to be affected by the

 3   Court's rulings right now, I am letting the Court know she does

 4   not fly in until late tomorrow night, and so just wanted to let

 5   the Court know that.  Would the Court entertain the possibility

 6   of being aware that if we need to break slightly early

 7   tomorrow, resume with Witness Quesada on Wednesday morning?

 8        THE COURT:  Because she will be the last witness and

 9   you won't have any other witnesses to put on?

10        MS. DAVIES:  Well, the other witness, Your Honor,

11   would be Ms. Blackwell, and we moved her to rebuttal for

12   obvious reasons.

13        THE COURT:  Let's play it by ear.  I don't know what

14   the weather will be like exactly either.  We may get a weather

15   delay tomorrow morning, so we will have to see.  The schedule

16   is unclear.  But if it's possible to call witnesses out of

17   order in order to fill in gaps before Ms. Quesada is available,

18   let's try to do that, see if we can cooperate since the -- we

19   are going to be fighting weather the whole time, so it's best

20   if we make use of the time when people are here.

21        We will be in recess, then, until 8:30 tomorrow.

22   Thank you.

23        (Recess at 6:23 p.m.)

24

25

1                                    INDEX

2    OPENING STATEMENT

3       By Ms. Davies                                            28

4       By Ms. Christl                                           36

5    WITNESSES

6       Christopher

7             Direct Examination By Ms. Davies                  43

8             Cross-examination By Ms. Christl                  98

9                                   EXHIBITS

10   Exhibit          Offered   Received   Refused   Reserved   Withdrawn

11   6                           93

12   22                          51

13   23                          54

14   24                          55

15   25                          61

16   26                          56

17   28                          57

18                          REPORTER'S CERTIFICATE

19        I certify that the foregoing is a correct transcript from

20   the record of proceedings in the above-entitled matter.  Dated

21   at Denver, Colorado, this 14th day of November, 2019.

22

23                                  S/Janet M. Coppock

24

25