1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLORADO
2
Criminal Action No. 19-CR-00224-PAB
3
UNITED STATES OF AMERICA,
4
     Plaintiff,
5
vs.
6
DAKOTA MICHAEL HELLER,
7
     Defendant.
8  _____

9                    REPORTER'S TRANSCRIPT
                 Trial Preparation Conference
10 _____

11         Proceedings before the HONORABLE PHILIP A. BRIMMER,

12 Chief Judge, United States District Court for the District of

13 Colorado, commencing at 11:32 a.m., on the 25th day of October,

14 2019, in Courtroom A701, United States Courthouse, Denver,

15 Colorado.

16                         APPEARANCES

17         Patricia Davies and Andrea Surratt, U.S. Attorney's

18 Office, 1801 California Street, Suite 1600, Denver, CO 80202,

19 appearing for the plaintiff.

20         Natalie Stricklin and Jacob Rasch-Chabot, Office of

21 the Federal Public Defender, 633 17th Street, Suite 1000,

22 Denver, CO 80202, appearing for the defendant.

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
     Produced via Computer by Janet M. Coppock, 901 19th Street,
25      Room A257, Denver, Colorado, 80294, (303) 335-2106

1                          PROCEEDINGS

2              *THE COURT:*  The matter before the Court is United

3     States of America versus Dakota Michael Heller.  This is

4     Criminal Case 19-CR-224.

5              I will take entries of appearance, please.

6              *MS. DAVIES:*  Good morning, Your Honor.  Patricia

7     Davies and Andrea Surratt for the United States.  With us at

8     counsel table is Special Agent Philip Jones with the FBI.

9              *THE COURT:*  Good morning to each of you.

10             On behalf of Mr. Heller?

11             *MS. STRICKLIN:*  Good morning, Your Honor.  Natalie

12    Strickland and Jake Rasch-Chabot on behalf of Mr. Heller.  He

13    appears with us.  Ms. Christl's appearance was waived for

14    today's hearing.

15             *THE COURT:*  Right.  And Mr. Heller is on bond.

16             All right.  We are here today for a trial preparation

17    conference.  We are set for a three-day jury trial beginning on

18    Monday.  So we will go through various things, but why don't we

19    start off with the weather.  So the weather, I don't know if

20    you looked at the forecast, but it's a problem.  And it's going

21    to -- there is a real significant chance that it's going to

22    delay jury selection.

23             And if it delays jury selection, it means that you're

24    going to have less time to try this case.  So you are going to

25    have to be -- really think through over the weekend, you know,

1    what testimony you really need because, you know, this is not a

2    trial that will go as long as needed.  It's set for three days,

3    so you're going to have to adapt to the weather just like

4    everyone else will.

5            We are going to bring in a fairly large jury pool

6    because of the nature of the charge and also some extra because

7    of various people who live outside of the -- you know, a fair

8    distance away from the court, but you just never know what's

9    going to happen.  So unfortunately the jury selection may take

10   even longer than it might otherwise take.

11           Why don't we first of all take up a motion that is

12   outstanding, and that is Docket No. 73.  This is Mr. Heller's

13   motion to admit evidence pursuant to Rule 412(c)(1).  Why don't

14   I start off with the United States.  The United States hasn't

15   responded to that motion.

16           Ms. Davies, go ahead.

17           *MS. DAVIES:*  Thank you, Your Honor.

18           Your Honor, among the various briefing that the

19   government did need to respond to, in the absence of specific

20   direction from the Court, we did not on this one because we do

21   not -- we take issue with a couple points, but at the end of

22   the day we understand some of this evidence if otherwise

23   admissible is not precluded by 412.  And by that I mean the

24   following, Your Honor.

25           I dispute that, in fact, the categories of evidence

1    that the defendant has offered under 412 are, in fact, 412.

2    And on the face of the notice it references that it's supposed

3    to involve sexual instances under the advisory notes and/or

4    instances where the defendant verbally communicates a desire to

5    engage in sexual intercourse or has sexual fantasies about the

6    defendant, none of which is applicable here and none of which

7    are the categories of evidence purported to be offered.

8           However, the government further disputes that anything

9    that pertains to a factual truth about what the defendant

10   thought after the alleged sexual contact is inadmissible on

11   relevancy grounds.  And although there is not very much case

12   law that speaks to this, the cases that do speak to it have so

13   found.  And I would cite the Court to *Doe v. United States*, 666

14   F.2d 43, Fourth Circuit 1981, knowledge that the defendant

15   acquired after the incident is irrelevant to the issue of

16   consent.

17          Having said that, Your Honor, the government agrees

18   that the categories of evidence that support the issue of

19   whether or not there was permission given by the victim before

20   the abusive sexual contact may be relevant if, in fact, that

21   evidence exists, and it also agrees that the defendant may

22   attempt to impeach the victim if it is proper impeachment.  And

23   on that I would submit.

24          *THE COURT:*  All right.  Thank you.

25          Mr. Rasch-Chabot?

1          MR. RASCH-CHABOT:  Your Honor, so in our motion, you

2     know, we noted that we also don't necessarily think that this

3     is 412 evidence and that we're, you know, just providing notice

4     that, you know, in an abundance of caution much in the same way

5     the government usually does with 404(b), you know, to the

6     extent that this would be considered 412 evidence, we think

7     it's relevant.  It sounds like the only dispute is the

8     after-the-fact evidence, which would be the photos, photos like

9     shirtless photos and photos of like a simulated blow job, and

10    we believe that those are relevant because --

11         THE COURT:  And what's the time frame of those?  How

12    long after the incident were those photos exchanged?

13         MR. RASCH-CHABOT:  I am not entirely sure, Your Honor.

14    I am not sure, Your Honor.  The government might know the time

15    line better than I do.  But the point being that evidence of an

16    ongoing relationship after the fact just under a 401 relevance

17    standard, which is an extremely low threshold, it makes a

18    consequence effect at least somewhat more probable than not

19    that the continuing relationship between them, including some

20    potentially sexually suggestive photos, suggests that -- makes

21    it more unlikely that there was a lack of consent in any prior

22    sexual act.

23         THE COURT:  All right.  Thank you.

24         Ms. Davies, anything else on that one?

25         MS. DAVIES:  No, Your Honor.  Thank you.

1          *THE COURT:*  So the motion before the Court is the

2     motion to admit evidence pursuant to Federal Rule of Evidence

3     412(c)(1).

4              First of all, I agree with really both sides when they

5     say that the conduct by minor No. 1 that is at issue probably

6     doesn't necessarily fit within the rule.  The government is not

7     disagreeing as to the relevancy or at least potential relevancy

8     of the pre-incident conduct by minor No. 1, and I agree that

9     evidence seems appropriate.  I am not ruling that it comes in.

10    It has to otherwise admissible, but it does seem at least at

11    this point not to be barred by Rule 412.

12             In terms of the post-incident conduct, I also find

13    that that is at least potentially relevant.  I am not sure what

14    the time frame is, although my understanding is that I think

15    it's within a year or two.  Once again, I am not making a

16    ruling on its admissibility at this point other than the fact

17    that it doesn't seem to be barred by 412, and at least that

18    type of evidence may have potential relevance to the issue of

19    consent post-incident behavior by minor No. 1, may indeed, and

20    it in many cases has been held to be relevant to the issue of

21    consent.  So I will grant that motion.

22             All right.  Why don't we talk about the -- well, let

23    me just make a comment on the government's trial brief, the

24    government's trial brief on, let's see, the issue of Rule 610.

25    This has to do with religion.  And I don't know exactly how

```
 1   that will come up in terms of specific exhibits or specific,

 2   for instance, cross-examination, but I do think that the way

 3   that the government broadly describes Rule 610 is way

 4   overbroad.  It's a very narrow rule.

 5          So this case is going to have all sorts of things

 6   about religion in it.  It has to do with a church.  And if

 7   someone's religious views are being brought to the jury's

 8   attention solely to discredit them, perhaps because it's an

 9   extreme view or something of that nature, then Rule 610 would

10   kick in.

11          But Rule 610 can be used for a lot of different

12   purposes -- sorry, religious beliefs can be brought to the

13   jury's attention for a lot of other perfectly appropriate

14   purposes, for instance, interest or bias or to explain why

15   certain actions were taken.  So I wanted to just let people

16   know that the fact that Rule 610 exists does not necessarily

17   have the type of constraining effect that seems to be the

18   position of the government.

19          Any problem, Ms. Stricklin, with the use of the

20   pseudonym Christopher during the trial?

21          MS. STRICKLIN:  No, Your Honor.  In fact, all the

22   exhibits have been modified and we have agreed to that.

23          THE COURT:  All right.  So obviously the government

24   will have to make sure that witnesses who probably would have a

25   much more likelihood of inadvertently mentioning the minor
```

1    No. 1's actual name have been properly prepared.

2         All right.  Let's talk, then, about the mechanics of

3    the trial.  So hopefully we'll get going at 8:00.  We will at

4    least have the attorneys and Mr. Heller and we can have Special

5    Agent Jones here at 8:00.  We will talk about issues that may

6    have come up.

7         One thing I do not want to do, I mean, I think we are

8    going to have trouble getting going because of the weather, but

9    I don't want any surprise motions.  You know, if there is some

10   big suppression issue that someone dreamt up over the weekend,

11   it needs to be filed ASAP.  I don't care if it's 10:00 p.m. or

12   whatever, but I do not want to bog ourselves down with dealing

13   with some type of issue that could have been brought up or

14   could have been brought to the Court's attention earlier.

15        And then once we get enough people to begin jury

16   selection, we will start that.  So just to let you know, I

17   think that most people are fairly familiar with this, but --

18   and Mr. Rasch-Chabot, are you going to be part of the trial

19   team or are you just bringing your expertise regarding legal

20   issues to bear on our trial preparation conference?

21        *MR. RASCH-CHABOT:*  Undetermined at this point, Your

22   Honor.  I am sort of on standby to help out.

23        *THE COURT:*  That's fine, sure.  Yeah, the weather

24   could effect things in that regard too.

25        But anyway, let's talk about bringing in the panel

1    members.  So the Clerk's Office will generate a randomized list

2    of the potential jurors.  And as I said, once we have a

3    sufficient number to begin, we will bring those people in.

4    They will be seated in order.  So the first person on the list

5    will be seated in the first chair closest to the bench back row

6    in the jury box.  And then the eighth person on the list will

7    be in the back row furthest from the bench.  And then we'll

8    fill up the middle row and then we'll fill up the first row,

9    which is the folding chair row.

10            Because the trial is relatively short, I am going to

11   have just one alternate.  But as a result of having one

12   alternate, we will seat 31 jurors up there to begin with.

13   Because we have one alternate, it means that the government

14   will have seven peremptory challenges.  Mr. Heller will have 11

15   peremptory challenges.  And that means that the first 13 people

16   will be the presumptive jurors.

17            We will be playing musical chairs.  So once one side

18   exercises its peremptory challenges, then I will have people

19   physically move.  But it does mean that when you are exercising

20   your challenges, you need to exercise them among the first 13

21   people.  So sometimes people will say, we move to excuse

22   Ms. Smith, and she is like seated in a folding chair as well.

23   That doesn't work because none of the first 13 will be seated

24   in the folding chairs.  So just focus on those people who are

25   actually technically part of the jury at that time.

1          I am going to randomly designate seat No. 7 as the

2     alternate.  Pursuant to Rule 24(c)(4), the challenge to the

3     alternate has to be done with one's last strike.  However, I

4     think that if the attorneys agree, that you can waive that and

5     you can exercise your challenges to the alternate at any time

6     or no time, whenever you want to do it.

7          Any preference on that, Ms. Davies?

8          MS. DAVIES:  That's fine, Your Honor.  No preference.

9          THE COURT:  The latter is fine?

10         MS. DAVIES:  It is fine that the parties agree that we

11    can do it at any point.

12         THE COURT:  Ms. Stricklin?

13         MS. STRICKLIN:  I agree with that.

14         THE COURT:  That's fine.  So you can exercise multiple

15    strikes as to seat No. 7, the alternate, if you wish or not,

16    and you can exercise your last strike on someone other than the

17    alternate, okay?

18         The excusals for the peremptories will be done in open

19    court and done orally.  We are not going to be passing some

20    piece of paper around.  So you just thank and excuse someone.

21    And then there will be -- the replacement people, in other

22    words, the people after seat No. 13 will replace those in

23    order.  So, for instance, if Mr. Heller were to excuse two

24    people, the first person excused would be replaced by the next

25    person like that, okay?

1        Any questions about those mechanics, Ms. Davies?

2            *MS. DAVIES:*  No, Your Honor.  Thank you.

3            *THE COURT:*  Ms. Stricklin?

4            *MS. STRICKLIN:*  No, Your Honor.  Thank you.

5            *THE COURT:*  Now let's talk about the voir dire

6    process.  First of all, before I begin with voir dire, I

7    typically read some type of a very, very short description of

8    what this case is about to the jury.  I could use the

9    description that's in the preliminary jury instruction, in

10   other words, indicate to the jury that the defendant has been

11   charged with knowingly engaging in sexual contact with another

12   person without that person's permission.  I typically don't

13   like to read the Indictment because the Indictment contains all

14   sorts of language that you otherwise just have to then explain

15   away to the jury, the fact that it's charged in the conjunctive

16   and all those types of things.

17       Any problem with the Court reading the description of

18   the charge contained in the preliminary jury instruction,

19   Ms. Davies?

20           *MS. DAVIES:*  No, Your Honor.

21           *THE COURT:*  Ms. Stricklin?

22           *MS. STRICKLIN:*  No, Your Honor.

23           *THE COURT:*  While we are on the subject of the

24   preliminary jury instruction, any problems or suggested changes

25   to that instruction, Ms. Davies?

1          *MS. DAVIES:*  Your Honor, it is not an objection, so I

2     didn't file anything, but I do have just a couple things I

3     wanted to discuss with the Court.

4          *THE COURT:*  Go ahead.

5          *MS. DAVIES:*  For personal reasons based on a prior

6     prosecution, I do not use my middle initial because it is

7     associated with my children, so I would like it not to be

8     appearing in this.

9          *THE COURT:*  I don't think that's a problem.  I'll take

10    that out.

11         *MS. DAVIES:*  Ms. Surratt has also requested that her

12    middle name not be used.

13         *THE COURT:*  Okay.  We will do that.

14         *MS. DAVIES:*  Thank you, Your Honor.

15         The other issue, Your Honor, is I don't know, but I

16    want to raise with the Court in case this will either be

17    confusing or distracting to the jury, would this be a juncture

18    where it would be appropriate to advise them that the victim

19    will be referred to with a pseudonym or is that something we

20    should deal with otherwise?

21         *THE COURT:*  I am going to do that at some point.  The

22    question is when.  This is a fairly stock instruction.  I

23    probably won't do it then, but I think we need to do it early

24    on because otherwise, you know, they would just be hearing one

25    name, that type of thing.  So I won't modify this particular

1    instruction because this instruction is only going to be given

2    at the end of voir dire.  I think it's more appropriate to

3    provide information about the pseudonym early on, so I will do

4    that at some point.

5          MS. DAVIES:  Thank you, Your Honor.

6          Then the remaining issue is just again something I

7    wanted to raise with the Court to avoid confusion or

8    distraction.  When we were last before the Court and we were

9    setting this potential trial date, I advised that this special

10   agent had a long-standing commitment and is leaving on the

11   29th.  So to the extent it is worth addressing, I wanted to

12   remind the Court that he will be here on the first day of trial

13   and for a portion of the second day, and then he will

14   disappear.  And to the extent that provides any confusion, I

15   wanted to raise it.

16         THE COURT:  Yeah, no problem.  You mean in terms of

17   just the jury all of the sudden seeing him not here?

18         MS. DAVIES:  Yes, Your Honor.

19         THE COURT:  Yeah, it's up to the government to work

20   his testimony in, but remind me during the course of the trial

21   and I'll be happy to explain that Special Agent Jones had --

22   because of a prior commitment needed to leave and that's why he

23   is not here right now, whatever you want to do, okay?

24         MS. DAVIES:  That's it.  Thank you.

25         THE COURT:  Thank you.

1     Ms. Stricklin or Mr. Rasch-Chabot, any suggested

2  changes or objections to the preliminary instruction?

3     *MS. STRICKLIN:*  No, Your Honor.

4     *THE COURT:*  You're okay with middle names, your own

5  middle names or anything?

6     *MS. STRICKLIN:*  Yes, unless for consistency matters we

7  just want it to --

8     *THE COURT:*  I don't think it makes any difference, but

9  it's up to you.

10     *MS. STRICKLIN:*  It doesn't matter.

11     *THE COURT:*  Okay.

12     *MS. STRICKLIN:*  Thank you.

13     *THE COURT:*  All right.  Then let's talk about reading

14  a list of the potential witnesses to the jury.  Usually,

15  especially in a case like this where there is a disparity

16  between the number of witnesses on one side to the other, it's

17  probably best for the Court to read one list that's

18  alphabetized.

19     Any problem with that, Ms. Davies?

20     *MS. DAVIES:*  No, Your Honor.

21     *THE COURT:*  Ms. Stricklin?

22     *MS. STRICKLIN:*  No, Your Honor.

23     *THE COURT:*  Okay.  I'll do that.  So if there is a

24  change like, for instance, for whatever reason you know for a

25  fact that a witness that was listed is not going to testify,

1   let me know that on Monday morning and we will take that name

2   off.

3           This is going to be relevant in just a moment when we

4   go through the proposed voir dire questions, but because the

5   law comes from me, not from some stump speech by the attorneys

6   of which there are many examples in the defendant's proposed

7   voir dire, if there is a concept like proof beyond a reasonable

8   doubt, that type of thing, that you want in front of the jury

9   so that you can ask people if they are able to follow along

10  with that particular rule of law, you should -- it's best to

11  request, and that is what I am seeking right now, is any

12  request that I read certain instructions during the voir dire

13  process.

14          Ms. Stricklin?

15          *MS. STRICKLIN:*  I am understanding the Court's

16  question to be any request that you read instructions regarding

17  general principles of law to the jury?

18          *THE COURT:*  Because you are not going to be.

19          *MS. STRICKLIN:*  I understand.  No, Your Honor, I don't

20  have any specific instructions that I think the Court needs to

21  read.

22          *THE COURT:*  I think you will change your mind in just

23  a minute, but --

24          *MS. STRICKLIN:*  Well, that's -- I was just going to go

25  there.  Possibly the elemental because we do have some

1    questions regarding that particular instruction.

2         THE COURT:  We are not going to go into the elements.

3         MS. STRICKLIN:  Okay.

4         THE COURT:  You have a question about the defendant

5    testifying.  Do you want me to read that instruction?

6         MS. STRICKLIN:  Yes.  I guess I am just a little bit

7    confused if the Court intends on addressing these principles in

8    its own fashion or not.

9         THE COURT:  Here is the deal.  You have a lot of

10   questions where you are basically telling the jury what the law

11   is and then you are saying, what do you think?  Can you follow

12   that?  You are not going to be doing that.  You can ask them

13   questions, but the law is going to come from me.  You are not

14   going to be instructing them on the law.

15         As a result, I can, by virtue of reading jury

16   instructions before you get up, do that for you in essence.

17   And then you can ask whatever questions that you want in terms

18   of whether they can follow it, but I am not going to -- it's

19   too confusing.  I don't think it's a good idea to have you be

20   instructing the jury on the law.

21         MS. STRICKLIN:  I understand.  I think I misunderstood

22   the Court.  I do think it is important that the jury is

23   informed about the presumption of innocence, proof beyond a

24   reasonable doubt and the defendant's right not to testify.

25         THE COURT:  Okay.  Got it.

1        MS. STRICKLIN:  I misunderstood what the Court's

2   intentions were regarding those topics.

3        THE COURT:  No problem.

4        MS. STRICKLIN:  Thank you.

5        THE COURT:  Ms. Davies, any by the United States?

6        MS. DAVIES:  No, Your Honor.

7        THE COURT:  Thank you.

8        There has been a request to allow more than the

9   standard 15 minutes.  I am going to -- I may if we get going

10  quickly give you extra time, but I may not if we're -- if jury

11  selection is really going slow and we didn't get enough people

12  in to start or we are way behind.  So plan on 15 minutes, but I

13  may give you up to 25.  I won't give each side more than 25.

14       Let us then take a look at the government's proposed

15  voir dire.  Keep in mind that just because I say one of the

16  parties' questions is okay doesn't mean that I am going to ask

17  it.  It just means that if you have the time, you can ask it.

18  Most of the questions on the government's first page, this is

19  Docket No. 91, are the types of things that I ask about, but I

20  don't typically ask about newspapers, magazines, social media,

21  text messaging, but it's perfectly fine to ask about those

22  topics.

23       When we get into Page 2, Section C, Question No. 1,

24  this is a question that I think is a very dangerous question in

25  terms of a lot of people might raise their hands and want off

1    the jury as a result.  People who will have difficulty, of

2    course, that's not the standard for deciding whether or not

3    someone should be excused.  And it's also, the way it's

4    phrased, so harrowing that it makes it sounds like it's going

5    to be tough.  Well, anyone would probably answer that question

6    yes, and yet jurors all over the country all the time decide

7    cases that involve facts that are much, much, much more

8    difficult.  So while the question is okay, I would suggest that

9    the government thinks about the wording of that.

10         Question No. 3 I will not allow.  It essentially asks

11   the jurors to speculate about facts which they are not even

12   aware of.

13         Question No. 4 I will not allow.  It's confusing and

14   it, once again, asks the jurors to speculate about things that

15   they don't know about.  One problem with a lot of the

16   government's questions -- well, it comes up in just a minute.

17         Question No. 5, it's phrased in kind of a loaded way,

18   "Do all jurors agree."  It should instead be phrased, "Has

19   anyone had a traumatic event happen to them" and "can you

20   imagine people acting differently," something of that nature

21   instead of trying to suggest the answers by the way that it's

22   phrased.

23         The questions are not designed to condition the jury.

24   It's not designed to condition the jurors to answer in a

25   particular way.  Rather, the purpose of voir dire is to try to

1    find out whether people have had certain experience or hold

2    certain views that would prevent them from being fair and

3    impartial.

4           Question No. 6 I will disallow.  It calls for

5    speculation about topics that the jurors would not necessarily

6    know about.

7           Same for No. 7.

8           Question No. 8, once again, that's phrased in a loaded

9    fashion.  Any type of phrasing, "Does anyone believe," suggests

10   that anyone who dares to raise his or her hand is probably

11   wrong, so that question needs to be rephrased so it's more

12   neutral, but otherwise it's okay.

13          Question No. 9 I will disallow.  It's phrased in a

14   loaded fashion and it asks -- it suggests facts.

15          Question No. 10 needs to be rephrased.  As long as

16   it's rephrased generally, not specific to this case, but just

17   as a general question.  You know, in other words, not this

18   case, but, you know, "If you were a juror, could you find a

19   defendant guilty if there is only one eyewitness," or something

20   of that nature.

21          Question 11 once again needs to be rephrased more

22   neutrally.  It has the language, "Do any of you believe"?  In

23   Section D, once again, it needs to be rephrased because it's

24   phrased in a loaded way.

25          Otherwise, the questions are fine except on Page 4,G,

 1   types of evidence, I won't allow Question No. 1.  Once again,

 2   it asks the jurors to speculate about things they don't know

 3   about.

 4        Question No. 1 in Section I on Page 5 I will not allow

 5   either.  I mean, for one thing, Mr. Heller doesn't have any

 6   obligation whatsoever to present any evidence, so phrasing

 7   things in terms of two sides is usually a bad idea.

 8        Any questions about those rulings on behalf of the

 9   government?

10        MS. DAVIES:  Your Honor, I guess the only question is

11   there are multiple instances where you said we need to

12   rephrase, and I just want to make sure I don't not understand

13   the Court correctly and rephrase in a way that still doesn't

14   address the problem.  So we will -- every place you indicated

15   rephrasing we will try to make it just as neutral and not

16   suggest an answer.  Will that achieve the Court's concern or

17   address the Court's concern?

18        THE COURT:  We'll see.  I think you know what the

19   issue is.  If you say, "Is anyone deign to believe that," blah,

20   blah, blah -- that's a loaded question.  It needs to be phrased

21   neutrally.  And I don't even know why -- you know, I am always

22   curious why you would ask loaded questions because what you

23   want to find out is not -- you are not trying to beat them into

24   not raising their hand.  You want them to raise their hand so

25   you can exclude them if they have some bad thing, so I think

1    it's always better to ask in a neutral fashion.

2          Anything else, Ms. Davies?

3          *MS. DAVIES:*  No, Your Honor.  Thank you.

4          *THE COURT:*  Let's take a look at the defendant's

5    proposed voir dire.  This is Docket No. 95.  In terms of

6    Question No. 2(e), I will not permit anyone to ask about the

7    verdict that jurors reached in a given case.

8          Also, (f), the first example of many here where there

9    is prefaces to questions.  No prefaces to questions.  You just

10   ask the question.

11         Everything else is fine until we get to Section II on

12   Page 3.  All those prefaces are bad.  The questions that are

13   part of those questions are fine until we get to Page 4,

14   Question No. 6.  I won't allow question No. 6.  I'm not sure

15   what it means to think that someone is somewhat guilty, but

16   it's too vague.

17         No. 7, I am not going to allow No. 7.  No. 7 is kind

18   of a bizarre type of question that's gained some popularity

19   recently, but the bottom line is that the caption of everything

20   is going to indicate that Ms. Davies and Ms. Surratt represent

21   the United States.  So the fact that they indicate that doesn't

22   seem to be anything that would cause too many assumptions one

23   way or the other.

24         Question No. 9, as I said before, I will have already

25   read the jury instruction about Mr. Heller's right not to

1   testify, but the questions are okay except 9(b).  The

2   defendants shouldn't be telling the jury things that Mr. Heller

3   may or may not do.  I think it will be implicit that he has got

4   a right not to testify.  And, of course, you can talk about

5   that, but telling the jury whether or not he is going to

6   testify is feeding facts to them before the factual part of the

7   trial has started.

8           On Page 5, Section III, yeah, the preface there is

9   bad.  I am not going to allow anyone to talk about the facts of

10  the case in voir dire.  So questions No. 1 and 2 are both bad.

11  I won't allow them.  In terms of Ambien, I think that could be

12  relevant, but it should -- I don't want anyone to just say this

13  case is going to involve Ambien.  Rather, you can ask people

14  whether they've ever taken any type of sleep aid during an

15  airline flight.  And if they say yes, you can ask them what.

16  And if it's Ambien, you can then go into those different types

17  of drug reactions because different people have had different

18  type of reactions to Ambien, so I think it's appropriate to ask

19  about that.

20          Any questions about that, Ms. Stricklin, generally?

21          *MS. STRICKLIN:*  Yes, Your Honor.  So in the first part

22  under our suggested questions in Section III, the Court doesn't

23  want us talking about any of the specific facts.  If like, for

24  example, in Question No. 1, if the --

25          *THE COURT:*  What page are we on?

1          MS. STRICKLIN:  Page 5.

2          THE COURT:  Oh, okay.  Hold on.

3          MS. STRICKLIN:  So, for example, under the heading of

4   Sex Crimes, but under Question No. 1, if the specific ages were

5   removed, does the Court feel like that --

6          THE COURT:  Well, yeah, that's a good point on the

7   consent.  I think that we need to come up -- and you should

8   think about it -- I think we need to inform the jury at some

9   point that despite what they -- the common sense idea about

10  consent of a minor and how it's irrelevant is not part of this

11  case.  I think we need to get that out early on.

12         MS. STRICKLIN:  Right.  So that's what that question

13  is aimed at.

14         THE COURT:  And I think it's appropriate to come from

15  the Court.  So we should think about how we want to do that.  I

16  agree that we need to get that clarified early on because

17  otherwise I think that we're really -- it will confuse a lot of

18  people.

19         MS. STRICKLIN:  Okay.  I agree with the Court.  That's

20  what that question was sort of aimed at.

21         THE COURT:  I believe that -- I don't like the way you

22  went about it, but I think that we need to do that.  So I don't

23  know, maybe you can propose over the weekend, you can bring it

24  in on Monday at 8:00, but remind me about that because I do

25  think we need to get that concept out to the jurors because I

1    think that most people would just be like, what are you talking

2    about consent?  It's a minor.  I thought they couldn't consent,

3    you know, statutory rape and all those different types of

4    ideas.

5          MS. STRICKLIN:  That's what I am concerned about.

6    That's why that question was drafted.

7          THE COURT:  Right.  And once the Court has mentioned

8    that concept, then you can ask questions about that concept,

9    okay, as long as you just don't feed them facts from this case

10   as part of that.

11         MS. STRICKLIN:  I understand.  Thank you.

12         THE COURT:  Anything else?

13         MS. STRICKLIN:  No, thank you.

14         THE COURT:  Right.  But yeah, if you propose some

15   things that both sides hopefully can agree on, I think that

16   that would be good to bring out early on.  And also think about

17   introducing -- I haven't looked over all the jury instructions

18   yet, but it may be appropriate to have something in the jury

19   instructions on that idea as well, okay?

20         All right.  Then let's turn --

21         MS. DAVIES:  I am sorry, Your Honor.

22         THE COURT:  Yes.

23         MS. DAVIES:  I have not done a trial before Your

24   Honor, nor has Ms. Surratt, so it's a little unclear.  We have

25   consulted with colleagues and are not 100 percent certain as to

1   how much follow-up is allowed.  So we understand what of what

2   we proposed is within the Court's -- you know, permissible and

3   we'll rephrase as the Court has directed, but assuming we get

4   an answer --

5           THE COURT:  You can follow up on anything that someone

6   brings up.  You are not restrained.  You always have the

7   ability to ask follow-up questions, because who knows, someone

8   may bring up -- it happens all the time -- someone may bring up

9   something that no one would have ever anticipated or maybe

10  bring up something specific on, you know, some of these topics.

11  And, of course, both sides will have the opportunity to follow

12  up on that.

13          MS. DAVIES:  And if a particular prospective juror

14  indicates some discomfort about talking about whatever is the

15  issue because some of this stuff is sensitive, how does the

16  Court handle that?

17          THE COURT:  Bring it to the bench.  I mean, the last

18  thing we want to do is poison the rest of the jury with some

19  type of very strongly held opinion or some personal experience.

20  So even if someone is not uncomfortable talking about it at the

21  bench, if you have a feeling that the answer is going to be,

22  you know, like someone says, "Oh, yeah, I know how it works.

23  You know, the person who is accused of raping my sister, I went

24  to his a preliminary hearing," or something like that where you

25  just have a feeling that someone is about ready to bring

1    something up that may really prejudice the jury or influence

2    the jury, that's the type of thing where just ask me, "Can we

3    talk about this at the bench?"  That's the best way, okay?

4        All right.  And then make sure that you read my

5    practice standards regarding *Batson* challenges so just in case.

6    The bottom line is you do not want to let any of the jurors who

7    may be subject to a *Batson* challenge leave the courtroom

8    because if they leave, we can't get them back.

9        So, for instance, let's say that Ms. Stricklin thought

10   there was a pattern developing or something.  Then you would

11   ask, Your Honor, can Miss so and so remain in the courtroom for

12   just a little bit?  Hopefully I will figure out the shorthand

13   of that.  And then if the pattern doesn't develop, then, of

14   course, you could let me know and we could let those people

15   leave, but we don't want them to leave the courtroom.

16       All right.  Let's talk about openings.  How much time

17   does the United States request for its opening?

18       *MS. DAVIES:*  I don't think I will go that long, Your

19   Honor, but I am going to ask for a half hour.

20       *THE COURT:*  Once again, we may be severely time

21   challenged, so try to be flexible.

22       Ms. Stricklin?

23       *MS. STRICKLIN:*  Again, I don't think --

24       *THE COURT:*  Or maybe Mr. Rasch-Chabot is giving the

25   opening.  He doesn't know that, but --

1          MS. STRICKLIN:  I doubt it.

2          MR. RASCH-CHABOT:  I certainly hope not.

3          MS. STRICKLIN:  I don't think we will need that amount

4   of time either, but I suppose being consistent is --

5          THE COURT:  We will say 30 minutes.  And then the

6   government can think about this, but if anyone wants me to give

7   them a heads-up when they've approached 30 minutes, you can.

8   Just let me know on Monday.

9          All right.  Then let's talk about the subject of

10  witnesses.  I think based upon the time estimations that we are

11  going to fit within the three days, but the real wild card is

12  the weather, when we get to start.  So once again, you're going

13  to have to be flexible in terms of the witnesses.

14          One thing that I did want to mention, and that is as

15  to the FBI witness, the expert witness, if for some reason --

16  you know, let's assume that there is -- you know, issues have

17  been raised about minor No. 1 and his behavior, things that are

18  relevant to the testimony of the FBI expert, but then the

19  government rests and the defendant then says, "No evidence,"

20  that would not -- I would then allow the government to call

21  their expert because I am just staging -- you know, I think

22  it's appropriate that she testifies as a rebuttal witness, but

23  her testimony cannot simply be precluded by simply not putting

24  on any evidence.  In that case, I would be open to the idea of

25  the government then calling that particular expert.

1          Because we want to be very efficient, make sure that

2     you have your witnesses here.  That really applies mainly to

3     the government which has a number of different witnesses.  It

4     looks like from the government's exhibit list that there were

5     some stipulations that would obviate the need perhaps for the

6     expert on the flights to testify; is that right?

7          *MS. DAVIES:*  That's correct, Your Honor.

8          *THE COURT:*  So if you have a stipulation like that, it

9     looks like it's been marked as an exhibit.  For those of you

10    who haven't had a case in front of me, look at my practice

11    standards.  So it looks like that's been complied with.  What

12    you basically want is case caption, something that says

13    stipulation.  Each factual stipulation can be in a separate

14    paragraph.  If you have done it over multiple pleadings, that's

15    okay too.  It doesn't matter.

16         But then you mark that as an exhibit.  Someone moves

17    them into evidence.  The fact that they are stipulations

18    doesn't magically introduce them into evidence.  And then, of

19    course, at the time of their being admitted, if you want to

20    display them to the jury, that's fine.  I am not going to be

21    reading anything like that to the jury.  They are not going to

22    be part of the jury instructions.  Rather, they are pieces of

23    evidence.  And that way they go back with the jury too, so

24    that's how those will work.

25         Ms. Stricklin, did you have an estimate of how much

1    total time the cross-examination of the government's witnesses

2    will last?  Do you anticipate some long cross-examinations?  I

3    know that Ms. Christl will have a number of those witnesses and

4    you are not going to really know about that.

5         MS. STRICKLIN:  Yes.  I guess I can say that I would

6    anticipate the longest cross would be of Christopher.  I think

7    the remainder of the crosses will be relatively short, meaning

8    not hours or an hour, but I can't -- Ms. Christl has

9    Christopher, so I can't really say, but we are certainly

10   anticipating that will be the longest.  And the remaining, I

11   think it all would be under an hour, 30 minutes, maybe even

12   under 30 minutes.

13        THE COURT:  Undoubtedly under 30 minutes, although I

14   am not holding you to it.  It's just probably.  Okay, that

15   sounds fine because Tuesday a lot will have to be accomplished.

16   Typically what I have found over the years is you get 6.25

17   hours of testimony in each trial day, a full day.  We won't get

18   that much testimony on Monday because we have jury selection

19   and openings, and then correspondingly on Wednesday we have got

20   closings.  So there is a lot to be done, but Tuesday is the

21   day.

22        So Tuesday the schedule -- I didn't mention this, but

23   on Tuesday we will start at 8:30.  We will take a break for 15

24   minutes at about 10:15.  We will recess for lunch at 12:00.  We

25   will reconvene at 1:30.  We will have a break in the afternoon

1    at 3:15 typically for 15 minutes, and then we'll -- the jury

2    will be excused at 5:00.

3             You should not anticipate that I will allow someone to

4    lap over after 5:00 unless they are catching a flight.  But

5    every time the lawyers say "I just have a few more minutes,"

6    it's never a few more minutes.  In fact, that's another

7    pet-peeve of mine.  Always a good idea to never let the words

8    "I just have a few questions" escape from your lips because no

9    lawyer has ever followed that.  It's always more than that.

10   Why tell the jury something that you are just about to not

11   follow?

12            Okay.  Any request for sequestration?

13            *MS. STRICKLIN:*  Yes, Your Honor, please.

14            *THE COURT:*  Then we will have sequestration.

15            Make sure your witnesses know about that.  And make

16   sure that your witnesses are really careful in the elevators,

17   in the security line, in the hallways, all those things,

18   because a lot of them are just laypeople.  They don't know.

19   But they need to be extremely careful and they need to

20   especially look out for yellow juror buttons, but because the

21   weather will probably be cold, a lot of the jurors will have

22   their yellow juror buttons covered up with coats and things,

23   okay?

24            *MS. DAVIES:*  Two questions, Your Honor.  First, I

25   would ask for an exception for Special Agent Jones who is going

1    to be testifying.

2              *THE COURT:*  And he is your advisory witness?

3              *MS. DAVIES:*  He is our advisory witness.

4              *THE COURT:*  Yeah, he is excepted from that.

5              *MS. DAVIES:*  Secondly, Your Honor, I think this is

6    going to arise later perhaps in this conference, but we are

7    planning on calling our witnesses out of order in order to make

8    certain that the victim testifies, that Agent Jones testifies

9    afterwards, and that there is a chance for cross-examination of

10   him before he is gone.  The victim has requested to be able to

11   stay in the courtroom after his testimony for the rest of the

12   proceedings.

13             *THE COURT:*  Any objection?

14             *MS. STRICKLIN:*  I guess if they know there is no

15   reason that they would ever recall him, I don't have an

16   objection.  But I do think if there is a chance that he could

17   be recalled and has then listened to everything that everyone

18   has said, that to me is a potential problem.

19             *THE COURT:*  Yeah, I agree with Ms. Stricklin.  If you

20   can -- if you agree that he will not be recalled and also that,

21   of course, he won't talk about other people's testimony with

22   anyone, then I'll allow it.

23             *MS. DAVIES:*  Your Honor, I can certainly represent

24   that he will be instructed and I have no reason to think he

25   won't follow that instruction that he would not discuss

1    testimony with any other witness.  That is not a question.

2    Your Honor, without knowing what they are going to do in the

3    defense case, I think it's pretty impossible for me to say he

4    couldn't possibly be a rebuttal witness.  And the problem, Your

5    Honor, is he is the victim of this crime and --

6            THE COURT:  It doesn't matter.  He will be excluded.

7    That's just -- Ms. Stricklin has legitimate concerns about

8    that.

9            MS. DAVIES:  And, of course, Your Honor, he may be

10   cross-examined about anything were he to be in the courtroom

11   and be recalled.  So I understand the Court's point.  I am not

12   trying to be contentious.  But I just think the fact he is a

13   victim and there are other remedies to address if he is in the

14   courtroom and then, you know, we do unexpected, but

15   unexpectedly based on something the defendant does he needs to

16   be recalled, they have a means to address that.  And again, he

17   is the victim of the crime and he wants to be present at his

18   trial.

19           THE COURT:  Well, if you can cite case law to me that

20   would indicate that he would be excepted from sequestration,

21   but I am unaware of it.

22           MS. DAVIES:  Your Honor, I will do that research over

23   the weekend and I submit.

24           THE COURT:  Yeah.  At this point in time unless the

25   government agrees that he will not be recalled, he will be

1    precluded pursuant to the sequestration.

2         Make sure that you don't refer to anyone other than

3    the victim, who we are going to call Christopher, by just his

4    or her first name.  You need to observe the formalities.

5    People need to be referred to by the attorneys by at least a

6    full name or last name.  Witnesses, they can refer to people

7    however they refer to them.  That doesn't matter.

8         Also, during the course of the trial if you need to

9    confer with opposing counsel, ask me for permission to do so as

10   opposed to shouting across the tables, "Hey, is Exhibit 7 in,"

11   that kind of thing, because it makes for a bad record.

12   Ms. Coppock won't know what to record.

13        All right.  Those are the only things I had on the

14   subject of witnesses.  Anything else that the United States

15   would like to bring up on the subject of witnesses?

16        MS. DAVIES:  No other witness issues, Your Honor.

17   Thank you.

18        THE COURT:  Ms. Stricklin?

19        MS. STRICKLIN:  No, Your Honor.  Thank you.

20        THE COURT:  Make sure -- I don't think this is going

21   be to an issue, but make sure that people at counsel table and

22   even some people in the gallery are really careful about

23   maintaining poker faces.  The 10th Circuit just yesterday

24   affirmed Judge Blackburn's holding a legal assistant in

25   contempt during one of his trials because, you know, she is at

1    counsel table.  She is following along with the trial.  She has

2    seen the pattern of rulings.

3         And then when a witness, one of the witnesses on her

4    side was asked a question which she thought maybe even

5    appropriately was objectionable, she kind of mouthed "no" to

6    the person.  And Judge Blackburn held her in criminal contempt.

7    As a result, she got fired from her job and spent loads of

8    money on appeal and came up unsuccessful.  So anyway, it's just

9    really important to make sure that everyone keeps a good poker

10   face.

11        All right.  On the subject of exhibits, obviously

12   we'll have some recordings.  Does the government intend to use

13   some type of software program or something to play those?

14        MS. SURRATT:  Yes, Your Honor.  We will use Trial

15   Director to play the recordings.  And as of right now we have

16   the chunks of the recordings broken down so that the paralegal

17   can play them easily using Trial Director.

18        THE COURT:  Okay.  That's great.  And did you -- I

19   can't remember.  Did you come in this week and practice?

20        MS. SURRATT:  We did, Your Honor.  And we would

21   request the Court's permission to use the wireless headphones

22   that we understand have been used in this courtroom before to

23   allow the jurors to listen to the recordings.

24        THE COURT:  And you are going to bring those in,

25   right?

1          *MS. SURRATT:*  We are, Your Honor.  We tested them and

2     they appear to be working.

3          *THE COURT:*  Make sure that Ms. Stricklin and

4     Ms. Christl have had an opportunity to look at those things.

5     They have worked fine in the past.  This one, we have played

6     things through the system, but oftentimes it doesn't come

7     across quite at clearly.

8          *MS. SURRATT:*  Yes, Your Honor, we will do that.  This

9     recording in particular was a recording made on someone's

10     iPhone from inside a pocket, so it's particularly susceptible

11     to the echos and garbledness through the courtroom speakers.

12          *THE COURT:*  Okay.

13          *MS. SURRATT:*  On that topic, Your Honor, we have

14     prepared transcripts that we hope to use as aids to the jurors,

15     understanding that they will not be introduced as evidence in

16     the trial nor go back to the jury room.  But because of the

17     difficult nature of the recording to listen to and because of

18     the number of speakers, we hoped to -- that the Court would

19     allow us to use transcripts as aids to the jury.

20          *THE COURT:*  And what form are the transcripts in?  Do

21     they scroll along while the audio is being played?

22          *MS. SURRATT:*  So, your Honor, what I hope to do, and I

23     have copies with me, is I have 13 pages of paper stapled

24     together.  The first page is a cover page that indicates the

25     participants by their initials.  And I have a witness who will

1   authenticate the voices.  And then each page subsequent to that

2   is keyed to each of those chunks of the recording that I

3   referred to and there are line numbers on each.  And they are

4   short.  Some of them are four lines.  Some of them go on for

5   maybe two pages.

6          But to us, it seems like this is an easy way for the

7   jurors to follow along.  And it's also easy to then direct the

8   witness to certain line numbers to ask what is being discussed.

9   So we'd request that the Court allow us to hand out stapled

10  exhibits to the jurors just as aids while they are listening to

11  the recording.

12         THE COURT:  Ms. Stricklin, have you seen those?

13         MS. STRICKLIN:  I have.

14         THE COURT:  And Mr. Heller's position?

15         MS. STRICKLIN:  Your Honor, I have no objection to the

16  government putting on the exhibit that way.  I guess my only

17  question is from what I am understanding is the government

18  doesn't intend that the transcript would go back to the jury.

19         THE COURT:  Yeah, typically the law is that the

20  evidence is the recording.  And what I do in cases where both

21  sides have agreed to the use of some type of a transcript is

22  I -- before we do the first one, I instruct the jury that the

23  evidence is the recording, not the transcript.  The transcript

24  is being used as just an aid.  They are typically marked, but

25  the transcripts don't go back.

1          MS. STRICKLIN:  Then I have no objection to proceeding

2     that way.

3          THE COURT:  All right.

4          MS. SURRATT:  Your Honor, on the subject of the

5     transcripts, substantively instead of procedurally, if I may,

6     we sent -- like I mentioned, this is chunks of a longer

7     transcript.  On October 15th we sent to defense counsel the

8     entire transcript with the chunks marked that we intended to

9     extract and play for the jury.  We have heard from defense

10    counsel --

11         THE COURT:  And these are just the so-called group

12    confrontation or whatever?

13         MS. SURRATT:  Yes, Your Honor, what we have defined

14    the January 16th confrontation.  We simply excised from the

15    audio and from the transcript things that either the government

16    thought wasn't relevant or the things that the government

17    anticipatorily thought would draw objections from defense

18    because it was too inflammatory or discussed something about

19    the defendant that we agreed is not going to be an issue in

20    this trial like drug addiction, for instance.  So we have

21    excised those already.

22             And then we have proposed to the defendant what we

23    intend to play and given them the recording and the

24    transcripts.  Like I said, this was on October 15th.  And we

25    have heard that there will be likely 403 objections, but we

 1    have not yet received those objections.  And the problem is,

 2    Your Honor, as the Court knows, we are ready to go.  We have

 3    disks produced.  We have a witness who authenticated the disk.

 4    We have transcripts produced.

 5            So what I hoped was to get a ruling or a concession on

 6    the part of the defendant as to what was going to be admissible

 7    in trial and we haven't yet gotten that.  So in a best case

 8    scenario we would ask the Court to make a decision.  Worst case

 9    scenario we would ask the Court to ask if the defense could

10    have us their objections by 10:00 o'clock tomorrow morning

11    because at some point we will be in a jam in terms of making

12    new disks and making new transcripts because this is going to

13    be a very, very short and quick trial.

14        THE COURT:  Ms. Stricklin?  Yeah, obviously there is

15    logistical problems that Ms. Surratt I think legitimately would

16    like to try to avoid if possible.

17        MS. STRICKLIN:  I understand that position and I

18    appreciate it.  What I had said to the government this morning

19    is that I would review these and try to work with them, but

20    that I couldn't promise that every objection, you know, I would

21    notify them of every objection ahead of time primarily because

22    I don't know what the witness is going to say about this or

23    what follow-up questions or asked or what introductory

24    questions are asked in order to admit this.

25            But in terms of the words that are on the transcript,

1    I will do my best to go through them and convey to the

2    government what issues I have to see if there is a way that

3    further redactions can be made or if there is a way to agree on

4    this proposed exhibit.

5         THE COURT:  Yeah, I would urge you to do that as soon

6    as possible because it sounds like the government wants to try

7    to iron those out ahead of time.  And, you know, as we all

8    know, logistically it's very difficult to queue things up when

9    they are being objected to contemporaneously.

10         MS. SURRATT:  Your Honor, to the extent it gives the

11   Court or the defense counsel comfort, the way that I envision

12   this working in front of the jury is for the shorter clips,

13   some of which are a few seconds, some of which may be up to a

14   minute long, I would simply ask Mr. Price, our paralegal, to

15   press play and the recording would play.

16         And then with respect to some of the things that are

17   said, I would ask the witness, who was a participant, either

18   what he meant when he said something or what he understood

19   other participants to be saying based on his participation of

20   the conversation.  So in other words, I anticipate simply

21   playing the recording and then asking the witness a few, but

22   not many, questions about different parts of the recording and

23   then moving on to the next recording.

24         THE COURT:  You can do what you want.  Obviously,

25   though, you need to make a really good record of when you start

1    the recording and when you stop the recording to ask a

2    question, all those things, so that the Court of Appeals, if

3    necessary, will be able to know what was played.

4         MS. SURRATT:  Right, Your Honor.  That's a great

5    point.  And we hopefully anticipated that concern by already

6    breaking down the audio into these chunks.  What I mean by that

7    is the exhibit is marked as Government Exhibit 61.  That's a

8    disk.

9         THE COURT:  What does it consist of?

10        MS. SURRATT:  It's a disk that consists of not the

11   entire audio, but the audio already --

12        THE COURT:  By audio you mean not the entire cellphone

13   recorded confrontation?

14        MS. SURRATT:  Correct, Your Honor.  That confrontation

15   audio recording in its entirety is one hour long.  What we have

16   done rather than try to start and stop based on time points in

17   the recording is Government Exhibit 61A is already a chunk of

18   that recording.  Government 61B on the disk is already a chunk

19   of that recording, already excised from the whole.  So the

20   government's exhibit, the disk, Government Exhibit 61, is

21   already -- it already makes extremely clear what the government

22   intends to play and intends to introduce as evidence.  So in

23   other words, there is not going to be any confusion about what

24   was offered or admitted or played for the jury because it's

25   already been broken down into chunks.

1      THE COURT:  So Exhibit 61 is the entirety of

2  Exhibit 61A through I?

3      MS. SURRATT:  Correct, Your Honor.

4      THE COURT:  Then why do we need 61?

5      MS. SURRATT:  61 is just the disk that contains all

6  those individual audio clips.

7      THE COURT:  But 61 is a separate disk?

8      MS. SURRATT:  61 is a disk.  And A through I are audio

9  files on the disk.  Rather than making 10 different disks, I

10 made one disk and on that disk are audio files 61A, audio 61 --

11     THE COURT:  I see.  So there isn't one continuous

12 playing of A through I, but rather 61 contains individual audio

13 files consisting of 61A, B, et cetera.

14     MS. SURRATT:  Correct, Your Honor.  And again, this

15 also goes to the point of at this point the government is ready

16 to go with what it has identified as what it believes to be

17 both relevant and probative.  And at this point redoing the

18 work is obviously possible because anything is possible.

19     THE COURT:  Can I quote you on that later next week?

20     MS. SURRATT:  Excuse me, Your Honor?

21     THE COURT:  Can I quote you on that later next week?

22     MS. SURRATT:  So how this came full circle, this is

23 why we sent these to the defense a long time ago.  But I'm not

24 trying to throw anyone under the bus, and I understand

25 Ms. Christl had an emergency, but at some point it will become

1   logistically almost impossible for the government to reform

2   what it has done here.

3          The corollary to that, Your Honor, is the way we

4   intended to introduce these items was we had the government's

5   witness through whom they will be introduced Listen to the

6   entire disk, Government 61A, compare the words on the audio,

7   the recording, to the transcripts and initial the disk so he

8   will be able to on the stand authenticate it.  Obviously, if

9   anything changes, that can't be done.

10          We do understand from the defense that should anything

11   change based on their objections and the Court's ruling, the

12   government will make a new disk and defense won't object to the

13   authenticity of the disk, meaning we won't have to lay the

14   foundation through that witness.

15          THE COURT:  Okay.  Because presumably if there are

16   changes, it will be deletions, not additions.

17          MS. SURRATT:  Most likely, Your Honor, but we

18   certainly don't foreclose the defendant's request to add stuff

19   and we will consider any request that they make.

20          THE COURT:  All right.  Thanks for that preview.  And

21   then I can't remember, but are there any physical exhibits that

22   the government has other than disks?

23          MS. SURRATT:  Other than paper, there is the

24   defendant's cellphone which we intend to have Special Agent

25   Jones authenticate and display for the jury, but we don't

1    intend to introduce the entire cellphone into evidence.  In our

2    view there is no reason for the jury to, for instance, take the

3    cellphone back to the jury room.

4           What we intend to do is have Special Agent Jones

5    recognize and authenticate the phone.  From that he will talk

6    about how he dumped the contents of that phone using

7    Cellebrite, and we also have a stip to the process.  And from

8    that Cellebrite report we have pulled individual exhibits, and

9    it's only those individual exhibits that we intend to actually

10   introduce into evidence.  So in other words, there is no reason

11   for the jury to have a 100-gigabyte Cellebrite report with them

12   when only very few exhibits from that Cellebrite report are

13   probative or relevant.

14          THE COURT:  That's fine.  I was just wondering whether

15   the cellphone would be sent back, which has happened in trials

16   but it can present a new issues.

17          Okay.  Any additional questions on exhibits by the

18   government?

19          Make sure if you have paper exhibits that each page

20   bears a consecutive number, okay?  It doesn't -- it doesn't

21   have to start with one.  Maybe it's an excerpt of something

22   that is already consecutively numbered, but it will help the

23   witnesses out considerably if they have an exhibit that has

24   consecutive numbers so if they are asked to look at Page 6,

25   they can easily look at Page 6, for instance.

1          And then the other thing is think about the issue of

2    video exhibits going back to the jury at the end of the case.

3    We used to have what we called the clean computer that IT had.

4    Now we have this fancy new device that the jury can have.  It's

5    a little station where they can do it, but I will let everyone

6    take a look at that before so you can make sure that you're

7    convinced that it does what it is represented to be able to do,

8    namely, play the disks but not do anything else like access the

9    internet or something.

10          Okay.  Any questions on exhibits on behalf of

11   Mr. Heller?

12          *MS. STRICKLIN:*  No, Your Honor.  Thank you.

13          *THE COURT:*  On jury instructions I haven't had a

14   chance to go through everything yet, but what we will do is on

15   Monday at 5:15 we will have our first meeting about jury

16   instructions.  I am going to try to pass out a set of court

17   instructions on midday Monday.  If you have a chance, try to

18   look them over a little over the lunch hour, but we will talk

19   about jury instructions Monday, not with an idea of finalizing

20   them, but with an idea of making substantial progress on them

21   if we can.

22          Tuesday evening I won't be able to meet on jury

23   instructions unless we do it just right after 5:00 for just a

24   short period of time.  But we will need to, if we haven't

25   finalized the instructions, we will need to work a jury

 1   instruction conference, the final jury instruction conference

 2   into Wednesday.  So depending on how things are going, we may

 3   need to do that over the lunch hour sometime.  That way we

 4   won't be subtracting from our amount of testimony time.

 5          Does Mr. Heller intend to use some type of trial

 6   presentation software other than just using the document

 7   viewer?

 8          *MS. STRICKLIN:*  We also have Trial Director.  I think

 9   Mr. Cohen will be present.  And everything should be loaded

10   onto that as well.

11          *THE COURT:*  All right.  Of course, the new document

12   viewers are very, very sharp and in a pinch they can also

13   substitute for that.

14          All right.  Those are all the topics that I had.

15          Ms. Davies, anything else on behalf of the United

16   States?

17          *MS. DAVIES:*  No, Your Honor.  Thank you.

18          *THE COURT:*  Thank you.

19          Ms. Stricklin, anything else on behalf of Mr. Heller?

20          *MS. STRICKLIN:*  Your Honor, two things.  The first is

21   attached to our proposed voir dire was a jury questionnaire.

22          *THE COURT:*  Oh, right.  I am not going to allow the

23   jury questionnaire, but the different topics that are mentioned

24   on it are appropriate to ask if you want to.  The problem with

25   jury questionnaires is just that it really slows things down

1   hugely, and I already think that we've got a big problem on

2   that subject.

3       MS. STRICKLIN:  Okay.  So those questions are

4   appropriate for our attorney conducted voir dire.

5       And then the second issue, which I will defer to

6   Mr. Rasch-Chabot, is regarding last night's order that came out

7   about the clergy privilege.

8       MR. RASCH-CHABOT:  Your Honor, I just wanted to -- you

9   mentioned you didn't want any surprise motions or anything, but

10  I did want to alert the Court that we had planned on renewing

11  our objection to the clergy privilege evidence or, if Your

12  Honor would prefer, we can file a motion for reconsideration

13  well in advance, not a new issue, but ...

14      THE COURT:  Right.  I guess I am not quite clear.

15  Other than kind of stating a general objection to the Court's

16  order, are you making like a motion for reconsideration now

17  orally or --

18      MR. RASCH-CHABOT:  I would prefer to file a motion for

19  reconsideration in writing, which I can do as soon as possible.

20      THE COURT:  Yeah, as soon as possible, that's fine.

21  Obviously, you can do that.

22      MR. RASCH-CHABOT:  I just wanted to alert Your Honor.

23      THE COURT:  Sure.

24      Anything else on behalf of Mr. Heller?

25      MS. STRICKLIN:  No, Your Honor.  Thank you.

1        *THE COURT:*  Then Mr. Heller's bond will be continued

2   and the Court will be in recess.  Thank you.

3        (Recess at 12:46 p.m.)

4                        REPORTER'S CERTIFICATE

5        I certify that the foregoing is a correct transcript from

6   the record of proceedings in the above-entitled matter.  Dated

7   at Denver, Colorado, this 15th day of January, 2020.

8

9                              S/Janet M. Coppock
                          _____

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25