IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 19-cr-00224-PAB

UNITED STATES OF AMERICA,

 Plaintiff,

v.

1. DAKOTA MICHAEL HELLER,

 Defendant.

## GOVERNMENT'S MOTIONS *IN LIMINE*

  In this motion *in limine*, the Government respectfully requests that the Court: (1) limit questioning by defense counsel of Harmony Kilgore only to subjects about which the witness has personal, non-hearsay knowledge; (2) preclude defense counsel from questioning Kilgore about the grand jury; (3) allow the Government to ask questions of its witnesses relating to their understanding of conversations to which they were a party; (4) permit the Government to combat the implication, if appropriate, that only the Government has the ability to subpoena records or witnesses; and (5) allow the Government to authenticate certain records pursuant to Federal Rule of Evidence 902(11).

  The Government incorporates by reference the facts of the case from the Government's Trial Brief that was filed in advance of the first trial in this matter (Doc #85) and does not repeat those facts here.

1

## **ARGUMENT**

### A. THE COURT SHOULD PROHIBIT DEFENSE COUNSEL FROM ASKING QUESTIONS DESIGNED TO DRAW OBJECTIONS FROM THE GOVERNMENT OR INTENDED TO MISLEAD THE JURY

During the Government's investigation of the defendant, the Government interviewed the defendant's sister, Harmony Kilgore. Kilgore was represented by counsel during the interview, which occurred on May 7, 2019. Kilgore told the Government that, a few days after returning from the Uganda mission trip, the defendant spoke with Kilgore about something that had upset him. The defendant described to Kilgore that, during the flight, he and Christopher held hands, played footsie, and used Ambien. The defendant told Kilgore that he placed his hand on Christopher's crotch and that Christopher's penis was hard. The defendant told Kilgore that he felt terrible about what had happened.

At the first trial in this matter, the defendant called Kilgore to testify in his case-in-chief. During Kilgore's testimony, the defendant's counsel asked Kilgore about the May 7, 2019 meeting with the Government, as follows:

> Q. Ms. Kilgore, at some point this year did the FBI special agent make contact with you, Special Agent Jones?
> A. Yes.
> Q. Did you get served with a subpoena?
> A. I did.
> \* \* \*
> Q. And where did the subpoena direct you to go?
> A. To court.
> Q. To testify in a trial like this or was it to testify before something else?
> A. Before a Grand Jury.
> Q. And did you later receive instruction to go -- from Special Agent Jones to go somewhere other than before the Grand Jury?
> A. To the police station.
> \* \* \*
> Q. And when you went there, Assistant United States Attorney Ms. Davies was there, correct?

> A. Yes.
> Q. And she and Special Agent Jones, did they ask you questions about your knowledge of the incident that occurred between Mr. Heller and Christopher?
> A. Yes.
> Q. Did you tell them what Mr. Heller told you about an incident that occurred between him and Christopher on – in April of 2017?
> A. Yes.
> Q. And did you tell Ms. Davies, the Assistant United States Attorney that's sitting here, everything that your brother told you about that incident?
> A. Yes.
> Q. What did your brother tell you about that incident?
>
> MS. DAVIES:     Objection, hearsay.
> THE COURT:     Sustained.
> \* \* \*
> *BY MS. CHRISTL:*
>
> Q. Ms. Kilgore, after you met with Ms. Davies and spoke to her, did she end up calling you before the Grand Jury to testify?
> A. No.
>
> MS. CHRISTL:     I have nothing further.
> THE COURT:     Thank you.

(Trial Transcript ("TT") 461-63).

During her closing arguments, defendant's counsel implied that because the defendant told Kilgore what supposedly happened on the airplane trip home, and because the Government elected not to put Kilgore in front of the grand jury or call her to testify at trial, that the Government was deliberately concealing facts favorable to the defendant:

> Special Agent Jones asked [Harmony Kilgore], who was his sister, because he knew he needed to talk to the person who heard from Mr. Heller what happened on that flight. The government issued a subpoena for her to testify before the Grand Jury. They ended up just meeting at a police station, Ms. Davies, Special Agent Jones, and they interviewed Harmony Kilgore about their investigation and what she knew about this incident.

3

>     And Ms. Davies and Special Agent Jones let her go and they did not call her to testify before the Grand Jury. The government says, we don't have the technology yet to read minds about what Mr. Heller was thinking at the time. Maybe not the technology to read minds, but they had a first -- they had an account, a secondhand account, but they had an account from someone that Mr. Heller told right after the incident.
>
>     Did they call Harmony Kilgore to testify today? No. Patricia Ms. Davies, the prosecutor, was at that meeting. She knows what was said at that meeting. So no, you don't need technology. You need witnesses in order to prove this beyond a reasonable doubt. And they don't have -- they did not call that witness to testify. And I think you can speculate as to why they didn't call her to testify before the Grand Jury and why they didn't call her to testify here today, knowing it's their burden to prove what Mr. Heller knew at the time.

(TT 577-78).

### 1. <u>Defense Counsel Should Be Precluded From Asking Questions of Harmony Kilgore That Counsel Knows Will Not Elicit Admissible, Non-Objectionable Testimony</u>

Hearsay testimony is inadmissible, absent an exception to or exclusion from the rule against hearsay. Fed. R. Evid. 802. It is black-letter law that the defendant's own out-of-court statements, when offered by the defendant for the truth of the matter asserted, are inadmissible hearsay. *See, e.g.*, *United States v. DeLeon*, 287 F.Supp.3d 1187, 1235 (D.N.M. 2018). Similarly, Federal Rule of Evidence 602 provides that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." "A court should exclude testimony for lack of personal knowledge only if in the proper exercise of the trial court's discretion it finds that the witness could not have actually perceived or observed that which he testifies to." *United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1132 (10th Cir. 2014) (quotation marks omitted). Such testimony is inadmissible if "in the proper

4

exercise of the trial court's discretion it finds that the witness could not have actually perceived or observed that which he testifies to." *United States v. Sinclair*, 109 F.3d 1527, 1536 (10th Cir. 1997).

For instance, in *United States v. Snodgrass*, 635 F.3d 324 (7th Cir. 2011), the district court precluded a witness from testifying about what he had "heard" about events that occurred over the course of a deteriorating relationship between the defendant and another individual. *Id.* at 329. This witness had no first-hand or personal knowledge of the situation or specific events. Accordingly, the district court prohibited the witness from testifying about the events in question. The Seventh Circuit affirmed, holding that the exclusion of the witness's "hearsay testimony" about "facts not within his personal knowledge" is consistent with Federal Rules of Evidence 802 and 602. *Id.* The Seventh Circuit also held that the district court did not abuse its discretion by making this ruling *ex ante*, rather than waiting for each question to be asked at trial. *Id.*

Kilgore, of course, has no first-hand knowledge of what happened on the airplane from Dubai to Seattle—she simply was not there. Her testimony about what the defendant told her about what happened on the airplane is therefore easily excluded under Rule 602. Moreover, what the defendant told Kilgore about what supposedly happened on the flight from Dubai to Seattle is hearsay in that it is the defendant's out-of-court, self-serving statement offered for the truth of the matter asserted. At the first trial, faced with a sustained hearsay objection, counsel for the defendant did not argue otherwise, nor did counsel point to any applicable hearsay exceptions.

The only apparent purpose for asking Kilgore to repeat what the defendant told her was to force the Government to object so that counsel could make the claim that the Government knows what the defendant told Kilgore and is hiding it from the jury.

5

Counsel should be precluded from engaging in this misleading tactic during the retrial. Accordingly, the Government respectfully requests that the defendant be precluded from asking questions of Harmony Kilgore that call for testimony about what Heller told her—that is, questions designed to elicit testimony that is excludable under Federal Rules of Evidence 802 and 602. In other words, this Court should not permit the defendant to ask questions of its witness for the sole purpose of drawing Government objections in front of the jury.

> 2. <u>Defense Counsel Should Be Precluded From Questioning Kilgore About The Grand Jury Because Such Testimony Is Not Relevant</u>

To be admissible, evidence must be relevant. Fed. R. Evid. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. The bar for relevancy is low: "the evidence must render the asserted fact of consequence more probable than it would be without the evidence." *United States v. Leonard*, 439 F.3d 648, 651 (10th Cir. 2006). Relevant evidence may nevertheless be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

At the first trial, the sole issue for the jury was whether the defendant believed he had permission to rub Christopher's penis. (TT 562). The Government expects the re-trial will present a second additional issue for the jury, based on Count Two of the superseding indictment: whether the defendant knew Christopher was incapable of appraising the nature of this conduct, physically incapable of declining participation in

6

the conduct, or physically incapable of communicating unwillingness to engage in the conduct. (Dkt #143). Whether Kilgore was subpoenaed to testify in front of the grand jury, and whether she did or did not ultimately testify has no conceivable relevance to either of these issues. Counsel should be precluded pursuant to Rule 402 from attempting to elicit this testimony.

Moreover, knowing full well the scope and substance of Special Agent Jones' testimony before the grand jury in this matter, counsel nevertheless questioned Kilgore during the first trial in order to create the misimpression that: (i) Kilgore was subpoenaed by the Government; (ii) Kilgore subsequently met with the Government outside of the presence of the grand jury; and (iii) after hearing what Kilgore had to say, the Government deliberately kept her testimony out of the grand jury. Because counsel has been provided copies of the grand jury testimony in this case pertaining to both the initial and superseding indictments, counsel is aware that this narrative is false and intentionally misleading.[1] Accordingly, whatever probative value this line of questioning may have—and the Government asserts there is none—it is substantially outweighed by its unfair prejudice and tendency to mislead the jury, and should be excluded under Rule 403.

**B. THE GOVERNMENT IS PERMITTED TO ASK ITS WITNESSES FOR THEIR CONTEMPORANEOUS INTERPRETATION OF STATEMENTS MADE DURING CONVERSATIONS TO WHICH THOSE WITNESSES WERE PARTY**

At the first trial, the Government had some of its witnesses review text messages they exchanged with the defendant, or recount conversations they had with him. As to

---

[1] This recitation of what occurred in the grand jury is deliberately vague in an attempt to adhere to the Government's obligations pursuant to Federal Rule of Criminal Procedure 6(e). Should the Court wish to review the grand jury transcript, the Government will make it available.

7

some of these communications, the Government asked its witnesses to express their contemporaneous understanding of what they thought the defendant meant when he sent certain texts or said certain things in conversations to which that witness was a party.  Counsel for the defendant objected to these lines of inquiry.  For instance, during David Wolf's testimony, the Government played portions of the audio recording of the "confrontation" during which members of the church confronted the defendant about his assault of Christopher, and then asked Wolf to explain what he understood certain things to mean:

> Q. Mr. Wolf, do you see in Lines 24 and 25, who is that speaking?
> A. Dakota Heller.
> Q. Do you see where he says "I wanted to turn myself in from the very beginning"? What did you understand Mr. Heller to be saying?
>
> MS. STRICKLIN: Your Honor, I am going to object to the continued questions about what Mr. Wolf understood these other people to be saying.
> THE COURT: Sustained.
> MS. SURRATT: Your Honor, is your ruling that I can no longer do that at all for the remainder of the audio?
> THE COURT: If the witness has a foundation to know what someone else intended, then you can.

(TT 356).

Responding to another, similar objection as to David Wolf, the Government endeavored to lay an appropriate foundation by establishing that the witness: (i) was a party to the conversation; (ii) knew the purpose of the confrontation; (iii) understood what was being discussed at the confrontation; (iv) had spent a lot of time with the defendant; (v) was good friends with the defendant; and (vi) had an understanding of the defendant was talking about.  (TT 358-59).  After laying this foundation, the Government asked its question again and Wolf answered without objection from the defendant.

8

The next day, however, the defendant objected again to this type of questioning as to Government witness Kari Quesada, who was asked to give her understanding of text messages the defendant sent to her. (TT 415). The objection was sustained for failure to lay a foundation. (TT 415). Earlier in the same colloquy with Quesada, however, the Government had already established that the witness: (i) knew the defendant pretty well; (ii) had many conversations with the defendant aside from the text messages before the jury; and (iii) believed that she understood what the defendant was talking about in those conversations generally. (TT 409-410). In response to the sustained objection, the Government laid additional foundation by: (i) asking Quesada if something had happened that gave the witness an understanding of what was going on in the defendant's life at the time; (ii) establishing that Quesada believed that the relevant event was the confrontation and the fallout from the confrontation; and (iii) confirming that this is how Quesada understood what the defendant was telling her in the text message. (TT 415). The Court continued to sustain the objection, noting that "it's not clear where her understanding came from." (TT 415).

The Government then attempted to lay *additional* foundation through Quesada, establishing that: (i) in 2018-2019, Quesada knew the defendant "very well;" (ii) Quesada's relationship with the defendant was that of "close friends;" (iii) they saw each other at least once a week, if not more, at church and in social situations; (iv) the defendant and Quesada communicated in person and electronically "fairly regularly;" and (v) those communications factored into how Quesada understood what the defendant was telling her in the text messages he sent. (TT 416). Despite this foundation, the defendant's objection was nevertheless sustained at a subsequent sidebar. (TT 419).

9

Federal Rule of Evidence 701 permits lay, non-expert witnesses to give their opinion when that opinion is: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  As it pertains to interpreting conversations, this type of lay testimony is permissible when the witness is "a participant in the conversation, has personal knowledge of the facts being related in the conversation, or observed the conversations as they occurred."  *United States v. Young*, 847 F.3d 328, 350 (6th Cir. 2017).  In other words, "[a] district court does not abuse its discretion in admitting testimony by a witness with firsthand knowledge as to his understanding of words used by the defendant . . . ."  *United States v. Scott*, 243 F.3d 1103, 1106 (8th Cir. 2001).  This type of lay opinion testimony is admissible to "help the jury or the court to understand the facts about which the witness is testifying."  *United States v. Peoples*, 250 F.3d 630, 641 (8th Cit. 2001).

This issue arises most often when co-conspirators (or undercover officers) who were participants to a conversation are called upon to interpret coded or ambiguous words used during that conversation.  For instance, in *United States v. Parsee*, 178 F.3d 374 (5th Cir. 1999), the district court properly admitted testimony of a co-conspirator interpreting parts of a telephone conversation to which the co-conspirator was a participant.  Referring to Rule 701, the Fifth Circuit affirmed, noting that the co-conspirator "was a participant in the conversation and she testified to her understanding of the communications; her testimony is rationally based on her perceptions."  *Id.* 379.  Moreover, the court noted that "a portion of her testimony concerned a coded conversation and her explanation aided the jury's understanding."  *Id.* at 380.  Finally,

the court held, the defendant "had ample opportunity to cross-examine" the co-conspirator such that the "jury responsibly could assign the proper weigh to her testimony." *Id.  See also United States v. Awan*, 966 F.2d 1415, 1430 (11th Cir. 1992) (admitting lay testimony of law enforcement officer who was party to the conversation at issue).

      Here, of course, the issue is not coded drug conversations, but rather portions of the confrontation and ambiguous text messages and private conversations that are relevant with context only witnesses can provide.   And, at the first trial, the defendant seemed to agree.  For instance, in summation, counsel for the defendant argued that the purpose and the import of the confrontation was ambiguous: she pointed out that Gabe Kinzley began the confrontation by saying "[w]e know what you did," rather than "talk[ing] about what happened on the flight."  (TT 571).  She noted that, during the confrontation, "[t]hey [didn't] talk details."  (TT 571).  She also argued that the defendant's statements in the confrontation were at least, in part, about his same-sex attraction generally, not specific to his molestation of Christopher.  (TT 571).  Counsel made the same argument with respect to the text messages that the defendant sent to Quesada.  (TT 571-72 ("Kari Quesada can come up here and say all day long that she thinks she knows that he was now referring to Christopher in those text messages . . . .")).  In other words, the words used during these communications are open to interpretation, and allowing witnesses who were party to those communications relay their understanding of those words—given the context, timing, and their knowledge of and relationship to the defendant—is helpful to the jury.  To the extent the defendant disagrees with his friends' understanding of what he said, he is free to cross-examine them and argue, as he did in the first trial, that they misinterpreted what he was saying

11

or what had occurred during a particular conversation.

Rule 701, therefore, is satisfied. The witnesses through whom the Government intends to introduce this type of testimony will be testifying based on their perception of the conversations; what they have to say will be helpful to understanding their testimony and determining a fact in issue; and nothing about their testimony would fall within Rule 702. Accordingly, the Government requests that—after an appropriate foundation is laid—the Court allow witnesses who were party to conversations with the defendant testify about their understanding of the defendant's communications.

### C. IT IS NOT IMPROPER BURDEN-SHIFTING FOR THE GOVERNMENT TO COMBAT THE IMPLICATION THAT ONLY THE GOVERNMENT CAN SUBPOENA RECORDS OR WITNESSES

During the first trial, the defendant's counsel cross-examined Special Agent Philip Jones about various investigative steps that the FBI undertook during the investigation of the defendant. For instance, she focused on the seating arrangements on the Emirates flight from Dubai to Seattle:

> Q.   Let's go back and talk about your investigation. One of the things that you do is you gather records, correct?
> A.   What type of records?
> Q.   Records -- in this case you got a record from Emirates?
> A.   Correct.
> Q.   And the record that you got from Emirates was the exhibit that you were just shown in your direct examination with the seat assignments for Christopher, Nate Goodman and Dakota Heller, correct?
> A.   That's correct.
> Q.   You never attempted to get a seating chart from Emirates?
> A.   No.
> Q.   Okay. You never attempted to figure out who was sitting in the seat that Mr. Heller sat in?

(TT 267-268).

On redirect, the Government asked Special Agent Jones if he has "an

understanding of whether the defendant can issue subpoenas to obtain documents and records in a criminal case." The defendant's counsel objected on the basis that the Government was "burden shifting." The objection was sustained. (TT 279-280).

Counsel returned to this theme in her closing argument:

> You heard no evidence about when that seat switch took place. Did it take place at boarding? Did it take place on the flight, after the meal service? There was no evidence that Mr. Heller was anywhere around when Christopher even took the Ambien.

(TT 564).

As a general matter, it is not burden-shifting "for a prosecutor to note that the defendant has the same subpoena powers as the government, particularly when done in response to a defendant's argument about the prosecutor's failure to call a specific witness." *United States v. Hernandez*, 145 F.3d 1433, 1439 (11th Cir. 1998); *see also United States v. Naholi*, 911 F.3d 897, 903 (8th Cir. 2018); *cf. United States v. Williams*, 739 F.2d 297, 299 (7th Cir 1984) (holding that, in the Seventh Circuit, "before a party may raise to the jury the possibility of drawing an inference from the other party's failure to call a particular witness, that party must show that the absent witness was peculiarly within the other party's power to produce, and that the testimony of the absent witness would elucidate issues in the case" (internal quotation marks omitted)).

Here, the defendant implied that the Government's investigation was deficient since it did not, after indictment, seek a trial subpoena for additional records from Emirates to determine who originally had the assigned seat next to Christopher. In response, on cross-examination of the case agent, it was not improper burden-shifting for the Government to elicit that the defendant had the same ability as the Government to seek these records. Should the defendant imply that only the Government could

13

have obtained certain records or produced certain witness, the Government may, at the re-trial, elicit testimony or make arguments pertaining the defendant's equal ability to undertake these investigative steps.

### D. DORA RECORDS ARE ADMISSIBLE PURSUANT TO FRE 902(11)

The Government anticipates that it will offer into evidence in its case-in-chief records from the Colorado Department of Regulatory Agencies, Divisions of Professions and Occupations ("DORA"). These records pertain to medications prescribed to the defendant. When DORA provided these records to the Government, it also provided a certification attesting, in substance, that the documents were true copies of records on file with the entity, and that the records were made at or near the time of the recorded event, were kept in the regular course of the entity's business, and were made as a regular practice of that entity's business. This certification is attached as Exhibit 1.

Federal Rule of Evidence 902(11) states that "Certified Domestic Records of a Regularly Conducted Activity" are "self-authenticating" if they are supported by a "certification of the custodian" that the records meet the requirements of Federal Rule of Evidence 803(6)(A)-(C). In turn, Federal Rule of Evidence 803(6)(A)-(C) requires the following:

> (A) the record was made at or near the time by — or from information transmitted by — someone with knowledge;
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; [and]
> (C) making the record was a regular practice of that activity[.]

Thus, "Rule 902(11) permits a party to establish the authenticity of documents as domestic business records through a declaration from the records' custodian," as long as the party offering the evidence provides the adverse party with sufficient notice of its intent to proceed in this manner. *See, e.g.*, *United States v. Lewis*, 594 F.3d 1270,

14

1278-79 (10th Cir. 2010).   This same certification is also sufficient to establish that the records qualify for admission under the exception to the hearsay rule set forth at Federal Rule of Evidence 803(6).   *See United States v. Yeley-Davis*, 632 F.3d 673, 678 (10th Cir. 2011).

The certification attached as Exhibit 1 meets the requirements set forth in Rules 902(11) and 803(6).[2]   The Government respectfully requests a ruling from the Court that the written certification in Exhibit 1 complies with Rule 902(11) relating to authenticity and hearsay regarding these records.

## **CONCLUSION**

The Government respectfully requests the Court grant the Government's *in limine* motions.

Respectfully submitted,

JASON R. DUNN
United States Attorney

By:   */s  Patricia Davies & Andrea Surratt*
Assistant U.S. Attorneys
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
E-mail: patricia.davies@usdoj.gov;
andrea.surratt@usdoj.gov

---

[2] The Government provided notice to defense counsel of its intent to authenticate these records in this manner by email dated February 14, 2020.  Counsel has offered to let the Government know by early in the week of February 17, 2020 whether counsel intends to object to the authenticity of these documents.