IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 19-CR-00224-PAB

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

DAKOTA MICHAEL HELLER,

    Defendant.
_____

REPORTER'S TRANSCRIPT
Trial Preparation Conference
_____

    Proceedings before the HONORABLE PHILIP A. BRIMMER, Chief Judge, United States District Court for the District of Colorado, commencing at 4:22 p.m., on the 28th day of February, 2020, in Courtroom A701, United States Courthouse, Denver, Colorado.

APPEARANCES

    Andrea Surratt and Patricia Davies, U.S. Attorney's Office, 1801 California Street, Suite 1600, Denver, CO 80202, appearing for the plaintiff.

    Kelly Christl and David Kraut, Office of the Federal Public Defender, 633 17th Street, Suite 1000, Denver, CO 80202, appearing for the defendant.

Proceeding Recorded by Mechanical Stenography, Transcription Produced via Computer by Janet M. Coppock, 901 19th Street, Room A257, Denver, Colorado, 80294, (303) 335-2106

```
 1                        PROCEEDINGS

 2          THE COURT:  The matter before the Court is United

 3   States of America versus Dakota Michael Heller.  This is

 4   Criminal Case 19-CR-224.

 5          I will take entries of appearances, please.

 6          MR. DAVIES:  Good afternoon, Your Honor.  Patricia

 7   Davies and Andrea Surratt from the U.S. Attorney's Office.

 8   With us at counsel table is Special Agent Philip Jones of the

 9   FBI.

10          MS. CHRISTL:  Good afternoon, Your Honor.  Kelly

11   Christl and David Kraut on behalf of Mr. Heller.

12          THE COURT:  And Mr. Heller appears today.  He is on

13   bond.  Good afternoon to each of you as well.

14           We are here today for a trial preparation conference.

15   Of course, we tried this case before, but there was a mistrial.

16   So we are set for trial on Monday.  We don't need to go over

17   all the things that we would typically go through because you

18   all pretty much know it, but we will talk about some of the

19   recent motions that were filed.

20           In terms of jury selection, I am going to designate

21   seat No. 10 as the alternate seat, and I will still use one

22   alternate.  And that means that the government will have seven

23   peremptory challenges, Mr. Heller will have 11 peremptory

24   challenges, and the replacement jurors will begin with the 14th

25   person.
```

1          Anything -- just in terms of trial mechanics, anything

2   you want to do differently in terms of my -- I thought that I

3   would probably summarize the charges the way that appears in

4   the preliminary instruction.  Any objection to that?

5          *MR. DAVIES:*  Your Honor, on the preliminary

6   instruction at least what I recall is that the Court only made

7   reference to Count One.  There is now, of course, a Count Two.

8          *THE COURT:*  Mr. Binder, I don't have my preliminary

9   instruction.  Can you print out a copy of that?

10         *MR. DAVIES:*  Your Honor, if I may, I have a suggestion

11  for the Court which I circulated to defense counsel as to how

12  to address the new charge.

13         *THE COURT:*  We'll move on from that because I am going

14  to need that in hand before I can take that up.  So let us move

15  on to the topic of -- I can't remember, did I read an

16  alphabetical list of the witnesses last time?  I think I did.

17         *MR. DAVIES:*  My memory is yes, that the Court read

18  both witness lists.

19         *THE COURT:*  Do you want me to do that again this time?

20         *MS. CHRISTL:*  That's fine, Your Honor.  We just filed

21  an amended witness list adding one witness --

22         *THE COURT:*  Yeah.

23         *MS. CHRISTL:*  -- so the Court is aware.

24         *THE COURT:*  Yeah, I noticed that was filed about 4:12,

25  but that's okay.

1          Did you get a copy of that, Ms. Davies?

2          MR. DAVIES:  Ms. Surratt saw it on her phone, but we

3     haven't yet.

4          THE COURT:  Okay.  Well, then we'll put together an

5     alphabetical list of the witnesses and that's what I'll read to

6     the jury as part of jury selection.

7          All right.  Ms. Davies, I now have a copy of that.

8     And I thought I amended the preliminary instruction in that

9     regard, but I guess I didn't.  So what's your suggestion?

10          MR. DAVIES:  Your Honor, I have a handwritten copy if

11     you would like me to hand it up or I can read it.  Your

12     preference.

13          THE COURT:  Probably both.  Go ahead.  Why don't you

14     read it first.

15          MR. DAVIES:  So in the third full paragraph where it

16     says "indictment," I added "is in two counts.  The first

17     count," and then it picks up with where the Court "has charges

18     the defendant," et cetera.  And then after that first full

19     sentence in the third paragraph, I add, "The second count

20     charges the defendant with knowingly engaging in sexual contact

21     while the other person was incapacitated," and the next

22     sentence just changing "charge" to "charges."

23          THE COURT:  I am sorry, where is that change?

24          MR. DAVIES:  The charge to charges?

25          THE COURT:  Oh, description of the charges.

1          MR. DAVIES:  Correct.

2          THE COURT:  Ms. Christl, any objection to that

3  description?  Oh, Mr. Kraut?  Where is Ms. Stricklin?

4          MS. CHRISTL:  Your Honor, Ms. Stricklin will not be

5  trying this case with us.  It will be Mr. Kraut instead.

6          THE COURT:  Go ahead, Mr. Kraut.

7          MR. KRAUT:  Thank you.  Good afternoon, Your Honor.

8          We do not object to the language that the prosecution

9  proposes to add into that preliminary instruction or the

10  location where they suggest inserting that sentence regarding

11  the second count.  However, we are asking the Court to read to

12  the jury the consent instruction before jury selection begins.

13  My understanding is the Court did this at the first trial.  And

14  by consent instruction, I am referring to what's been

15  reproposed as Government's Instruction No. 13 in Document 175.

16  That reads, "The alleged victim's age is not an element of the

17  charged offense," and it goes on from there.

18          We assert that somewhere in this preliminary

19  instruction shortly after describing the two counts in the

20  indictment would be the appropriate place to read this consent

21  instruction.  And we are -- given that there is now a second

22  count, we would also ask the Court to note that knowingly with

23  respect to the second count applies to Mr. Heller's state of

24  mind.  So I don't have a written suggestion prepared on that

25  exact issue, but we can prepare that before Monday and let the

1  Court know.

2       THE COURT:  Ms. Davies, any objection to the Court

3  doing what it did the last time which is to read that, what

4  Mr. Kraut identifies as Government No. 13?

5       MR. DAVIES:  No objection to that portion of the

6  request.

7       THE COURT:  As to the remainder of it, I am going to

8  deny that.  This is a preliminary instruction.  It's not the

9  final instructions.  And to insert, to either read Government

10  No. 13 as part of this instruction or to provide some

11  definition of knowingly, that's not the character of this

12  particular instruction.  So while I will read No. 13, I am not

13  going to do the rest of your request.

14       Anything else, Mr. Kraut?

15       MR. KRAUT:  In the alternative, we would request

16  slightly modifying the prosecution's requested sentence.  As it

17  reads now, it states, "The second count charges the defendant

18  with knowingly engaging in sexual contact while the other

19  person was incapacitated."  Our request is to insert between

20  the word "while" and the word "the," "while the defendant knew

21  the other person was incapacitated," as that more accurately

22  reflects the law and the jury instruction that they will

23  ultimately receive with respect to the elements of Count Two.

24       THE COURT:  Response?

25       MR. DAVIES:  Your Honor, this is just a summary of the

1   charge.  To the extent we are going to start parsing and adding

2   *mens rea* in different parts, as the Court knows, we've

3   requested a deliberate ignorance instruction.  This is not what

4   the preliminary instruction is about.

5       THE COURT:  I agree with Ms. Davies.  This is just a

6   brief description of the charges.  The preliminary instruction

7   is not given to the jury.  It's read to them, of course, but

8   it's just preliminary.  And as a result, the final jury

9   instructions will be the -- where we will parse out the exact

10  language and the exact elements.

11      MR. KRAUT:  Understood, Your Honor.

12      The only other request is I think in the Court's

13  minute order containing the introductory jury instruction

14  Ms. Stricklin's name remained.

15      THE COURT:  We will make sure to change that.  I

16  wasn't sure about who was onboard.  Maybe you were just the

17  appellate guy, but we will substitute that, obviously.

18      MR. KRAUT:  Nothing further with respect to the

19  preliminary instructions.

20      THE COURT:  Anything else on the preliminary

21  instructions, Ms. Davies?

22      MR. DAVIES:  No, Your Honor.

23      THE COURT:  We will go ahead and revise that one

24  accordingly.

25      Now why don't we turn our attention to the proposed

1    voir dire questions.  I didn't have a chance to be able to

2    compare what was submitted last time which was with what has

3    been submitted this time.  Any differences, first of all, on

4    behalf of the United States?

5            MS. SURRATT:  Yes, Your Honor.

6            THE COURT:  Go ahead.

7            MS. SURRATT:  So if you were to do a red line between

8    prior government's proposed voir dire and this one, you would

9    actually find fairly substantial differences because we never

10   refiled voir dire after we had our final trial prep conference

11   and the court gave us advice on what we were to and were not to

12   ask.  So what was filed last time --

13           THE COURT:  Oh, okay.  So I guess what I am asking is

14   this, and that is to the extent that this latest version

15   conforms to my rulings as to the previous submission, I am not

16   too worried about that.  Anything different which I haven't

17   opined upon?

18           MS. SURRATT:  Yes.  The only thing we added that we

19   did not discuss last time is on Page 2, Section B3 discussing

20   addiction.

21           THE COURT:  B3?

22           MS. SURRATT:  Yes.

23           THE COURT:  That's fine.  That's it?

24           MS. SURRATT:  Yes, Your Honor.

25           THE COURT:  Mr. Kraut or Ms. Christl, anything

1     different about the defendant's proposed voir dire which is

2     Docket No. 168?

3              MR. KRAUT:  Yes, Your Honor.  We added a request for

4     questions relating to homosexuality.  This is found on the

5     bottom of Page 5 of Docket 168.  I believe other than that, our

6     proposed questions are the same as what was proposed back in

7     October.

8              THE COURT:  Okay.

9              MR. KRAUT:  There may have been some minor language

10    changes to some of the questions, but that's the only new

11    section.

12             THE COURT:  Okay.  Let me ask the United States, first

13    of all, in your review of Docket No. 168, anything concerning

14    word changes that you are concerned about?

15             MS. SURRATT:  No, Your Honor.

16             THE COURT:  Any objection to what Mr. Kraut identified

17    about the question regarding homosexuality?

18             MS. SURRATT:  No objection, Your Honor.

19             THE COURT:  Yeah, I think it's appropriate to ask.  No

20    problem.

21             Anything else, Mr. Kraut?  Is that it?

22             MR. KRAUT:  With respect to the request to add that by

23    the government, to add that question about addiction, we don't

24    object to it, but it remains our position that there should not

25    be any evidence during the trial relating to Mr. Heller's

 1    struggles with substances.

 2          THE COURT:  Yeah, I am trying to remember, I don't

 3    think that I allowed that.  Were there attempts to get that in

 4    last time?  I don't think so.

 5          MS. SURRATT:  There were not, Your Honor.

 6          THE COURT:  Why would -- right, because there is a

 7    danger if it becomes relevant.  I mean, you know, we will get

 8    to the so-called sex addiction in a minute, but it seems like

 9    drug addiction would be a bit of a different character.  Why

10    would drug addiction be a topic or that would at least be

11    relevant for purposes of jury selection?

12          MS. SURRATT:  One moment, Your Honor.

13          THE COURT:  Sure.

14          MS. SURRATT:  Your Honor, it's two things.  The

15    proposed voir dire question just asks about struggles with any

16    addiction.  It doesn't specify drug addiction.

17          THE COURT:  I know, but almost every -- I never heard

18    of anyone say, oh, yeah, my brother is a sex addict.  That

19    doesn't typically come up.  It's usually drug addiction.  And

20    there could be a lot of people.  It could bog things down quite

21    a bit.

22          MS. SURRATT:  Sure.  And we don't anticipate drug

23    addiction on its own to come up at this trial.  I think I noted

24    in the notice that was filed today that Mr. Heller has compared

25    his sex addiction to his drug addiction in that explaining that

1   his sex addiction magnitude is worse than his drug addiction.

2   That's the only way in which I could anticipate drug addiction

3   coming up.  I don't anticipate it coming up on its own.

4           THE COURT:  Okay.  Then why not ask about sex

5   addiction as opposed to drug addiction?

6           MS. SURRATT:  We could do that, Your Honor.

7           THE COURT:  Okay.

8           MR. KRAUT:  Your Honor, the defense would object to

9   that as it's our position, and I imagine we will get to this in

10  a moment --

11          THE COURT:  Right, subject to what I rule on that

12  aspect.

13          MR. KRAUT:  Right.  One other thing I wanted to

14  mention in modifying the proposed jury selection questions, we

15  did add under the Sex Crimes section a question that was not

16  there previously, although that section was there previously,

17  so 2B:  Would Mr. Heller's belief about Christopher's consent

18  matter to you?  That was not in --

19          THE COURT:  Yeah, that will be excluded.  That's

20  trying facts to the jury.  That's not allowed.  Yeah, and I

21  can't believe that 2A -- wait a minute.

22          MR. KRAUT:  So on Page 5 of Docket 168, what appears

23  under No. 2 has additional language that was not there

24  previously and then 2A was there previously, but 2B we added.

25  And I believe 1 is the same as what was there before.

1    THE COURT:  The first question.  Well, here is the

2    thing.  Anything that I ruled against, it's the same as last

3    time that I ruled against, it's the same ruling as before.  And

4    I ruled against what is now 2A and B.  As a matter of fact, as

5    far as I can tell, I ruled against No. 1, too.

6    MR. KRAUT:  I was not aware of that, Your Honor.

7    THE COURT:  You will have to go back and look at the

8    bridge on that because, yeah, I didn't allow that at all.

9    Those are questions which are introducing facts in front of the

10   jury and that's something that I do not allow.  You can't

11   present facts to the jury and then ask them about them.

12   MR. KRAUT:  So during jury selection the jury will not

13   be advised by anyone, the Court or either party, that the

14   alleged victim in the case at the time of the contact was 16

15   years old?

16   THE COURT:  I can't remember what I did last time.  I

17   will look at that.  We are going to read the jury instruction.

18   I don't remember.  Ms. Christl, do you recall?

19   MS. CHRISTL:  I do, Your Honor.  I believe if the

20   Court is not going to allow us to ask it that way, the

21   modification I believe that we did ask lots of jurors and

22   focused on quite a bit during jury selection was asking the

23   question:  Do you believe a 17-year-old can consent to sex?

24   THE COURT:  Yeah, that's okay, but you can't use

25   Christopher.  You can't use facts of the case.  I am not going

1    to allow -- yeah, you are going to do voir dire, Mr. Kraut?  So

2    you have to look over that transcript carefully because I don't

3    want to -- it's 20 to 5:00 today.  I am not going to repeat all

4    that, but I do not allow anyone to use prefaces.  So for

5    instance, you couldn't say:  There will be testimony in this

6    case that X, Y and Z.  What do you think?

7        You can't do that.  And you can't use a hypothetical

8    that, you know, blatantly mimics the facts, as Ms. Christl

9    suggested.  In light of the fact that I read that instruction

10   about consent, there could be some questions along those lines.

11   And assuming that we did that last time, that's okay, but

12   otherwise any ruling that I made on questions that are now just

13   being reproposed to me, my rulings are all the same.

14        *MR. KRAUT:*  Understood.

15        *THE COURT:*  Anything else on the voir dire questions?

16        *MS. SURRATT:*  Not from the government, Your Honor.

17        *MR. KRAUT:*  The only other voir dire related issue is

18   that I believe in our motion we did request additional time for

19   attorney conducted voir dire for a total of 30 minutes, and we

20   are renewing that request.

21        *THE COURT:*  Ms. Christl, do you recall, did I read

22   certain jury instructions last time?  And if so, do you want me

23   to read the same ones?

24        *MS. CHRISTL:*  I am sorry, did you --

25        *THE COURT:*  Did I read certain jury instructions to

1    the jury during voir dire last time?  And if so, would you like

2    me to read the same ones like proof beyond a reasonable doubt?

3              MS. CHRISTL:  Yes.

4              THE COURT:  I will do that.  I will give each side 20

5    minutes.  That's it.

6              How much time does the United States want for

7    openings, for your opening rather?

8              MR. DAVIES:  I am going to ask for 30 minutes or less

9    believing it will be similar to last time, which will be 15

10   minutes.

11             THE COURT:  Ms. Christl?

12             MS. CHRISTL:  Same, Your Honor.

13             THE COURT:  I will give you each 30 minutes.  Same as

14   before, if you want me to give you a heads-up at a particular

15   point, I will be happy to do that.  You can let me know on

16   Monday.

17             Request for sequestration?

18             MR. KRAUT:  Yes, we renew that request.

19             THE COURT:  And so Mr. Kraut, you weren't here, but if

20   you look at that transcript, you will see this, but make sure

21   that you don't refer to witnesses if you are conducting an

22   examination just by that person's first name.  You can't chum

23   them up that way.  The witnesses can talk about people however

24   they want to.

25             And then an important thing, Mr. Kraut, is not to --

1    if you want to consult with opposing counsel about something,

2    just ask for permission just so Ms. Coppock doesn't have to try

3    to strain to get your side conversation on the record when you

4    don't intend that, but she doesn't know.

5          MR. DAVIES:  Your Honor, may I address the

6    sequestration, please?

7          THE COURT:  Yes.

8          MR. DAVIES:  Agent Jones will be our advisory witness.

9    He will be testifying, so I wanted to make certain it was clear

10   that it was okay for him to remain in the courtroom.

11         THE COURT:  Any objection to that?

12         MS. CHRISTL:  No objection, Your Honor.

13         THE COURT:  Under Federal Rule of Evidence 615 he is

14   allowed.

15         MS. CHRISTL:  And Your Honor, we have Rivka

16   Morgan-Sherman.  I don't anticipate needing to call her, but

17   she is on our witness list as potential impeachment.  She may

18   be in and out of the courtroom.  I don't anticipate her sitting

19   at counsel table.

20         THE COURT:  Any objection to that, Ms. Davies, if she

21   comes in and out occasionally?

22         MR. DAVIES:  No, Your Honor.

23         THE COURT:  That's fine too.

24         MR. DAVIES:  And, Your Honor, as to the sequestration,

25   if the Court remembers, we briefed last time the victim's right

1  to be present.

2          THE COURT:  Yes, we did, and same ruling on that.

3          MR. DAVIES:  Thank you, Your Honor.

4          THE COURT:  And I will preserve any objection because

5  I think that there was an objection.  Same objection will be

6  preserved by Mr. Heller as to that.

7          Any issues about exhibits that we should talk about

8  that are new?  I think in response to the government's recent

9  motion *in limine*, the defendant conceded the fact that that one

10 was an official record, but I can't think of any.  I don't know

11 if there is any other issue that would come up.

12         MR. DAVIES:  Your Honor, the government did file an

13 amended exhibit list earlier today and added one exhibit that

14 had been provided to the defense.  And it's a text message of

15 the defendant that came into our possession last night.  We

16 produced it this morning.  It is now on the government's

17 amended exhibit list filed today.

18         THE COURT:  It's been produced, I assume?

19         MR. DAVIES:  It has, Your Honor.

20         THE COURT:  Okay.  Mr. Kraut, Ms. Christl, any exhibit

21 issues to take up at this time?

22         MR. KRAUT:  Your Honor, we do object to the

23 government's proposed admission whenever that time may come of

24 the text messages that were disclosed to us today which appear

25 to be from -- between Gabriel Kinzley and Dakota Heller.  We

1    can wait until the time during trial when the government seeks

2    to admit these.

3         THE COURT:  It would be helpful to have a preview of

4    what the issue is as long as it's not too lengthy.

5         MR. KRAUT:  The issue is that there are a series of

6    text messages that apparently Mr. Kinzley just disclosed to the

7    government although they are from a significant time ago,

8    over -- almost three years ago.  And they relate -- they are a

9    conversation between Mr. Heller and Mr. Kinzley about obtaining

10   various prescription medicines in advance of the trip to

11   Uganda.  And there is discussion from Mr. Heller about working

12   for a physician I presume in the capacity of maybe remodeling

13   her home or her office because as you are aware, I think he is

14   a contractor.

15        THE COURT:  Right.  So not working for, meaning not

16   within the doctor's practice, but rather performing some type

17   of handyman or whatever home services.

18        MR. KRAUT:  Right.  And I am not aware of what those

19   services would have been and these text messages don't make

20   that clear.  But regardless, it states, "The doctor I am

21   working for is an OB-GYN," and then he goes on to share some

22   information that that physician shared with him.

23        THE COURT:  He meaning?

24        MR. KRAUT:  Mr. Heller texts to Mr. Kinzley some

25   really medical advice that he received from his client who

1   happens to be a physician.  And then there is some discussion

2   about obtaining Ambien and Z-Paks which --

3          THE COURT:  And how does that discussion arise?  Is it

4   a question from Mr. Kinzley?

5          MR. KRAUT:  It is very difficult to parse this out

6   exactly the context of this conversation.

7          THE COURT:  In any event, someone mentions that.  And

8   then what's said, if anything, about Ambien?

9          MR. KRAUT:  There is a question from Mr. Kinzley to

10   Mr. Heller, "Can you have your doctor prescribe malaria pills,

11   Ambien and a Z-Pak?"  And then following that there is an

12   ongoing text conversation about that.  Ultimately Mr. Heller

13   states, "Yeah, Ambien was prescribed to me just FYI."  And then

14   there is another break by about half of a day in the text

15   messages.

16          So it's a series of text conversations relating to

17   what looks like preparations to go on the Uganda trip.  There

18   is mention of Ambien.  We are objecting based on foundation in

19   part because it's unclear even from the attached interview,

20   it's unclear as to why Mr. Kinzley did not previously disclose

21   these after three years.

22          THE COURT:  That doesn't sound like foundation.  But

23   let's assume that Kinzley takes the witness stand and says,

24   yup, that's the text message.  I didn't know about that, but I

25   downloaded it just last week.

1           MR. KRAUT:  Right.  We remain unsure on whether or not

2      the exhibit contains all communication between the two at the

3      time and if there was other communication that doesn't appear

4      in this exhibit.  It's very difficult, as I have said and as I

5      think the Court has heard, to understand the full context of

6      this conversation.  So that's the foundation exhibit.  And we

7      are also objecting based on relevance as well as hearsay as it

8      contains statements from a person who is not even a witness at

9      all that are being shared from Mr. Heller, apparently, to

10     Mr. Kinzley.

11          THE COURT:  Who is the person that's not a witness?

12          MR. KRAUT:  The doctor, the client of Mr. Heller's.

13          THE COURT:  I am sorry, what are the statements of the

14     doctor?

15          MR. KRAUT:  He says that she or he recommends the

16     ladies bring any meds with them for UTI or yeast infection

17     treatment because they may not be able to get that in the

18     country.

19          THE COURT:  Yeah, it sounds like that one can be

20     boiled down quite a bit.  There is a lot of parts of it that

21     don't appear to have any relevance whatsoever and other parts

22     of it sound relevant.

23          MR. KRAUT:  The 401, 403 objection is really the main

24     objection.  And the prejudice of allowing this in is it

25     suggests to the jury that Mr. Heller and in some part

1    Mr. Kinzley are coordinating an effort to obtain prescription

2    medication for use other than what the doctor would intend it

3    for, which there has been quite a bit of testimony -- I saw it

4    in the transcripts of the first trial -- about sharing

5    prescription medication among these people who went on this

6    trip and even having it on the packing list with respect to

7    Ambien in what I will describe as a very cavalier attitude by

8    the adults who arranged and participated and organized this

9    trip toward prescription medications and their ability to

10   obtain them and share them with one another on the trip.

11        THE COURT:  I think that's true.

12        MR. KRAUT:  Yes.  So this particular piece of the case

13   I believe unfairly depicts Mr. Heller as for lack of a better

14   term the drug dealer for the group.

15        THE COURT:  I don't really think so.  As I recall, and

16   I can be corrected, but the evidence that came out last time

17   was that the organizers sent out a, you know, "to bring" list.

18   Ambien was on it.  There wasn't really an implication that, you

19   know, by any means Mr. Heller was the point person or

20   something.  And I guess the question would be why wouldn't

21   Mr. Heller just be one among many people who may have had

22   Ambien, and if anything, he was just being asked to bring it in

23   the same way a bunch of other people were asked to bring it.

24        MR. KRAUT:  Well, there is no evidence I am aware of

25   that there were any other messages like this with other people.

1       THE COURT:  No, of course not, but there was -- I

2  forget the source of it, but there was evidence that it was on

3  the packing list and other people had it.  And so there

4  certainly wasn't at the first trial, not that it couldn't be at

5  the second, that identified Mr. Heller as someone who was the

6  drug dealer for the plane or anything of that nature.  Other

7  people it seemed like also brought Ambien and were passing it

8  out.

9       MR. KRAUT:  The other aspect of the objection under

10  401 and 403 is that I don't expect a significant dispute on the

11  point of whether or not Mr. Heller had Ambien.  I think it was

12  available to everyone.  This didn't seem like a significant

13  area of dispute in the case.  Both sides through direct and

14  cross-examination questioned witnesses about how prevalent its

15  use was and how common it was on this particular trip.  So it

16  doesn't appear to be necessary for the government to go out of

17  its way to share a text message chain that is in itself

18  somewhat confusing about Mr. Heller trying to use a business

19  relationship he happens to have with a physician to really

20  illegally obtain prescription medication.

21       THE COURT:  I'm not sure that that's the implication

22  of the text message.  I think he indicated that he already has

23  it.  And I am not -- I do agree that to the extent that there

24  would be an implication in the text messages that Mr. Heller,

25  you know, was inappropriately getting Ambien from, you know, a

1    client, you know, that that would -- it would seem like that

2    would be extraneous.  The fact that he had access to Ambien is

3    relevant.  And I think the government has the right to

4    introduce at least part of that e-mail because it demonstrates

5    that he, No. 1, he indicates that he had Ambien.  And his

6    access to it previous to the trip I think is relevant, but I am

7    not going to rule on that because I think that that text

8    message can probably be boiled down considerably, but I am not

9    going to rule on it at this time, okay?

10          I don't want to hear too much on that unless you have

11   to --

12          MR. DAVIES:  You are not going to hear too much, Your

13   Honor.  Your Honor, I have given the actual marked exhibit to

14   Ms. Kelly -- to Ms. Christl, and it actually contains two

15   pages, not the entirety that Mr. Kraut was arguing about.

16          THE COURT:  That's the trial exhibit?

17          MR. DAVIES:  Yes.  And it is much shorter, more

18   succinct, and it makes the point the Court made which is

19   absolutely based on Count Two, his access to Ambien is

20   relevant.  It in no way does or is the government's intention

21   to try to make him out a drug dealer, but it's absolutely

22   probative to Count Two.

23          THE COURT:  And is there a suggestion in the

24   government's exhibit that Mr. Heller may have been going to try

25   to obtain under the table Ambien?

1        *MR. DAVIES:*  No, Your Honor.

2        *THE COURT:*  That won't preclude you, Mr. Kraut or

3   Ms. Kelly -- now I am starting to do it -- Ms. Christl from

4   making an objection if it comes up if there is some

5   implication, okay?

6        All right.  Let's turn our attention to the new things

7   that were filed because we need to get through that.  First of

8   all, as far as the defendant's motion to renew pretrial

9   motions, I will make the same orders as I did the last time in

10   regard to each of those.  I don't think there is any need to

11   make a further record unless someone thinks so.

12        Why don't we turn our attention, then, first of all,

13   to the government's motion *in limine* or motions *in limine*.

14   This is Docket No. 174.  First of all, let me -- I am just

15   going to rule on these because Mr. Heller filed a response to

16   that.

17        First of all, as to the first motion which is on

18   Page 2 of Docket No. 174, this has to do with questions being

19   posed to the defendant's sister, Harmony Kilgore.  I think that

20   Mr. Rasch-Chabot who authored the response makes a good point,

21   which is the Court can't blanket rule against it.  It's

22   possible non-hearsay questions that could be asked of her, but

23   I do agree with the government that a question that simply

24   said, "Yeah, what did he tell you," that question would not be

25   posed in good faith.

1          We had a trial already.  We know for a fact that the

2     government objected to that.  The government has indicated that

3     it will still object to that.  It's inadmissible hearsay by the

4     defendant and it would not be a question that would be posed

5     for any type of proper purpose.  So if that's the question,

6     then I am granting the motion, but I am not going to rule on

7     anything else.

8          As Mr. Rasch-Chabot pointed out, there could

9     potentially be at least some questions posed of her even

10    regarding what the defendant said that if phrased correctly

11    would not call for a hearsay response, but the defendant would

12    have to have a good faith belief that it was seeking the

13    admissibility -- or the admission of evidence that was proper.

14         In terms of the second request -- oh, so the second

15    part of the government's motion asks that its witnesses be

16    allowed to testify as to their interpretation of statements

17    made by Mr. Heller.  To tell you the truth, a lot of that is

18    somewhat speculative.  The government has cited a few examples

19    of my sustaining those objections.  I think that those

20    objections were sustained for good reason.  And any time a

21    witness is being asked to interpret what the defendant said to

22    them is probably objectionable because really what it is is

23    just a conduit for a witness to speculate about what was going

24    on in Mr. Heller's mind and they can't do that.

25         It is true that there may be a rare circumstance

1    concerning a defendant who used some type of term or phrase for

2    which the witness has some context, for instance, some term of

3    art that the witness -- or that the defendant has used in the

4    past, so I am not saying that there couldn't be situations

5    where a witness would be precluded from doing that.  But as the

6    defense response to that, the point is essentially that

7    Mr. Heller in those texts or in those recorded statements isn't

8    doing any of those things, so I think it's highly unlikely that

9    the government can make out that type of exception.  So that

10   part of the motion *in limine* will be denied.

11          The third part is that -- oh, the business about

12   subpoenaing records and so forth.  I don't find any error in my

13   previous rulings to that effect.  I think for the reasons that

14   Mr. Heller points out in the response, it is dangerous.  It's a

15   dangerous subject to get into regarding the ability of the

16   defense to subpoena people or that type of thing.  Different

17   rules apply.  And I deny that portion of the government's

18   request.

19          The fourth part are the DORA records.  And Mr. Heller

20   conceded that that document was a self-authenticating record.

21          I think that that deals with the government's motion

22   *in limine*.  Anything else, Ms. Surratt on that one?

23          *MS. SURRATT:*  Your Honor, motion *in limine* No. 2 has

24   to do with Harmony Kilgore talking about how she was subpoenaed

25   for the Grand Jury, met with the government, and then was not

1   required to testify in front of the Grand Jury and how that

2   line of questioning was incredibly misleading given that again

3   pursuant to our 6(e) obligations -- I don't want to go too in

4   depth -- the Grand Jury knew what Harmony said.  And so to

5   imply to the trial jury that the Grand Jury didn't know what

6   Harmony said was incredibly misleading.

7        THE COURT:  I am not going to preclude it.  This is

8   the type of thing that happens in criminal trials all the time.

9   I mean, she testified truthfully.  It may be used for the type

10  of implication that the government doesn't like or maybe it was

11  perhaps a little misleading, but I am not going to preclude the

12  defense from asking those questions.

13       MS. SURRATT:  You are not going to preclude them.

14       THE COURT:  No.

15       MS. SURRATT:  Your Honor, then we ask that Special

16  Agent Jones be permitted to testify about what the Grand Jury

17  heard in this case.

18       THE COURT:  If he has knowledge of it.

19       MS. SURRATT:  He was the witness, Your Honor.

20       THE COURT:  Yeah, I think you probably could.

21       MS. SURRATT:  So this would be --

22       THE COURT:  Some type of rebuttal testimony.

23       Ms. Christl?

24       MS. CHRISTL:  Your Honor, in rebuttal I think it's

25  fine, but for him to testify is --

1    THE COURT:  Yeah, anticipatorily that would not be
2   appropriate.  Yeah, I agree.  Yeah, rebuttal, I think that it's
3   appropriate for rebuttal.

4        All right.  And then I am trying to find what was very
5   recently filed.  Oh, yes, Docket No. 185, government's notice
6   of intent to offer additional statement by the defendant
7   pertaining to sex addiction.  Mr. Kraut is ready to go.

8        Go ahead, Mr. Kraut.

9    MR. KRAUT:  Thank you very much, Your Honor.  The
10  defense objects to this motion.  I understand that the
11  government did not use or refer to Federal Rule 404(b) in
12  filing this motion, but we certainly characterize it as such a
13  motion.  We object under Rule 403, 401, Rule 404, Rule 501 with
14  respect to clergy privilege, and Rule 602, personal knowledge.

15       The most recent government -- this motion asks to
16  admit evidence of the reasons --

17   THE COURT:  It's really a notice, but you are
18  presuming the government would attempt to introduce this.

19   MR. KRAUT:  That's right.

20   THE COURT:  And I assume that your comments are in the
21  way -- are essentially a motion in limine.

22   MR. KRAUT:  Yes.

23   THE COURT:  Okay, go ahead.

24   MR. KRAUT:  A motion in limine to preclude the
25  admission of such evidence, that's right.  Thank you.

1          They are seeking -- they appear to be seeking to admit

2     evidence of the reasons that Mr. Heller was asked to step down

3     from youth leadership at Cornerstone Church back in 2015.

4     Based on information that we received in discovery, we believe

5     that the witnesses from Cornerstone Church, particularly

6     Mr. Kinzley and perhaps Mr. Carlucci, would say that the

7     reasons that Mr. Heller was asked to step down back in 2015 was

8     that Mr. Heller confided in Mr. Kinzley in particular that he

9     was engaging in casual sex with adult men who he had met on

10    various apps, specifically Tinder and Grindr; that he was

11    accessing and viewing adult pornography more than he felt was

12    healthy, and he described that be as an addiction; that he had

13    what he described as both a sex addiction and a cocaine

14    addiction.

15         And at that time in an effort to help Mr. Heller at

16    Mr. Heller's request, Mr. Heller apparently signed up for a --

17    some type of an e-mail notification system which sent an

18    automatic notice to Mr. Kinzley if Mr. Heller were to access a

19    pornographic website.  The name that's described in the

20    interview is Covenant Eyes and XXX Watch.  Apparently these are

21    systems that presumably Mr. Heller would pay for to notify his

22    accountability representative or accountability partner of any

23    access that he shouldn't have had.

24         Now, the government's purported purpose to admit this

25    evidence is that Christopher is expected to testify now

1  suddenly that at the Chipotle meeting a week after returning

2  from Uganda, Mr. Heller says to him in reference to the

3  incident on the plane, "This is why I was asked to step down

4  back in 2015."

5         We assert that the government's purported purpose of

6  admitting this evidence to explain that statement is not

7  accurate.  In other words, we assert that if Mr. Heller did

8  make such a statement to Mr. Harbeson at the Chipotle,

9  Mr. Heller was not saying I knowingly fondled you against your

10  will because of my ongoing problems with casual gay sex,

11  pornography and cocaine.  That is not at all what Mr. Heller

12  was saying and the evidence doesn't support that

13  interpretation.

14         There is no evidence of drug use, pornography

15  addiction, use of Grindr or Tinder or things of that nature

16  after 2015.  And in fact, that conclusion that the government

17  needs to make this evidence relevant requires inference upon

18  reference, all of which are prohibited by Rule 404(b).

19         Specifically those inferences would be that the issues

20  addressed back in 2015 are long-standing or permanent character

21  traits of Mr. Heller's; that those traits somehow make him more

22  likely to sexually assault a 16-year-old against that

23  16-year-old's will, which he was aware of; and that he acted in

24  conformity with those traits in 2017 on the plane.  That's the

25  chain of inferences necessary in order to make this evidence

1    relevant to the statement that Mr. Harbeson now claims

2    Mr. Heller made.

3            Allowing the government to make this argument would

4    essentially allow them to argue that because Mr. Heller in 2015

5    confided in a spiritual religious adviser that he in his words

6    was struggling with same sex attraction and adult pornography

7    and drug use then, that he was more likely to sexually assault

8    Christopher on a plane in 2017.  But in 2015 Mr. Heller never

9    told anyone that he was sexually attracted to 16-year-old

10   males.  He said that he was meeting adult men for casual

11   consensual sex and feared that that behavior was inconsistent

12   with his faith.

13           I pose a hypothetical to the Court which is if the

14   victim in this case was a 16-year-old girl, would the

15   government be allowed to present evidence of casual consensual

16   sex with adult women as evidence of guilt?  Of course not.

17   Sexual orientation has nothing to do with the likelihood of

18   forcing sex on another person.  And I think the government

19   would agree with that despite the argument that they are making

20   in support of this proffered evidence.

21           The evidence is also protected by the clergy

22   communicant privilege under 501.  It's clear that he was going

23   to Mr. Kinzley to discuss this back in 2015 as a religious

24   adviser.  In fact, he made Mr. Kinzley his covenant watch

25   accountability partner, as I said before.  And Mr. Kinzley's

1    response to this information was to use his role, Mr. Kinzley's

2    role, as a pastor at Cornerstone to coordinate a religious

3    retreat for Mr. Heller and then use that position to encourage

4    Mr. Heller to attend that retreat, which Mr. Heller did

5    according to the evidence that's been disclosed to us in

6    discovery.

7            So for all of these reasons, the conversation or the

8    statements that were made between Mr. Heller and Mr. Kinzley

9    back in 2015 that ultimately led Mr. Kinzley to ask Mr. Heller

10   to step away from his youth leadership role are not admissible

11   for any purpose in the current trial and would not make any

12   fact more likely to be true or untrue than it would be

13   otherwise that's at issue in this case and would violate

14   Rule 404, 501 and 602.

15           I don't think that we should be in a position to need

16   to essentially proffer what Mr. Heller did mean or would have

17   meant if he had said to Mr. Harbeson in the Chipotle, "This is

18   why I was asked to step down."  But if the Court requires such

19   a proffer, I think the point of the argument is that there

20   could be many things that he was referring to that are not

21   this.  And so the government's chain of inferences is too long

22   and too fraught with prejudicial evidence to allow this

23   evidence to come in.

24           If I can have just a moment, Your Honor.

25           *THE COURT:*  Yeah.

1      *MR. KRAUT:*  That's all on that particular issue.

2      *THE COURT:*  Thank you, Mr. Kraut.

3      Response?

4      *MS. SURRATT:*  Yes, Your Honor.  This is decidedly not

5  a motion under 404(b).  The government has known about the sex

6  addiction evidence since well before the first trial, and we

7  deliberately did not move under 404(b) because we are not

8  arguing that because Mr. Heller has a sex addiction that we

9  actually believe continues to this day, he therefore acted in

10  conformity with that addiction to molest Christopher.  That is

11  not what we're saying.

12      What we're saying is Christopher would testify that

13  Mr. Heller told Christopher in reference to the molestation on

14  the airplane, "This is why I was asked to step down from the

15  youth ministry," meaning the reason I molested you is the same

16  "this" that caused me to be asked to step down from the youth

17  ministry.

18      So then what becomes relevant is what is the "this"?

19  What is the "this" that Mr. Heller is telling Christopher,

20  "This is what caused me to step down from the youth ministry"?

21  And the scene is they go into the Chipotle.  Mr. Heller is

22  crying before they really start talking and sort of in his

23  emotive state says, "This is why they asked me to step down

24  from the youth ministry."

25      We know why Mr. Heller was asked to step down from the

1   youth ministry and it is not ambiguous.  We know from

2   Mr. Kinzley because it is Mr. Kinzley who told Mr. Heller the

3   reasons Mr. Heller was being asked to step down from the youth

4   ministry and it was not ambiguous.

5           The sequence of events is as follows and it's not

6   quite as Mr. Kraut represents.  Before Mr. Heller was asked to

7   step down from the youth ministry, Mr. Heller asked Mr. Kinzley

8   to be his pornography accountability partner because Mr. Heller

9   had told Mr. Kinzley that he was struggling with pornography.

10  So in other words, while Mr. Heller was volunteering with the

11  youth program, Mr. Kinzley already knew about the pornography,

12  so that was not why Mr. Kinzley asked Mr. Heller to step down.

13          At some point after that Mr. Heller calls Mr. Kinzley

14  in a panic and says, "Don't look at the e-mail that just got

15  sent to you.  Don't worry, I would never hurt any of the kids."

16  Mr. Kinzley knows what Mr. Heller is referring to is this

17  e-mail pornography accountability program.  I don't know if

18  Mr. Heller knows this, but Mr. Kinzley actually never got the

19  e-mail that Mr. Heller was referring to, and so Mr. Kinzley

20  pretended like he got the e-mail and said, you know,

21  Mr. Heller, what are you talking about?

22          And Mr. Heller then disclosed to Mr. Kinzley that

23  Mr. Heller was still struggling with pornography, again facts

24  that Mr. Kinzley already knew, and that Mr. Heller had been

25  acting out sexually by hooking up with both men and women on

1    Tinder and Grindr, and Mr. Heller characterized this as a sex

2    addiction that was out of control.

3            Mr. Heller then compared the sex addiction to his

4    cocaine addiction and said, "The sex addiction is way worse.  I

5    am out of control."  Mr. Kinzley then decided that the sex

6    addiction and the sexual deviance and sexual acting out,

7    meaning the promiscuity, hooking up with strangers and this

8    out-of-control sex addiction made Mr. Heller an inappropriate

9    person to be volunteering with boys age 12 to 18.  And

10   Mr. Kinzley told Mr. Heller that, explicitly told Mr. Heller,

11   "I am asking you to step down because of your out-of-control

12   sex addiction and your acting out with respect to men and

13   women."

14           THE COURT:  But what was the motivation?  What was

15   Mr. Kinzley worried about, that as a result of that he might

16   discuss things?  He was a bad role model?  He would be seen

17   cavorting around town?

18           MS. SURRATT:  It's two things, Your Honor.  There is

19   another piece to this too.  At the same time Mr. Heller

20   disclosed to Mr. Kinzley that Mr. Heller had previously had a

21   relationship with a 17-year-old when Mr. Heller was much

22   younger than he is now, but an adult, so that worried

23   Mr. Kinzley.  But the impetus for asking Mr. Heller to step

24   down was that Mr. Kinzley thought Mr. Heller would have been a

25   poor role model because of his sex addiction and shouldn't be

1    around boys 12 to 18.

2           And Mr. Kinzley, too, was worried about him being

3    around boys when Mr. Heller admits that he is out of control.

4    He was struggling with impulse control.  And this is

5    Mr. Heller's own words characterizing his sex addiction as out

6    of control.  And Mr. Kinzley is worried about him being around

7    young boys.

8           THE COURT:  And why, because he might molest young

9    boys?

10          MS. SURRATT:  I think Mr. Kinzley was worried for the

11   safety of those boys, yeah.

12          THE COURT:  Did he ever tell Mr. Heller that or --

13   because, I mean, this case has a lot of examples of people who

14   upon reflection think things now.  And that is a lot different

15   than some contemporaneously formed belief or opinion.

16          MS. SURRATT:  So I think Mr. Kinzley did have the

17   contemporaneously formed belief, but what he for sure told

18   Mr. Heller was "I am asking you to step down because of your

19   out-of-control sex addiction."

20          THE COURT:  Because he would be a bad role model.

21          MS. SURRATT:  I don't know if he said because you will

22   be a bad role model.  It was because you have an out-of-control

23   sex addiction.  The reason in Mr. Kinzley's head was that he

24   didn't trust Mr. Heller to be around the church's young members

25   and because he thought he would be a bad role model, but the

1    proffered reason to Mr. Heller was, "You have an out-of-control

2    sex addiction.  I am asking you to step down from your role in

3    the youth ministry."

4         THE COURT:  Now, why, assuming that's all true, why is

5    that relevant to this case?

6         MS. SURRATT:  It's relevant because then Mr. Heller

7    goes to Christopher shortly after the incident on the airplane

8    and says "This," meaning the incident on the airplane, "is the

9    same reason I had to step down from the youth ministry."

10        THE COURT:  Okay.

11        MS. SURRATT:  Mr. Heller is telling Christopher, "My

12   sex addiction, my out-of-control sex addiction is the reason I

13   had to step down from the youth ministry.  That is the same

14   reason I molested you on the airplane."  So it's not a

15   propensity argument.  It's Mr. Heller's own words explaining to

16   Christopher why he did what he did.  "I am an out-of-control

17   sex addict.  That's why I molested you on the airplane."

18        THE COURT:  But, of course, this is an interpretation

19   of that conversation that Christopher came up with just

20   recently, as a matter of fact, after the previous trial.

21        MS. SURRATT:  So Christopher doesn't interpret the

22   conversation.  Christopher simply recounts what he remembers.

23   It's Gabe Kinzley who has the firsthand knowledge about what

24   Mr. Heller was told about why he had to step down from the

25   youth ministry.  Christopher simply says:  Mr. Heller told me

1    in this tearful Chipotle meeting "This is why I had to step

2    down from the youth ministry."

3           And I dropped it in a footnote, but I can explain why

4    Christopher's memory was prompted after the first trial, and it

5    has to do with the testimony in the first trial.

6           THE COURT:  Yeah, except that doesn't sound like

7    that's going to come in.  That sounds like another example of a

8    witness who was going -- may be asked to explain what

9    Mr. Heller was thinking.

10          MS. SURRATT:  So it's not, Your Honor.  So Christopher

11   is not going to be asked to give his contemporaneous

12   understanding of what Mr. Heller meant.  Christopher is not

13   going to be asked for an interpretation.  From Christopher we

14   simply elicit the words, "This is why I was asked to step down

15   from the youth ministry," a statement of the defendant.  That

16   statement of the defendant becomes relevant when Gabe Kinzley

17   explains why the defendant was asked to step down from the

18   youth ministry.

19          So the defendant is saying, "This is why I was asked

20   to step down from the youth ministry," and we know why the

21   defendant was asked to step down from the youth ministry

22   through Gabe Kinzley.  By the way, we also know it through Kari

23   Quesada.  After the Uganda trip -- and this has not been

24   produced in discovery to the defense because we learned this

25   basically as we were walking over today.  And again, we haven't

1     explored this area with our witnesses because we never intended

2     to introduce evidence of the sex addiction as propensity.  We

3     understand that it's not admissible as propensity.  It is

4     admissible for this purpose.

5             So after the Uganda trip, Mr. Heller told Kari Quesada

6     that he was asked to step down from the youth ministry for

7     hooking up with random people and, quote, "being out of

8     control."  Mr. Heller then said he went to therapy for his sex

9     addiction and the therapist said -- and Mr. Heller complained

10    that the therapist could not help because the therapist wasn't

11    trained in sex addiction.

12            So the point of these two sort of disparate stories,

13    Christopher at Chipotle and what Mr. Heller knows about why he

14    was asked to step down from the youth ministry is important

15    because it explains what Mr. Heller was saying to Christopher.

16    We are not asking anyone to interpret the defendant's words.

17    We are asking the party with the relevant knowledge about why

18    Mr. Heller was asked to step down from the youth ministry to

19    explain that.  And when those two things are put together, it's

20    not -- it's a strong inference and it's not a long logical leap

21    because it's the defendant's own words to Christopher.  "This

22    is why I was asked to step down from the youth ministry."

23            *THE COURT:*  Anything briefly on that, Mr. Kraut?

24            *MR. KRAUT:*  Yes, Your Honor.

25            First of all, in the discussion between Mr. Heller and

1   Mr. Kinzley about any sexual contact with a male who was 17, my

2   understanding is that anything that Mr. Heller said about that

3   to Mr. Kinzley referred to a time when Mr. Heller himself was

4   around that age, I believe 19.  So to somehow suggest that

5   that's what he is talking about now is not the case.

6        The issue in this case is Mr. Heller's perception of

7   Mr. Harbeson's consent.  That's the issue in this case.

8   Mr. Heller never once said in 2015 or any other time in his

9   life that I am aware of that he engaged in forced sex or forced

10  sexual contact with anybody.  He is talking about in 2015

11  having consensual sexual encounters.  This has no bearing on

12  whether or not he had a forced sexual encounter, a

13  nonconsensual sexual encounter which he knew was nonconsensual

14  in 2017.

15       These are two very different issues that the

16  government is attempting to conflate because it allows the

17  government to paint Mr. Heller as a sexual deviant and a sexual

18  predator and a sex addict.  And those are character traits that

19  they wish to use to make the jury believe that he acted in

20  conformity with those traits on the airplane in 2017.

21       So we assert strongly that this evidence cannot be

22  admitted for the purpose that they say it should be admitted

23  for because it doesn't relate to that purpose at all.  It

24  doesn't go to prove that point.  Mr. Harbeson should not be

25  allowed to testify as to what -- as to this particular

1    statement because the explanation of the statement is

2    inadmissible making Mr. Harbeson's --

3            THE COURT:  Let's get into the habit of calling him

4    Christopher because you will need to do that beginning Monday.

5            MR. KRAUT:  And I understand that, Your Honor, and I

6    do wish to be heard on that issue as well.

7            THE COURT:  Okay.  We have got to hurry.  It's 5:25.

8            MR. KRAUT:  I recognize that.  But with respect to

9    the -- what I consider again a late 404(b) motion, we strongly

10   object to it.  And if the Court is inclined to admit any

11   evidence relating to Mr. Heller's removal from his role as a

12   youth leader in 2015, the defense would have to request a

13   continuance in order to prepare further to deal with that

14   particular evidence and investigate that.

15           THE COURT:  Okay.  The defendant's oral motion

16   *In limine* is granted.  Here is the problem with it, and that is

17   this is really just an attempt to use a so-called statement or

18   admission of Mr. Heller to back door in some inappropriate

19   404(b) type evidence.  The government actually doesn't even

20   know for sure what Mr. Kinzley would testify to about a concern

21   that he might molest the boys.  It seems like Mr. Kinzley's --

22   the reasons that Mr. Kinzley had asked Mr. Heller not to be a

23   youth minister anymore was because he was a bad role model.  He

24   was out of control and he was engaging in inappropriate

25   activities, not that he might somehow molest someone.

1       And so therefore, you know, it would have to be

2   communicated to Mr. Heller because the statement is Mr. Heller

3   indicated this is why I did not, so there would have to be some

4   type of connection there.  And there doesn't seem to be any

5   evidence other than rank speculation for that connection.  And

6   as a result, to try to bring Mr. Kinzley in to testify about a

7   bunch of things which otherwise are just completely irrelevant

8   and unduly prejudicial under Rule 403, I do find that all of

9   the sex addiction, cocaine use, you know, sex with adults or

10  people of same sex, opposite sex, the probative value of that

11  information is substantially outweighed by the danger of undue

12  prejudice.

13      And as Ms. Surratt mentioned, I mean, the government

14  doesn't even think that it could have gotten those things in as

15  404(b), but there does not appear to be any justifiable or

16  clear connection between what Mr. Heller said and some cause

17  for him to have been asked not to become -- to be a youth

18  minister anymore, so I am going to exclude that evidence.

19      What else do we need to talk about before we recess

20  for today, Mr. Kraut?

21          *MR. KRAUT:*  Your Honor -- I am sorry.

22          *MS. SURRATT:*  One moment, Your Honor.  One clarifying

23  point, Your Honor.  Can Christopher still say that Mr. Heller

24  said to him, "This is why I was asked to step down from the

25  youth ministry?"

1          THE COURT:  What's the point?  I mean, what's the

2     relevance of that now?

3          MS. SURRATT:  It still goes to Mr. Heller's state of

4     mind.  Your Honor, I don't mean to beat this particular dead

5     horse.  Your Honor said a moment ago that it would be rank

6     speculation to think that we know why -- that Mr. Heller knew

7     why he was asked to step down.  And I hope I was clear, but

8     maybe I wasn't.  Mr. Heller did know.

9          THE COURT:  No, I didn't say that.  What I meant is

10     that the government intends to use this statement to get in all

11     the different reasons that Mr. Kinzley supposedly asked him to

12     step down.  And none of those have any bearing on anything

13     that's relevant other than it sounds like the government

14     suspects that Mr. Kinzley is going to say that he was worried

15     about him inappropriately touching some people.

16          MS. SURRATT:  So that part actually, Your Honor, is I

17     think totally irrelevant to my argument.  Here is actually the

18     full crux of my argument.  Mr. Kinzley told Mr. Heller that

19     Mr. Heller is being asked to step down because of his sex

20     addiction.  The reasons sort of don't matter for the argument I

21     am making.  So in other words, Mr. Heller knows the reasons he

22     is being asked to step down, so we don't have to speculate

23     because Mr. Heller knows why he is being asked to step down.

24          So then when Mr. Heller tells Christopher, "The reason

25     I molested you is the same reason I was being asked to step

1   down from the youth ministry," we know what Mr. Heller was

2   talking about because Mr. Kinzley told Mr. Heller why he was

3   being asked to step down.  That's my whole point.  And the

4   reasons why Mr. Kinzley was doing that sort of don't matter.

5   In fact, all the background doesn't even really matter.

6           All that matters is when Mr. Heller told Christopher

7   what Mr. Heller told Christopher, we know what was in

8   Mr. Heller's head when he said "this."  There is only one

9   "this."  The only reason Mr. Heller was asked to step down from

10  the youth ministry is the reason that Mr. Kinzley told him.

11          THE COURT:  Okay.  Now, let's assume that's all true.

12  Given the fact that you couldn't even get it in through 404(b),

13  why does the fact that Mr. Heller offers that as an explanation

14  suggest anything other than Mr. Heller is just, you know,

15  proposing some BS?

16          MS. SURRATT:  It's a party admission, Your Honor, and

17  it goes to the very issue as to Count One.

18          THE COURT:  What are you going to argue in closing?

19          MS. SURRATT:  I am going to argue that --

20          THE COURT:  He admitted it.  He is a sex addict and

21  that's why he did it.  Okay, then tell me what the relevance

22  is.

23          MS. SURRATT:  Your Honor, it goes to -- Mr. Heller is

24  not telling Christopher one week after they get back,

25  Christopher, I thought you wanted it.  I thought you flirted

1   with me.  I thought you held my hand.  I thought you played

2   footsy.  Mr. Heller is telling Christopher, I molested you

3   because I am a sex addict.  It goes to this whole theme of

4   impulse control, which is another thing Mr. Heller said in the

5   confrontation.  He said, "When I did this two years ago,

6   nothing could have stopped me from it."  It's the same theme.

7   It's Mr. Heller telling Christopher, I did what I did because I

8   am a sex addict.  In other words, I didn't do what I did

9   because I was trying to start a relationship with you,

10   Christopher.  I did what I did because I could not help myself

11   in the moment.

12       THE COURT:  All right.  Yeah, I understand, and that's

13   a good clarifying point about it.  However, I think that as to

14   that particular conversation, it being fraught with ambiguity,

15   whatever probative value it has along the theme that

16   Ms. Surratt just identified is substantially outweighed by the

17   danger of undue prejudice because getting into something that

18   the government concedes is just irrelevant, namely sex

19   addiction, the reason that he may have been asked to step down

20   from the youth ministry is -- outweighs any probative value, so

21   that will be excluded too.

22       All right.  Mr. Kraut, what else do we need to talk

23   about?

24       MR. KRAUT:  Thank you, Your Honor.  I will be as quick

25   as I can.  I think I can get this out in about four minutes.

1          We are aware that the government originally requested

2     a protective order to refer to Aiden Harbeson as Christopher

3     throughout all proceedings in the case.  And we are aware that

4     originally when that protective order was requested, the

5     defense had no objection to it and therefore it was ordered.

6     We now object to that protective order for several reasons.

7          First and foremost, circumstances have changed.

8     Mr. Harbeson has made now nine statements about the events to

9     law enforcement and the assistant U.S. attorneys prosecuting

10    the case, as well as two more in a public courtroom during the

11    previous trial.  The prior trial testimony was not sealed or

12    otherwise restricted in any way that I am aware of.

13         Evidence suggests that Mr. Harbeson's church community

14    forms the core of his social circle and they all know about

15    this case.  His parents know about this case.  His girlfriend

16    knows about this case and is listed as a witness and was

17    recently interviewed by Agent Jones.  He is now three months

18    shy of his 20th birthday, and the incident happened when he was

19    over the age of consent which is undisputed.  Whatever

20    justification may have existed originally for this aspect of

21    this protective order no longer exists.

22         The question becomes what is the prejudice?  Why

23    shouldn't we just refer to him as Christopher if that's his

24    request or that's the government's request?  There are two

25    sources of prejudice of continuing to do this.  First,

1   confusion of the issues.  The forced use by everyone involved,

2   especially the Court, of the pseudonym perpetuates the

3   government's I would assert false and misleading narrative that

4   the charged event constituted "child molestation."  That

5   particular term is highly prejudicial and evocative, triggers

6   visceral reactions in laypeople of all backgrounds, certainly

7   in jurors that we would expect to have.

8           And the implication of using that term and using a

9   pseudonym for Mr. Harbeson is that Mr. Heller is accused of

10  sexually assaulting a child, which is not the crime charged in

11  this case.  And so it injects confusion about the nature of the

12  charges that is prejudicial to Mr. Heller.

13          THE COURT:  Why would the jury hear the term "child

14  molestation?"

15          MR. KRAUT:  I am sorry?

16          THE COURT:  Why would the jury hear the term "child

17  molestation"?

18          MR. KRAUT:  In the transcripts from the first trial

19  during Mr. Harbeson's testimony, he used the word

20  "molestation."

21          THE COURT:  That's a different issue.

22          MR. KRAUT:  But the government adopted it and it was

23  used throughout the course of the trial.  And we would object

24  to the use of that term and we would ask the Court to

25  instruct --

1          THE COURT:  What term?

2          MR. KRAUT:  Child molestation or chile molester.

3          THE COURT:  That's a different issue.  We are sticking

4    on the pseudonym right now.

5          MR. KRAUT:  On the pseudonym.  So the use of the

6    pseudonym perpetuates the misleading assertion that this event

7    was child molestation.  That's the connection.

8          Now, the second source of prejudice is that the use of

9    the pseudonym impairs Mr. Heller's Sixth Amendment right to

10   effective assistance of counsel.  The defense should not be

11   required to participate in the government's language and the

12   government's charged language about the nature of this

13   incident.  The language that the parties decide to use to

14   describe the people and events involved in this case send very

15   specific messages.

16         By forcing Mr. Harbeson's lawyers -- I am sorry, by

17   forcing Mr. Heller's lawyers to refer to Mr. Harbeson as

18   Christopher when he is just shy of his 20th birthday and was

19   over the age of consent at the time of the incident, the Court

20   would be essentially forcing the defense to convey to the jury

21   that we share the government's belief that he is and was a

22   vulnerable child in need of special protections not afforded to

23   adults.

24         They will hear every other adult witness come in and

25   be referred to respectfully by his or her last name.  The

1   reality is there should be no different rule for Mr. Harbeson.

2   Requiring the defense to participate in this undercuts our

3   ability to convey our theory of innocence in this case, which

4   is both that Mr. Harbeson was above the age of consent and that

5   Mr. Heller believed that Mr. Harbeson consented.

6           We would never strategically decide to do this because

7   it would be ineffective to do so, so we should not be forced by

8   the Court to engage in that at the government's request.  So

9   our proposal is to call Mr. Harbeson Mr. Harbeson like every

10  other adult in the courtroom that testifies.

11          *THE COURT:*  All right.  Response?

12          *MR. DAVIES:*  Your Honor, I didn't really expect that

13  at 5:35 on Friday night before the trial on Monday morning we

14  would be revisiting an order this Court entered I believe --

15  oh, gosh, I don't have the full document with me, but as the

16  Court knows, many, many, many months ago.  So just as a

17  practical matter, I would point out that all of the exhibits,

18  all of the other things in this case have already been, with

19  the defense agreement, been prepared to reflect Christopher.

20  All the witnesses have been prepped in that fashion.  So if for

21  no other reason than to avoid the confusion of the issues that

22  defense counsel says he is trying to achieve, I suggest a

23  change at this late juncture to a standing order this Court

24  entered with the defense approval months and months ago is not

25  appropriate.

1          However, in light of the other arguments that he

2    makes, yes, Christopher has been interviewed by law enforcement

3    a number of times.  He was sexually assaulted when he was 16

4    years old and he was at a vulnerable age which was reflected in

5    the protective order.  Those interviews did not in any way

6    disclose or in any way vitiate the interests that were

7    protected by that protective order.

8          If the Court were to inquire, it would learn that a

9    very small amount of the church community, in fact, has been

10   apprized as to who is the victim in this case precisely because

11   Christopher has indicated he really wants to keep this very

12   private, a very painful matter as much of a close hold as he

13   can.  And that has been respected by all people involved that

14   are knowledgeable in the church, by his family, in other words,

15   to say that the government, Christopher and his community have

16   all acted in conformity with the principles underlying the

17   protective order.

18          The defense has now raised, and of course I am not in

19   a position to go and to do research so I can provide the Court

20   with case citations, but nonetheless, it is often the case, as

21   the Court knows, that even adults are afforded some measure of

22   protection and confidentiality when sensitive matters are at

23   issue.  The defense has not indicated any way in which a Sixth

24   Amendment right of effective assistance of counsel is

25   implicated.

1     This isn't a situation where the government in any way

2     tried to create the impression the defense is now claiming.

3     The victim himself thought of what occurred to him as being

4     molested, and it is correct that he said that word.  This is

5     not an instance in which the government has ever called this

6     child molestation or done any of the other things that the

7     defense now claims.  So for the same reasons that this Court

8     originally entered that protective order to protect a then

9     16-year-old victim about circumstances that are painful and

10    private and confidential, and because again raising it at five

11    5:40 on the Friday night before when all of the exhibits, all

12    the witnesses, all of the everything and no advance notice by

13    the defense so that we could have adjusted any of that, it is

14    inappropriate and it should be denied.

15         *THE COURT:*  The Court will deny Mr. Kraut's motion.

16         No. 1, there is absolutely no excuse for it to be made

17    this late in the game, you know, literally on the eve of trial.

18    And there is no basis whatsoever for the Court to reconsider.

19    That's really the standard.  The defendant hasn't shown any

20    basis for the Court having erred when it did that.

21         Moreover, a lot of the different points that were made

22    by the defense are absolutely completely contrary to the whole

23    purpose of ever using a pseudonym in the first place.  It may

24    be true that if the world knew or if the alleged victim made

25    his name known to a large number of people, that that would be

1    a reason not to do it.  The fact that the defendant -- or the

2    alleged victim made statements to the police, that somehow

3    would, you know, mean that you can't have a pseudonym, that

4    would be completely contrary to, you know, getting cooperation

5    from a victim in a sex assault case.

6            The fact that his support group knows or his family

7    knows once again would be completely contrary to the whole

8    notion of protecting someone who has been involved in a crime

9    as a victim that he or she believes is embarrassing, which this

10   type of crime certainly is or would reasonably be thought by

11   anyone who was victimized in that way.  So to suggest that just

12   because the person, you know, is telling family members or

13   church members about it wouldn't be any reason not to do it.

14           And there is also, I don't find any material prejudice

15   to forcing the defense to use the pseudonym.  It's not buying

16   into anything.  Most of the jurors have -- if anyone has even

17   heard about such a thing would know that oftentimes newspapers,

18   for example, don't use the name of alleged sex assault victims

19   because of privacy reasons.  No one would attribute that to

20   Mr. Heller buying into anything, so I see no prejudice that

21   would inure to the defense.  The defense, as a matter of fact,

22   used the term "Christopher" throughout the trial last time

23   without any objection whatsoever, and there is no reason why

24   the defense can't do that again.

25           All right.  Anything else that we need to take up

1    before we recess until Monday morning at 8:00?

2           Ms. Christl, go ahead.

3           MS. CHRISTL:  Your Honor, we filed Document No. 133,

4    which is an objection to the government's expert disclosure.

5    And I do not believe there has ever been a ruling on that.  And

6    I don't think we need to have a ruling right now, but just -- I

7    wanted to put that on the Court's radar.

8           THE COURT:  I will look back at that.  I may have

9    missed that, but I will try to get something to you on Monday,

10   okay?

11          Anything else, Ms. Davies?

12          MR. DAVIES:  Your Honor, just for the Court's

13   information, our witness list in terms of substance remains the

14   same.  We have switched the order with respect to some, and I

15   have supplied that information to the defense counsel.  I will

16   file that today still.  Same witnesses.  We have made some

17   shifts at the beginning to accommodate some schedules.

18          THE COURT:  And when do you think the government will

19   rest?

20          MR. DAVIES:  Your Honor, I believe on Wednesday.

21          THE COURT:  When?

22          MR. DAVIES:  You are asking me for a crystal ball that

23   is clearer than --

24          THE COURT:  It doesn't matter because here is the

25   deal.  You either use a crystal ball or I use the chess clock

1    on you.

2            *MR. DAVIES:*  I would say by early afternoon.  The

3    Court, if you recall, gave us through Thursday.

4            *THE COURT:*  Right, but, you know, we have more to do

5    on Thursday than finish up the defense case.  We've got -- you

6    know, if you want some closing argument time, then there has to

7    be time because we will be done.  It will be to the jury at

8    5:00 o'clock on Thursday.

9            *MR. DAVIES:*  Your Honor, we do want some closing

10   argument time.

11           *THE COURT:*  Here is the deal.  Ms. Coppock notes the

12   exact time that anyone starts or stops their exam enabling me

13   to retrospectively go through and impose, you know, to

14   calculate all the time that people have used.  So if the

15   government's case is going slowly in a way that's not going to

16   give Mr. Heller the time that he predicts he is going to

17   need -- and we'll see.  A lot of times defendants never call

18   any of the witnesses on their list, but maybe this is an

19   exception.  Yeah, I'll -- I am going to severely -- I am going

20   to make sure that you fit within the time limit, so you need to

21   run a tight ship, okay?

22           *MR. DAVIES:*  We will do so, Your Honor.

23           *THE COURT:*  Anything else on behalf of Mr. Heller?

24           *MS. CHRISTL:*  Actually, one more quick question.

25   Mr. Kraut had a question, and I don't remember the Court's

1    policy regarding our placement near the podium for voir dire,

2    opening, closing.  Do you want us behind the podium or within

3    an arm's length?

4         *THE COURT:*  Arm's length is fine as long as -- if

5    Mr. Kraut's arms are really long, he can maybe get close to the

6    jury box.  I doubt he needs that, but you can walk -- not

7    necessarily for voir dire.  Voir dire I would like you within

8    an arm's length of the podium, but for closing, opening, if you

9    want to walk to the midline here, you know, get out in front of

10   the furniture -- the furniture kind of corrals you in there --

11   there is no problem with that.

12        *MS. CHRISTL:*  That's it.

13        *THE COURT:*  Then we will be in recess until 8:00 a.m.

14   on Monday and Mr. Heller's bond will be continued.  Court will

15   be in recess.  Thank you.

16       (Recess at 5:47 p.m.)

17                        REPORTER'S CERTIFICATE

18      I certify that the foregoing is a correct transcript from

19   the record of proceedings in the above-entitled matter.  Dated

20   at Denver, Colorado, this 21st day of August, 2020.

21

22                           _____
                             S/Janet M. Coppock

23

24

25