IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 19-cr-00224-PAB

UNITED STATES OF AMERICA,

       Plaintiff,

v.

DAKOTA HELLER,

       Defendant.

---

## MOTION TO RECONSIDER (OR STAY) PILOT TRIAL DESIGNATION, OR TO EXCLUDE 90 DAYS FROM SPEEDY TRIAL ACT REQUIREMENTS

---

Defendant Dakota Heller, through undersigned counsel and opposed by the government, respectfully asks this Court to reconsider its order designating this case as a pilot trial, Doc. 205; in the alternative, Mr. Heller moves to exclude 90 days from the Speedy Trial Act computations. In support, Mr. Heller states:

## **INTRODUCTION**

On July 10, 2020, this Court published Jury Trial Protocols ("Protocols") for conducting trials during the COVID-19 pandemic. However, on October 15, 2020, the Court issued District Court General Order ("GO") 2020-18, suspending all civil and criminal trials through January 1, 2021, "with the exception of certain pilot trials as authorized by the chief judge." On October 22, the Court selected this criminal case as a "pilot trial," to begin on November 16, 2020. Doc. 205. In this motion, Mr. Heller makes two, alternative requests – granting either will postpone the trial.

*First, Mr. Heller asks the Court to reconsider (or stay) its order selecting this case as a pilot trial.* Under any reasonable selection criteria, Mr. Heller's jury trial is a poor candidate for

pilot designation.  The Court is familiar with this case, having presided over Mr. Heller's first trial. But, the reprosecution will be a different affair—it will be more complex, more time consuming, more resource intensive, and will present novel and serious health risks for all trial participants. There are also unique aspects to Mr. Heller's case that make it particularly difficult to litigate in a constitutionally permissible manner under the Protocols.  No case-specific reason exists to designate this case a pilot trial, especially over the objection of the defendant and when COVID-19 cases are surging in Colorado.  If the Court reconsiders the pilot trial designation, this trial would be continued under GO 2020-18. In that circumstance, Mr. Heller would not object to excluding the delay from the requirements of the Speedy Trial Act under 18 U.S.C. §3161(h)(7)(A).

*In the alternative, but for many of the same reasons, Mr. Heller asks the Court to exclude 90 days from the requirements of the Speedy Trial Act under 18 U.S.C. §3161(h)(7)(A).* As described below, granting that request would allow the Court to conduct this trial within 143 days of the resolution of this motion.

## FACTUAL & PROCEDURAL HISTORY

### *The Mistrial*

On April 3, 2017, Mr. Heller and "Christopher" had sexual contact aboard an airplane flying from Dubai to Seattle. On January 13, 2019, "Christopher" told his uncle, Gabriel Kinzley ("Mr. Kinzley"), that Mr. Heller touched "Christopher's" genitals without "Christopher's" consent during that flight. The following day, January 14, 2019, Mr. Kinzley reported "Christopher's" account of this incident to the FBI.

On May 8, 2019, the government obtained an indictment and arrest warrant for Mr. Heller for one count of Abusive Sexual Contact under 18 U.S.C. §2244(b). Docs. 1, 2. On May 9, 2019, Mr. Heller was arrested, advised in Court, and released on conditions. Docs. 4, 5, 8, 9.

Trial commenced October 28, 2019. Doc. 105. During the trial, nine witnesses testified,[1] including one expert. Docs. 105, 106, 107. The jury began deliberating late in the afternoon of the third day of trial. Doc. 107. After two full days of deliberations, the jury reported a deadlock, and the Court declared a mistrial. Doc. 107, 108, 110.

### The Reprosecution

On November 8, 2019, the government filed its intent to re-try Mr. Heller. Doc. 116. The Court reset the trial for December 16, 2019. Doc. 118. On November 15, 2019, the government disclosed an additional expert witness – a pediatric toxicologist who would testify about the effect of Ambien on the body of a teenage boy. Doc. 119. In that same notice, the government expanded the scope of the testimony it anticipated to elicit from Karen Blackwell, who testified at the first trial. *Id.*

Mr. Heller filed a motion to continue the December 16, 2019 trial date based on the government's expert disclosure. Doc. 131. The Court granted the motion and reset the trial for March 2, 2020. Doc. 141. On December 3, 2019, the government filed a superseding indictment adding a count, alleging a violation of 18 U.S.C. § 2244(a)(2). Mr. Heller moved to dismiss the added count on December 31, 2019, so speedy trial was tolled until the Court denied the motion on February 25, 2020. Docs. 150, 182.

---

[1] One witness testified twice: Gabriel Kinzley testified during the government's case-in-chief and in rebuttal.

The parties were prepared to proceed to trial on March 2, 2020 and began jury selection. A jury was not empaneled that day, in part, because a smaller than usual amount of prospective jurors were sent to each courtroom. In the late evening of March 2, 2020, Mr. Heller's defense team learned their expert witness, Dr. Davis, had fallen ill. She was scheduled to fly in from Reno, Nevada to testify for the trial. This was around the same time coronavirus infections were confirmed in the United States and community infections appeared inevitable. Mr. Heller made an oral motion to continue the trial due to Dr. Davis's sudden unavailability. The Court granted the motion and reset the trial for March 16, 2020. Doc. 192. The Court then held a status conference on March 12, 2020, to discuss the safety of going forward with a jury trial during the pandemic. Mr. Heller made an oral motion to continue the trial because it was not safe to proceed, and the motion was granted. Doc. 198. The following day, the President declared that the COVID-19 outbreak in the United States constitutes a national emergency.[2]

On March 26, 2020, the Court issued a minute order asking the parties to confer about trial dates, stating, "[i]n proposing dates, the parties are also encouraged to take into account practical issues regarding juror availability based on public health department projections regarding the duration of the COVID-19 pandemic." Doc. 199. The parties proposed August 17, 2020. Doc. 199. On July 23, 2020, Mr. Heller filed an unopposed motion to continue the trial date. Doc. 202. The Court granted that motion based on "issues created by the COVID-19 pandemic and the unavailability of the defendant's expert witness." Doc. 203. This case was continued until January 2021, by operation of GO 2020-18, until the Court selected it as a pilot trial and set it to begin on November 16, 2020. *Id.*

---

[2] https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

I.     **THE COURT SHOULD RECONSIDER ITS ORDER SELECTING MR. HELLER'S CASE AS A PILOT TRIAL.[3]**

The GO does not state how a criminal trial's suitability for pilot authorization is determined. Nor did this Court, in its minute order, explain how it arrived at the pilot designation. Mr. Heller respectfully asks the Court to disclose the criteria used to select this case as a pilot trial, so counsel may have a full and fair opportunity to discuss this issue on the record before trial. The pilot authorization means that, according to the Court, Mr. Heller's trial—unlike every other criminal and civil jury trial in this judicial district—can proceed now in a manner that is safe and constitutionally valid, notwithstanding the pandemic. But, this is impossible, as explained below. Under any metric, this case is ill-suited for pilot designation.

A.  **This case should not be a pilot trial because it is complex, time consuming, and resource intensive.**

Although this Court presided over Mr. Heller's first prosecution, the second trial will look vastly different.

First, the case is now considerably more complex. The first trial was largely focused on one issue, Mr. Heller's subjective knowledge as it related to consent. Mr. Heller will now have to rebut the new charge that Mr. Heller knew "Christopher" was "incapable of appraising the nature of the conduct, and physically incapable of declining participating in the sexual contact, and physically incapable of communicating unwillingness to engage in the sexual contact." Doc. 143. The government intends to introduce circumstantial evidence that Mr. Heller was the source of the

---

[3] At minimum, Mr. Heller asks this Court to stay the pilot trial designation order, until COVID-19 cases' positivity rates in Denver are back below 3%.  *See*, *Evidence Roundup: Why Positive Test Rates Need to Fall Below 3%*, Harvard Global Health Institute (2020), https://globalhealth.harvard.edu/evidence-roundup-why-positive-test-rates-need-to-fall-below-3/.

Ambien. While there was some cross-examination about this during the first trial, it will be more extensive in the second trial.

Moreover, conducting a jury trial during the pandemic will necessarily involve logistical challenges. For example, the Court will need to sanitize the witness stand between witnesses, take longer comfort breaks so social distancing is maintained in the restrooms, allow participants to unmask, outside the presence of others, to eat and drink, among other mitigation measures.

Second, the number of witnesses has nearly doubled. Each party has submitted expanded witness lists, including a new expert witness for each side. Docs. 119, 130, 134, 143. When this case proceeds to trial a second time, nineteen witnesses will be endorsed, totaling about fifteen hours of testimony. Doc. 186, 188. This includes three expert witnesses but does not include Mr. Heller, should he decide to testify. The increase in the number of witnesses will require additional cross-examination and potentially, defense evidence and rebuttal.

Third, there is new information at issue. After the mistrial, the government conducted several interviews with witnesses, including "Christopher", Mr. Kinzley, and Kari Quesada. Each individual provided new information about the flight, the Ambien, and the incident itself. Notwithstanding these developments, the government projects needing only an extra 15 minutes each for "Christopher's" testimony (going from two hours in the first trial to two hours and 15 minutes in this second trial) and for Mr. Kinzley's testimony (going from an hour and 15 minutes in the first trial to an hour and 30 minutes in this second trial). *Id.* These are unrealistic projections. Mr. Heller anticipates the presentation of evidence and cross-examination will require significantly more time in this second trial. Presumably, the government will re-interview the witnesses, yet again, before trial. As the Court previously noted, "[T]his case has a lot of examples of people who upon reflection think things now." Tr. p. 35, TPC, Feb. 28, 2020. There can be no serious question

that, under these circumstances, the cross-examinations for all witnesses will now be more extensive.

Finally, all of this amounts to a longer, more resource-intensive trial. Based on the previous trial, which involved only one expert, seven lay witnesses, and an agent – and was held before the pandemic – it is reasonable to expect jury selection, the presentation of evidence, and deliberations to require more than one full court week. Presumably, trial duration is an important factor in determining whether to designate a case for pilot trial status because longer exposure to others, especially indoors, increases COVID-19 infection risk.[4]

**B.     This case should not be a pilot trial because the Protocols implicate constitutional issues that, due to the nature of Mr. Heller's case, are of particular concern here.**

1.     *The jury will be unable to meaningfully assess the trustworthiness and reliability of witness testimony.*

This case turns on in-court credibility assessments, which the jury cannot make if, as the Protocols require, "[e]veryone in the courtroom must wear a mask" or testimony is offered over VTC.  The Protocols create two options for the presentation of witness testimony. First, the witness may wear a mask and testify from the jury box in the same courtroom as the judge, parties, and jury. Second, the witness may testify without a mask via VTC from the jury deliberation room. There are significant problems with both options, as applied here.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "The bloodline of this venerated right is long, and reaches into antiquity." *United States v. Kaufman*, 546 F.3d 1242, 1252 (10th Cir. 2008). "The Clause provides

---

[4] *Staying Safe Isn't Just About Hygiene and Distance. It's About Time, Too.*, CNN (May 19, 2020), https://www.cnn.com/2020/05/18/us/coronavirus-time-risk/index.html.

defendants with both the right to face physically the government's witnesses and the right of cross examination." *Id.* at 1253.  The "face-to-face encounter between the defendant and the witness may provide *the jury* with important information in assessing the witness's credibility." *Id.* at 1254 (emphasis original); *accord Coy v. Iowa*, 487 U.S. 1012, 1019 (1988) ("The Confrontation Clause does not, of course, compel the witness to fix his eyes upon the defendant; he may studiously look elsewhere, but the trier of fact will draw its own conclusions."); *California v. Green*, 399 U.S. 149, 158 (1970) (noting the virtue "of compelling the witness to stand face to face with the jury in order that they may look at him and judge by his demeanor upon the stand and the manner which he gives his testimony whether he is worthy of belief").

Here, the central issues are whether the government will prove beyond a reasonable doubt that at the time of the sexual contact, Mr. Heller knew "Christopher" (1) did not consent to the sexual contact and/or (2) was so incapacitated that he was incapable of consenting to such contact. It might be reasonable to select as a pilot trial a case that turned on physical evidence, for example. But Mr. Heller's trial will involve little objective evidence; there is no surveillance video, forensic analysis, or independent eyewitness testimony. Instead, the jury must evaluate Mr. Heller's state of mind based on lay witness memory and expert opinions.

The lay witness credibility assessments will be challenging due to the sensitive nature of the charges, the potential tension between witnesses' religious beliefs and homosexuality, and the close personal relationships these witnesses had with Mr. Heller and still have with "Christopher". Over the years he belonged to their church, Mr. Heller confided in several clergy members who are now government witnesses. These same people are "Christopher's" relatives and friends. The Court and parties gained valuable insight into these challenges, when, following the first trial,

several jurors described the importance of Mr. Kinzley's facial expressions in evaluating his credibility.

If a witness testifies in the courtroom wearing a mask, neither the Court, Mr. Heller, counsel, nor the jury can see the witness's face during the testimony. The VTC alternative will likewise affect the ability of the jurors to assess credibility—and it is particularly relevant here. Mr. Heller's expert witness, Dr. Davis, cannot travel during the pandemic due to her age and because she lives with high-health-risk individuals. Defense counsel attempted to find a local expert, or even an expert who is within a day's drive of Denver, and could not find anyone with similar qualifications and expertise to Dr. Davis. If this case proceeds as a pilot trial, Mr. Heller will have no choice but to present her testimony by video.  Another defense witness may not be able to testify in-person for his/her own protected health reasons. However, this witness would likely be available to testify in person by January 2021.

    2.  *Mr. Heller will not have a public trial, which is critical in this case.*

During the first trial, the gallery was nearly full every day. The majority of the spectators were "Christopher's" family, friends, and fellow church members. The Court allowed "Christopher" to sit in the courtroom throughout the trial, and Mr. Heller's mother attended the entire trial. Presumably, the same individuals who watched the first trial intend to be present for the retrial.  Additionally, Mr. Heller expects a close friend and another family member to attend. However, the Protocols prohibit members of the public from attending any part of the trial in person. The significant public interest alone makes it a poor choice for a pilot trial.  That is, given the unusually large audience the first trial attracted, it is clear that the protocols' prohibition on in-person attendance will have a greater impact on Mr. Heller's trial than other trials.

It also impacts Mr. Heller's constitutional rights. "The Sixth Amendment directs, in relevant part, that 'in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial.'" *Presley v. Georgia*, 558 U.S. 209, 212 (2010). "The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." *Waller v. Georgia*, 467 U.S. 39, 46 (1984). "In addition to ensuring that judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury." *Id.*

Moreover, in the first trial, this Court permitted "Christopher" to sit through the entire trial pursuant to 18 U.S.C. § 3771(a)(3) ("A crime victim has the . . . right not to be excluded from any such public court proceeding."). At this point, it is not clear whether "Christopher" would be allowed to be physically present during a retrial that was otherwise closed off to the public – Mr. Heller would certainly object to that. Allowing "Christopher" to be the only spectator would draw unwarranted attention to him and would be prejudicial to Mr. Heller. That potential prejudice is exacerbated by the fact that the Protocols contemplate seating jurors in the gallery to maintain social distancing. Allowing the alleged victim to be the only spectator seated in the gallery amongst the jury would be highly inappropriate.

Accordingly, in light of Mr. Heller's constitutional right to a public trial, the alleged victim's statutory right to be present, and the known significant public interest in this case, it should not be a pilot trial.

### C.     This case should not be a pilot trial due to Colorado's rising COVID-19 infection rates.

Since the Court selected this case for a pilot trial, there has been a marked increase in COVID-19 spread, creating even more risk for all trial participants than existed at the time of the

designation.  Recently, the United States entered the "third wave" of the pandemic. Colorado has

seen a 111 percent increase in cases and a 72 percent increase in hospitalizations over the past 14

days.[5]

Adams, Logan, and Denver counties recently moved to "Safer-at-Home Level 3: High

Risk." [6] This is the second-highest level of restriction designated by the state health department.

On October 30, 2020, Colorado's Second Judicial District (Denver County) suspended all jury

trials until January 4, 2021, without an exception similar to this District's pilot trial designation.[7]

With spiking infection rates and new statewide contact tracing, this trial presents a greater

risk than before that one of the nineteen witnesses, thirteen jurors, four lawyers, court staff, two

advisory witnesses, approved spectators, or Mr. Heller will require isolation. If one criteria for

pilot trial designation is exposure risk to the participants, now is not the time for this trial. Under

these circumstances, it simply makes no sense for a trial of this duration, complexity, and nuance

to be selected as a pilot trial.

### D.     There is nothing about Mr. Heller's case that suggests a fast track is necessary.

This case presents no urgent need for immediate adjudication. Mr. Heller has waived his

right to a speedy trial. He is not in custody.  This case involves no physical evidence that could be

lost or destroyed if the trial is postponed. Nor is there any serious concern that witness memories

---

[5]  *Colorado Coronavirus Map and Case Count*, New York Times (November 2, 2020) https://www.nytimes.com/interactive/2020/us/colorado-coronavirus-cases.html.

[6] *Colorado County COVID-19 Dashboard*, CPDHE Website (November 2, 2020) https://covid19.colorado.gov/data/covid-19-dial/covid-19-dial-dashboard.

[7] Second Judicial District, State of Colorado, *Third Amended Administrative Order Regarding Court Operations Under COVID-19 and Suspension of Jury Trials*, 2020-04 (Oct. 30, 2020), available at https://www.courts.state.co.us/Media/Opinion_Docs/Third%20Amended%20Admin%20Order%20Limited%20Court%20Operations%20and%20Suspension%20of%20Jury%20Trials%202020-04.pdf.

will fail, especially given the volume of prior trial testimony already on record.  Mr. Heller's case presents none of the characteristics one would expect to associate with a case authorized to proceed to jury trial immediately, when all other cases in this judicial district must await safer conditions. The pilot designation should be reconsidered.

## II.      IN THE ALERNATIVE, THE COURT SHOULD GRANT A 90-DAY ENDS OF JUSTICE CONTINUANCE.

### A.      The Speedy Trial Clock

The parties agreed the Speedy Trial Act allowed 70 days from November 1, 2019 to begin the retrial. Docs. 116, 117. The court set the second trial for December 16, 2019. Doc. 118.

On November 22, 2019, Mr. Heller filed an Unopposed Motion to Continue the Jury Trial. Doc. 131. On December 2, 2019, with 49 days remaining in the speedy trial period, the Court granted Mr. Heller's motion, excluding 45 days from the requirements of the Speedy Trial Act. Doc. 141. This left 94 days from December 2, 2019 within the speedy trial period. The Court scheduled the second trial for March 2, 2020.

Due to the pendency of several motions filed before the second trial, only 32 days elapsed from the speedy trial period between December 2, 2019 and March 2, 2020.  Thus, 62 days remained in the speedy trial period on March 2, 2020.

The second trial began on March 2, 2020. However, on March 3, 2020, after the jury was selected but before it was sworn, the Court continued the trial due to the unexpected unavailability of Mr. Heller's expert witness. Doc. 192. The Court reset the trial for March 16, 2020 and excluded the 14 days between March 3 and 17, 2020 from the requirements of the Speedy Trial Act. *Id.*

On March 10, 2020, Colorado's governor declared a state of emergency due to the COVID-19 pandemic. On March 12, 2020, the Court granted Mr. Heller's oral motion to continue the trial,

excluding an additional 60 days from the speedy trial period. Doc. 197. When the speedy trial period resumed on March 17, 2020, 122 days remained.

On April 6, 2020, Mr. Heller filed an Unopposed Motion to Exclude 90 Additional Days From the Speedy Trial Calculation. Doc. 200. On April 15, 2020, the Court partially granted that motion, excluding 60 days from the speedy trial calculation and resetting the trial for August 17, 2020. Doc. 201. This left 161 days in the speedy trial period as of April 15, 2020.

On July 23, 2020, Mr. Heller filed another unopposed motion to exclude 90 days from the speedy trial computation. Doc. 202. On July 28, 2020, the Court granted that motion and reset the trial for November 16, 2020. Doc. 203. By adding 90 days to the 61 days remaining in the speedy trial period, the Court's order of July 28, 2020 allowed the trial to commence within 151 days of that date.

As of the filing of this motion, 98 days have elapsed from the speedy trial period since July 28, leaving 53 days remaining in the speedy trial period. If the Court grants this motion, the Speedy Trial Act will allow this trial to begin within 143 days of the resolution of this motion.

**B.      The Jury Trial Protocols Will Not Adequately Protect Mr. Heller's Trial Rights.**

The Protocols are premised on the belief that certain jury trials can safely resume despite the general suspension of trials. However, the Protocols do not resolve the inherent tension between public safety and constitutional rights. Mr. Heller does not assert that a jury trial in the District of Colorado cannot be convened until a COVID-19 vaccine exists. However, even assuming the Protocols will protect the health and safety of the participants and community, this particular jury trial cannot be conducted on November 16 in a constitutionally valid manner until several fundamental questions, identified below, are resolved.

1.     *Mr. Heller Must Have An Opportunity To Confirm, Before Trial, That He Will Have a Jury Selected From a Fair Cross Section of the Community.*

The Sixth Amendment requires that Mr. Heller's jury "be a body truly representative of the community . . . and not the organ of any special group or class." *Taylor v. Louisiana*, 419 U.S. 522, 527 (citations omitted). "[T]he selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." *Id.* at 528; see also 28 U.S.C. §1861 ("[A]ll litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes.").

"The purpose of a jury is to guard against the exercise of arbitrary power – to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of a judge." *Taylor*, 419 U.S. at 530 (*citing Duncan v. Louisiana*, 391 U.S. 145, 155 (1968)). "This prophylactic vehicle is not provided if the jury pool is made up of only special segments of the populace or if large, distinctive groups are excluded from the pool. Community participation in the administration of the criminal law, moreover, is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system. Restricting jury service to only special groups or excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial." *Id.*

In late March 2020, this Court predicted that "due to various public health directives and general health concerns," the pandemic would limit the ability of the Court to obtain an adequate cross-section of the community for jury selection." GO 2020-3 at 1. The Protocols likewise anticipate "a higher rate of excused jurors" and confirm "the Jury Division has increased monthly jury pools by approximately 40%." Protocols at 1. As the Court already recognized, automatic

exclusion of certain groups of people violates Mr. Heller's right to select a jury from a fair cross-section of the community.

The Protocols provide that potential jurors will be screened for factors that will exclude them from service. These factors, and others that will inevitably arise during the screening process, will mean large groups of people will be systematically excluded from Mr. Heller's venire. The pandemic's measurable impact on the demographic makeup of the venire, and how a court handles excusals or deferrals, implicates the Sixth Amendment's fair cross-section requirement.

> 2.   *Mr. Heller Must Have An Opportunity To Confirm, Before Trial, That He Will Be Able to Meaningfully Evaluate Juror Demeanor, Exercise His Peremptory Challenges, or Assess Batson Issues.*

According to the Protocols, prospective jurors will have to wear masks at all times while in the courthouse. In addition, if a constitutionally valid jury pool can be convened, that pool will be split into two groups: one group will join the judge and parties in Courtroom A201 while the other will watch the proceedings by live video feed from the jury assembly room. Mr. Heller and counsel, sitting in A201, cannot see or hear the jurors in the assembly room. If necessary, members of the assembly room group will move into A201 for a second round of *voir dire*, but Mr. Heller, counsel, and the Court will have had no chance to assess their demeanor during the first round.

The Supreme Court observed that "both the prosecution and the defense may be required to make fine judgment calls . . . [that] may involve a comparison of responses that differ only in nuanced respects, as well as a sensitive assessment of jurors' demeanor." *Davis v. Ayala*, 576 U.S. 257, 273 (2015) (discussing capital jury selection). "We have previously recognized that peremptory challenges are often the subjects of instinct, and that race-neutral reasons for peremptory challenges often invoke a juror's demeanor." *Id*. (citations omitted). These principles are no less applicable to non-capital jury selection.

It is impossible to make a nuanced assessment of jurors' demeanor through masks. In addition, the Court and parties will not observe half of the panel during the first round of jury selection. Without the opportunity to see the jurors' faces and observe their reactions to questioning of other jurors, Mr. Heller cannot develop challenges for cause, intelligently exercise his peremptory challenges, decide whether to lodge a *Batson* challenge to a government strike, or reply to a race-neutral reason proffered by the government in response to a *Batson* challenge.

>    3.    *Mr. Heller Must Have An Opportunity To Confirm, Before Trial, That He Will Have A Public Trial.*

The Protocols will prohibit members of the public from attending any part of the trial in person. Instead, members of the public can listen to a live audio feed of the proceedings. The Protocols do not specify how the public audio will be maintained, as a practical matter, but monitoring is necessary to enforce a sequestration order.

As discussed above, the "Sixth Amendment directs, in relevant part, that 'in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial.'" *Presley*, 558 U.S. at 212) (Sixth Amendment right to public trial extends to *voir dire*). In addition, "the public trial right extends beyond the accused and can be invoked under the First Amendment." *Id*.

In certain rare circumstances, a Court may find an exception to the public trial requirement, "but the balance of interests must be struck with special care." *Waller*, 467 U.S. at 45 (1984). Before excluding the public from a criminal trial, the Court must (1) find that the party seeking to close the hearing advances an overriding interest that is likely to be prejudiced, (2) ensure the closure is no broader than necessary to protect that interest, (3) consider reasonable alternatives to closing the proceeding, and (4) make findings adequate to support the closure. *Id*. at 48. By closing the courthouse doors to the public in every case, the Protocols do not carefully strike the balance of interests.

During the first trial, the gallery was nearly full every day of trial, and Mr. Heller expects even more spectators for the retrial. If the Court prohibits spectators pursuant to the Protocols, that rule should apply uniformly, including to "Christopher".

        4.      *Mr. Heller Must Have An Opportunity To Confirm, Before Trial, That Witness Testimony Will Be Presented In A Manner That Comports With The Confrontation Clause.*

Of all the rights conferred by the Confrontation Clause, none is more fundamental or important than the "irreducible literal meaning of the Clause: a right to *meet face to face* all those who appear and give evidence *at trial*." *Coy*, 487 U.S. at 1021 (emphasis original). The constitution requires face-to-face confrontation for good reason. First, a "witness may feel quite differently when he has to repeat his story looking at the man whom he will harm greatly by distorting or mistaking the facts." *Id.* at 1019 (internal quotation marks omitted). "It is always more difficult to tell a lie about a person to his face than behind his back." *Id*. at 1018 (internal quotation marks omitted). Second, face-to-face confrontation is the *defendant's* right and must occur to animate the other values furthered by the Confrontation Clause, such as allowing meaningful cross-examination and requiring the government to satisfy its high burden of proof. *Green*, 399 U.S. at 157 (1970) ("[The] literal right to confront the witness at the time of trial [forms] the core of the values furthered by the Confrontation Clause."); *Coy*, 487 U.S. at 1017 (Confrontation Clause requires the government to present its case through witnesses "who confront [the defendant] at trial [and] *upon whom he can look* while being tried." (emphasis added)).  Here, testimony from masked or remote witnesses will violate the Confrontation Clause, as explained in Argument I.

        5.      *Mr. Heller Must Have An Opportunity, Before Trial, To Confirm The Jury Will Be Able To Observe Him Unmasked.*

The Protocols also require Mr. Heller to wear a mask throughout the trial. "It is a fundamental assumption of the adversary system that the trier of fact observes the accused

throughout the trial, while the accused is either on the stand or sitting at the defense table. This assumption derives from the right to be present at trial, which in turn derives from the right to testify and rights under the Confrontation Clause." *Riggins v. Nevada*, 504 U.S. 127, 142 (1992) (Kennedy, J., concurring). "[T]he defendant's behavior, manner, facial expressions, and emotional responses, or their absence, combine to make an overall impression on the trier of fact, an impression that can have a powerful influence on the outcome of the trial." *Id.*

Prohibiting the jury from seeing Mr. Heller's face will deprive the jury of the opportunity to evaluate his credibility and demeanor throughout trial, thereby interfering with essential jury functions and undermining Mr. Heller's rights to due process and confrontation. Jurors should be able to see Mr. Heller's reaction to the testimony, especially given the close, personal relationships he had with many witnesses.

Further, covering the lower part of the face has "been shown to bias the perceptual inference toward more negative and less positive emotions." U.M. Mehta, G. Venkatasubramanian and P.S. Chandra, *The "mind" behind the "mask": Assessing mental states and creating therapeutic alliance amidst COVID-19*, Schizophrenia Research (2020), attached as Ex. A (citing Fischer, et. al., *Veiled Emotions: The Effect of Covered Faces on Emotion Perception and Attitudes*, Social Psychology and Personality Science 3(3), 266-273 (2012), attached as Ex. B).

### C.     These Circumstances Satisfy the Criteria for Speedy Trial Act Time Exclusions.

The Court is authorized under 18 U.S.C. § 3161(h)(7) to exclude from the time limitations in the Speedy Trial Act any delay for which the ends of justice served by the delay outweigh the best interest of the public and the defendant in a speedy trial.  One factor for the Court to consider in granting this delay is "[w]hether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of

justice."   18 U.S.C. § 3161(h)(7)(B)(i).   An additional factor, set forth in 18 U.S.C. § 3161(h)(7)(B)(iv), is whether failure to grant such a continuance "would deny counsel for the defendant . . . the reasonable time necessary for effective preparation, taking into account the exercise of due diligence."

In evaluating a request for an ends of justice continuance, "the record must clearly establish the district court considered the proper factors at the time such a continuance was granted." *United States v. Toombs*, 574 F.3d 1262, 1269 (10th Cir. 2009) (quoting *United States v. Gonzales*, 137 F.3d 1431, 1433 (10th Cir. 1998)).  The record must explain why the event identified by the moving party as necessitating the continuance results in the need for additional time. *See id.* at 1271.  Simply stating the event followed by a conclusory statement that the event necessitates further time does not satisfy the Speedy Trial Act. *See id.* at 1271-72. This Motion also arises under the unique facts and unprecedented circumstances created by the pandemic and the risk-mitigation measures adopted by the Court – these too must be factored into the analysis.

In *United States v. West*, 828 F.2d 1468, 1470 (10th Cir. 1987), the Tenth Circuit held a court should consider four factors when deciding whether to grant a continuance: (1) the diligence of the party requesting the continuance, (2) the likelihood that the continuance, if granted, would accomplish the purpose underlying the request for continuance, (3) the inconvenience to the opposing party, its witnesses, and the court resulting from the continuance, and (4) the need asserted for the continuance and the harm that could be suffered because of the court's denial of the continuance.

Defense counsel's request for a continuance satisfies the criteria in 18 U.S.C. § 3161(h)(7) and the factors in *West*. The ends of justice served by this requested delay either outweigh or serve

the best interest of the public and Mr. Heller.  Defense counsel have been diligent throughout this case, including throughout the pandemic.

It is likely this continuance would accomplish the underlying purpose of this request. Excluding 90 days from the requirements of the Speedy Trial Act will give the Court and parties nearly five months to assess the Jury Trial Protocols in light of the objections raised and further developments relating to the pandemic. A continuance also may allow Dr. Davis to testify in person and will likely allow Mr. Heller's other witness to testify in person. In addition, a continuance means the trial would not be held as already record-high infection rates continue to increase.

In addition, although a public health crisis or large-scale emergency is not specifically listed in §3161(h)(7) or *West*, this request is necessitated largely by the unprecedented challenges presented by the ongoing COVID-19 pandemic. This pandemic continues to interfere with court operations throughout the country. These unique circumstances relate to "whether the failure to grant such a continuance in the proceedings would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice." 18 U.S.C. §3161(h)(7)(B)(i).

The final *West* factor is the need asserted for the continuance and the harm that the defendant might suffer as a result of a denial.  The need for the continuance is supported by the reasons described throughout this motion.  Without the requested continuance, Mr. Heller will be forced to proceed to trial, in the midst of a pandemic, under protocols that compromise the constitutional viability of a criminal jury trial, the fair administration of justice, and the integrity of the defense function.

**CONCLUSION**

For the reasons stated here, Mr. Heller respectfully asks the Court to reconsider designating this case a pilot trial.  In the alternative, the Court should issue an order excluding 90 days from the Speedy Trial Act computations and vacate all set deadlines and trial dates. Unless the Court adopts all facts asserted here, Mr. Heller should be granted an evidentiary hearing on this motion.


Respectfully submitted,


VIRGINIA L. GRADY
Federal Public Defender



*s/ Kelly Christl*                                          *s/ David Kraut*
KELLY CHRISTL                                      DAVID KRAUT
Assistant Federal Public Defender          Assistant Federal Public Defender
633 17th Street, Suite 1000                      633 17th Street, Suite 1000
Denver, CO  80202                                    Denver, CO  80202
Telephone:  (303) 294-7002                      Telephone:  (303) 294-7002
FAX:  (303) 294-1192                                FAX:  (303) 294-1192
Email:  Kelly_christl@fd.org                     Email:  David_Kraut@fd.org
Attorney for Defendant                            Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2020, I electronically filed the foregoing **Motion to Reconsider (or Stay) Pilot Trial Designation, or to Exclude 90 Days From Speedy Trial Act Requirements** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

Patricia W. Davies, Assistant United States Attorney
Email: patricia.davies@usdoj.gov

Andrea L. Surratt, Assistant United States Attorney
Email: andrea.surratt@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Dakota Heller (via U.S. mail)

_s/ Kelly Christl_
KELLY CHRISTL
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
Email:  Kelly_Christl@fd.org
Attorney for Defendant